**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE CRONOS GROUP INC. SECURITIES LITIGATION | Civil Action No. 2:20-cv-01310-ENV-SIL <br><br> <u>JURY TRIAL DEMANDED</u> |

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

I.      NATURE OF THE ACTION ........................................................................ 2

        A.      The Company ................................................................................. 2

        B.      The Fraud ....................................................................................... 3

        C.      The Revelation .............................................................................. 5

II.     JURISDICTION AND VENUE ................................................................ 6

III.    PARTIES ................................................................................................. 7

IV.     SUBSTANTIVE ALLEGATIONS .......................................................... 8

        A.      Company Overview ...................................................................... 8

        B.      Cronos' History and Capital Raising Activity ........................... 10

        C.      Cronos' Posture Entering 2019 and the Need for Revenue Growth ................ 12

        D.      In 2Q19 Cronos Begins Artificially Inflating Its Revenue ................. 14

                1.      Cronos Publishes its 1Q19 Results ................................... 14

                2.      The MediPharm Agreements .............................................. 15

                3.      Defendants Begin Fraudulently Double Counting Revenue.................... 18

                4.      Cronos Falsely Posts Rapidly Growing Revenue During the
                        Class Period ...................................................................... 22

V.      DEFENDANTS' MATERIALLY FALSE AND MISLEADING
        STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ........................ 23

        A.      May 9, 2019 – 1Q19 Financial Results.............................................. 24

        B.      August 8, 2019 – 2Q19 Financial Results .......................................... 28

        C.      November 12, 2019 – 3Q19 Financial Results .................................... 29

VI.     THE FRAUD BEGINS TO UNRAVEL .................................................. 31

        A.      February 24, 2020: Cronos Delays its Earnings Announcement
                Without Explanation ...................................................................... 31

        B.      March 2, 2020: Cronos Credits its Reporting Delay to Accounting
                Issues ............................................................................................ 31

C.  March 17, 2020: Cronos Announces a Massive Restatement................................ 34

D.  March 19, 2020: SEC Inquiry Into Cronos' Dealings with MediPharm.................................................................................................... 37

E.  March 30, 2020: Cronos Finally Discloses the Truth, Filing its Restated 10-K and Disclosing the Existence of a Material Weakness ............................................................................................ 38

    1.  The Restatement of Wrongfully Recognized Revenue............................ 38

    2.  The Inadequate Internal Controls............................................... 41

VII.    ADDITIONAL ALLEGATIONS OF SCIENTER........................................ 44

VIII.   CONTROL PERSON ALLEGATIONS................................................ 47

IX.     LOSS CAUSATION................................................................ 48

X.      APPLICABILITY OF PRESUMPTION OF RELIANCE: *AFFILIATED UTE* AND FRAUD-ON-THE MARKET PRESUMPTIONS........................... 50

XI.     NO SAFE HARBOR .............................................................. 52

XII.    CLASS ACTION ALLEGATIONS .................................................. 53

XIII.   COUNTS........................................................................ 55

COUNT I Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants ...................................................... 55

COUNT II Violation of Section 20(a) of the Exchange Act Against the Individual Defendants .................................................................................... 56

XIV.    PRAYER FOR RELIEF ........................................................... 58

XV.     JURY TRIAL DEMANDED ........................................................ 58

Court-appointed Lead Plaintiff Keith D. Norman ("Lead Plaintiff" or "Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned counsel, hereby brings this Consolidated Amended Class Action Complaint (the "Complaint") against Cronos Group Inc. ("Cronos" or the "Company"), Michael Gorenstein, Cronos' Chairman, President and Chief Executive Officer ("CEO") and Jerry F. Barbato, Cronos' Chief Financial Officer ("CFO").  The allegations herein are based on Plaintiff's personal knowledge as to his own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of Lead Counsel, which includes a review of: U.S.  Securities and Exchange Commission ("SEC") filings by Cronos; securities analysts' reports and advisories about the Company; consultations with former Cronos employees, press releases, and other public statements issued by the Company; media reports about the Company; other publicly available information; and consultation with experts in the cannabis industry and in areas of accounting and damages.  Lead Counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to—or are exclusively within the custody or control of—the Defendants.  Plaintiff believes that substantial evidentiary support will exist for the allegations herein after a reasonable opportunity for discovery.[1]  On behalf of itself and the class it seeks to represent, Plaintiff alleges the following.

---

[1] This Complaint uses the following conventions, which also apply to any document adopting the definitions used in this Complaint.  Quarters are identified in the format quarter number, "Q," last two digits of the year – so for example the First Quarter of 2019, is "1Q19."  The symbol C$ refers to Canadian dollars and the symbol US$ refers to United States dollars.  If a figure is quoted in Canadian dollars, followed by ("US$_"), the U.S. dollar figure is calculated at a conversion ratio of $1.42 Canadian dollars per U.S. dollar, which was the approximate exchange rate on the last date of the Class Period.

## I.    NATURE OF THE ACTION

1.      This is a paradigmatic federal securities class action alleging claims for flagrant accounting fraud.  The case is brought on behalf of all persons and entities who purchased or otherwise acquired the publicly traded securities of Cronos on a U.S. Stock Exchange between May 9, 2019, and March 30, 2020, inclusive (the "Class Period"), and were damaged thereby. This action seeks to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top executives.

2.      Throughout the Class Period, Defendants caused Cronos to report artificially inflated revenues with an astoundingly simple accounting fraud involving booking revenue for several massive sales without disclosing to the market that those sales were simply fabrications, invented to inflate Cronos' reported revenues.  As the fraud unraveled, Cronos was forced to issue *massive restatements* reducing its 1Q19 and 3Q19 revenues by *39%* and *40%*, respectively. The Company also was forced to disclose a material weakness in its internal controls as those controls had failed to identify and stop these blatant violations of applicable accounting rules.

### A.    The Company

3.      Cronos is a Canadian medical and legal marijuana company that operates in several international markets, although most of its business is in Canada and the United States. Cronos sought to establish various brands of cannabis products targeting different markets, develop a supply chain, and develop valuable intellectual property related to cannabis products.

4.      During the Class Period, Cronos described itself as a "development stage" company.  It fit that description well.  It was targeting a rapidly growing industry, and had a potentially strong market position and a growth-oriented business plan.

- 2 -

5.      Like most development stage companies, Cronos was not profitable, and its net income was less important to its valuation than its ability to grow revenues.  Between the end of 2016 and 2018, the Company grew its revenues from approximately US$419,000 to approximately US$12 million.

6.      Prior to the Class Period, Cronos raised capital to fund its growing business including through equity offerings and loans.  Then, in the 4Q18, Cronos announced it was receiving a US$1.8 billion investment by U.S. based Altria Group ("Altria").  This investment increased Cronos' assets from under US$200 million to about US$2 billion.  The Altria investment was expected to lead to much faster revenue growth for Cronos, as it meant Cronos had more resources to deploy in generating growth.  It also heightened the pressure on Cronos to deliver on those expectations, as any reasonable return on investment, after receiving the US$1.8 billion, would require fast growth.

**B.      The Fraud**

7.      Beginning in 1Q19, Cronos artificially inflated its revenues by booking revenue from fictitious sales and treating commercial relationships that did not involve genuine sales as if they were real sales and met the requirements for revenue recognition.  The Company then booked the fictitious "purchases" (in reality, buying back what it had pretended to sell), to offset those sales from a net income perspective.

8.      On May 14, 2019, Cronos announced that it had entered into two agreements with MediPharm Labs ("MediPharm").  MediPharm claims to specialize "in the production of purified, pharmaceutical-quality cannabis oil and concentrates and advanced derivative products."

(a)      The "Supply Agreement" required Cronos to buy at least C$30 million (US$21,126,760) of processed Cannabis from MediPharm and anticipated potential additional

- 3 -

purchases beyond that amount.  By comparison, this C$30 million expense was more than twice Cronos' aggregate cost of sales, marketing, and R&D budget for the prior two years combined. In other words, the relationship with MediPharm was clearly a core operation of Cronos and a matter that would be thoroughly known to its senior management, barring gross recklessness.

(b)     The second aspect of the relationship with MediPharm disclosed in the May 14, 2019, announcement was the "Tolling Agreement."  This agreement called for Cronos to transfer product to MediPharm for processing, in exchange for a fee (*i.e.*, a "toll").  As Cronos expressly stated, this was a "fee for service" arrangement.

9.      As was eventually revealed, Cronos was booking its transfers of product to MediPharm as sales.  This was a blatant violation of applicable accounting standards because MediPharm was not "buying" product from Cronos.  Instead, MediPharm was processing product for Cronos.  MediPharm was not a customer of Cronos; MediPharm was a service provider and supplier for Cronos.

10.     Furthermore, even if one could treat the cannabis being transferred as a sale, the transactions with MediPharm would still amount to an economically insubstantial "round-trip" transaction.  The details of the relevant accounting standards are explained herein, but in summary, it is a basic accounting principle that when one company has a relationship with a second company wherein they both sell product and buy product from each other, those transactions need to be netted against each other to avoid inflating revenues, if the transactions lack commercial substance.

11.     The accounting rules on round-trip transactions are neither complex nor a matter of interpretation.  Cronos was not miscalculating the portion of a "sale" that needed to be zeroed out.  It was failing to zero out these round-trip "sales" at all.  This served the Company's short-

term interests by providing the false appearance of revenue growth, but misled investors by creating the false impression that the Company was successfully achieving (actual and real) substantial revenue growth.  The following graphic summarizes the flow of cannabis product between Cronos and MediPharm pursuant to the Supply Agreement and Tolling Agreement.



### C.    The Revelation

12.    The first hint of Defendants' fraud occurred on February 24, 2020, when Cronos announced that it would need to delay its earnings call.  This disclosure was a clear indicator to investors of soon-to-be-disclosed accounting problems.  On the news that the Company's results would be delayed, Cronos' stock price declined by *10.9%*.

13.    Then, on March 2, 2020, Cronos announced that its Annual Report on SEC Form 10-K would not be filed on time.  Instead, it filed an incomplete placeholder 10-K, which filing did not include audited financial results.  Notably though, this filing wrongfully (but revealingly) disclosed that MediPharm was one of its three biggest customers in 2019.  This was notable because Cronos' relationship with MediPharm should not have been generating sales for Cronos at all; MediPharm was a vendor performing services for Cronos and selling product to Cronos. Again, this disclosure was caused by and clearly indicated the forthcoming accounting problems. On this news, Cronos' stock price declined by *11.6%*.

14.     On March 17, 2020, after the market closed, Cronos again announced that it would need to continue delaying the filing of its Annual Report.  It also disclosed that the fraudulent accounting of revenues caused Cronos' results to be dramatically overstated.  It previewed that it would be issuing a ***39% downward restatement*** and a ***40% downward restatement*** in 1Q19 and 3Q19, respectively.  This news resulted in a dramatic ***18.5% decline*** in Cronos' stock price.

15.     On March 19, 2020, it was reported that Cronos had instructed its employees to retain certain records, including records of transactions, negotiations, and other dealings with MediPharm, due to an SEC inquiry.  Further details about the inquiry are not yet public, but the SEC inquiry is ongoing.

16.     Finally, on March 30, 2020, Cronos finally published its completed 10-K for 2019 with audited financials in which the Company officially restated its revenue.  This filing provided further details on Defendants' misconduct and revealed that Cronos' auditor had determined that there were "material weaknesses" in its internal controls for financial reporting. Additionally, whereas Cronos had previously disclosed MediPharm as one of its three largest customers it was forced to remove MediPharm from that list due to the elimination of Cronos' fake sales to MediPharm.  On this news, Cronos' stock price ***declined by 10.5%***.

17.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

18.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

- 6 -

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

20.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

21.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the NASDAQ.

III.    PARTIES

22.     As set forth in the Certification previously submitted to the Court (ECF No. 19-3), during the Class Period, Court-appointed Lead Plaintiff Keith D. Norman acquired Cronos securities on the NASDAQ at artificially inflated prices and was damaged upon the revelation of the alleged corrective disclosures.

23.     Defendant Cronos is incorporated in Ontario, Canada, and the Company's principal executive offices are located at 720 King Street West, Suite 320, Toronto, Ontario, Canada M5V 2T3.  Cronos' securities trade on the NASDAQ under the ticker symbol "CRON." Cronos owns a variety of subsidiaries within the United States.

24.     Defendant Michael Gorenstein ("Gorenstein") has served as Cronos' Chairman, President and Chief Executive Officer ("CEO") at all relevant times.  Prior to leading Cronos, Defendant Gorenstein was the General Counsel at a New York based investment fund and prior to that he was a corporate attorney at Sullivan and Cromwell LLP.  Defendant Gorenstein participated in each of the Company's quarterly earnings conference calls described herein. Defendant Gorenstein was a direct and substantial participant in the fraud.

- 7 -

25.     Defendant Jerry F. Barbato ("Barbato") has served as Cronos' Chief Financial Officer ("CFO") at all relevant times.  Prior to joining Cronos, Defendant Barbato held various roles at Altria, including the role of "Finance Director."  Prior to his time at Altria, Defendant Barbato was a Senior Auditor for NACCO Industries.  He has degrees in accounting and business administration.  According to his public LinkedIn profile, he is located in Los Angeles California.  Defendant Barbato participated in each of the Company's quarterly earnings conference calls described herein.  Defendant Barbato was a direct and substantial participant in the fraud.

26.     Defendants Gorenstein and Barbato are sometimes referred to herein collectively as the "Individual Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Company Overview

27.     Cronos, formerly known as PharmaCan Capital Corp., is a multi-national cannabinoid company engaged in nearly all aspects of the cannabis industry, including the cultivation, manufacturing, and marketing of cannabis, cannabis-derived products, and hemp-derived products for both medical and adult-use purposes.  It is part of the growing industry of companies seeking to capitalize on changing legal regimes opening up the markets for cannabis products.  The Company serves several segments of the cannabis industry, including wellness, adult-use, and hemp-derived products.  A general picture of these businesses can be illustrated by reviewing its major brands:

(a)     PEACE NATURALS™ ("Peace Naturals") is a wellness brand sold in Canadian and non-U.S. international markets focused on medical cannabis.  According to the Company, Peace Naturals "is focused on building and shaping the global cannabis wellness market and promoting a holistic approach to wellness."

(b)     Spinach™ ("Spinach") is "geared towards a wide range of consumers who are looking for entertaining, fun ways to enhance activities."

(c)     COVE™ ("Cove") is positioned as the Company's premium adult-use cannabis brand, which is grown indoor in strain-specific grow rooms, which potentially allows for higher quality product.

(d)     Lord Jones™ ("Lord Jones") provides hemp-derived products in the U.S, including CBD products, supplements and cosmetics products that are distributed online and to over 900 stores and retail channels, such as Sephora, Neiman Marcus, and SoulCycle.  CBD is a compound found in cannabis, and Lord Jones' CBD products are marketed as offering certain health or psychological effects, but do not contain significant amounts of the compound THC, which is responsible for many of the psychoactive affects associated with marijuana use.  In the United States, CBD has a different legal status from cannabis products containing THC.

(e)     PEACE+™ ("PEACE+") is the Company's U.S. hemp-derived CBD brand, which as of March 30, 2020 was still under development and its products were not yet available for sale.

28.     Cronos reports its business through two primary business markets: "United States" and "Rest of World," which, for the fiscal year ending on December 31, 2019, represented 14.2% and 85.8% of the Company's net revenue, respectively.  However, the Rest of World segment is largely composed of Canada, which represents 99.1% of the reported net revenue from that segment.   Therefore, its overall revenue breakdown for the fiscal year ending December 31, 2019 was as follows:

| Cronos' 2019 Revenue Displayed by Segment and by Country | | | |
|---|---|---|---|
| **Segment** | **United States** | **Rest of World** | |
| 2019 Revenue | US$3,364,000 | US$20,386,000 | |
| 2019 % of Revenue | 14.2% | 85.8% | |
| | | | |
| **Countries** | **United States** | **Canada** | **Other** |
| 2019 Revenue | US$3,364,000 | US$20,202,526 | US$183,474 |
| 2019 % of Revenue* | 14.2% | 85.1% | 0.8% |
| * These numbers add up to 100.1% due to rounding. | | | |

29.    In Canada, Cronos sells dried cannabis and cannabis extracts directly to patients through Peace Naturals.  These patients are typically sourced through physician and clinic referrals or word-of-mouth recommendations from existing patients.  Cronos also sells dried flower, pre-rolls and cannabis extracts (in the form of tinctures and vaporizers) through its adult-use brands, COVE and Spinach.

30.    In the Rest of World market (excluding Canada), Cronos services Europe through sales of Peace Naturals branded cannabis to pharmaceutical companies, Australia and Asia-Pacific Latin America through sales of Peace Naturals branded cannabis by way of Australian Office of Drug Control (the "ODC"), and plans to service both Israel and Latin America through Cronos Israel and NatuEra S.à.r.l. ("NatuEra"), which are both joint ventures.

31.    In the United States, Cronos is engaged in the sale of cannabis-derived products such as CBD.  However, Cronos does not engage in any commercial activities related to the cultivation, distribution, or possession of U.S. Schedule I cannabis in the U.S.

**B.    Cronos' History and Capital Raising Activity**

32.    Cronos was incorporated on August 21, 2012 under the Business Corporations Act (Ontario) as 2339498 Ontario Inc.  Later in 2012, the Company changed its name from 2339498 Ontario Inc. to Searchtech Ventures Inc.

33.     On December 10, 2014, Cronos Group closed a deal with Hortican Inc. ("Hortican"), a company whose business model was to invest in medical cannabis companies in Canada, pursuant to which the shareholders of Hortican completed a reverse takeover of the Company.  Immediately prior to the completion of the deal with Hortican, the Company changed its name to PharmaCan Capital Corp.

34.     On October 6, 2016, the Company announced it would thereafter conduct business under the name "Cronos Group Inc."  In 2016, the Company closed two private placements, which raised, collectively, approximately C$25 million (US$17.6 million).

35.     In 2017, the Company made several additional capital raises, selling shares and raising about C$49.5 million (US$34.9 million).  It also secured a large construction loan related to Peace Naturals.  On September 12, 2017, the Company announced that it was admitted into the Nasdaq International Designation program under the symbol OTC – Nasdaq International Designation: PRMCF.

36.     In January 2018, Cronos issued additional equity, raising another C$46.0 million (US$32.4 million). On February 26, 2018, the Company announced that trading of its common stock would be elevated from the Nasdaq International Designation program to the NASDAQ. The next day, the common stock began trading on the NASDAQ under the trading symbol "CRON."

37.     In April 2018, Cronos sold further equity raising another 10,420,000 common stock, generating over C$100 million (US$70.4 million) for the Company.  The common stock were offered in the U.S. pursuant to the Company's effective registration statement on Form F-10 filed with the U.S. SEC and in Canada by way of a short form prospectus offering.

38.     On May 22, 2018, the Company announced that the trading of its common stock in Canada would be elevated to a higher listing tier on the Toronto Exchange (from the TSX-V to the TSX).  The next day, the Company's common stock began trading on the TSX under the trading symbol "CRON."

39.     In December of 2018, it was announced that Altria Group would invest about US$1.8 billion dollars to buy a 45% stake in Cronos.  The huge investment would also give Altria certain warrants to buy an additional stake in Cronos—up to 55%— at a price of US$19 per share.  This huge investment would later be closed – as planned. On March 8, 2019, Cronos announced the closing of the approximately *US$1.8 billion* investment in the Company by Altria.  The same day, Cronos repaid its outstanding debt under its outstanding credit facility.

40.     The Company claims that the "strategic partnership with Altria provides Cronos with additional financial resources, product development and commercialization capabilities, and deep regulatory expertise to better position the Company to compete in the global cannabis industry."  The Company and Altria also entered into an investor rights agreement, whereby Altria has certain governance rights and agreed to make Cronos Group its exclusive partner for pursuing cannabis opportunities globally.

**C.     Cronos' Posture Entering 2019 and the Need for Revenue Growth**

41.     Cronos entered 2019 in a highly unusual position due to its successful capital raising activities.  Factoring in the massive cash injection from Altria – Cronos had grown its balance sheet tremendously.  However, its actual performance remained tiny in comparison.

42.     The following table shows Cronos' growth in assets, revenue, and profit for the years 2015, 2016, 2017:

| Cronos' Assets, Revenue and Net Income at Year End | | | | |
|---|---|---|---|---|
| | **FY15** | **FY16** | **FY17** | **FY18** |
| **Assets** | US$10,641,000 | US$31,922,000 | US$74,259,000 | US$183,471,000 |
| **Revenue** | - | US$419,000 | US$3,147,000 | US$12,121,000 |
| **Net Income** | US$303,000 | US$ (899,000) | US$ (1,483,000) | US$ (21,817,000) |
| **Ratio of Assets to Revenue** | N/A | 76x | 24x | 15x |

43. However, the massive injection of cash by Altria heightened the need for Cronos to show corresponding revenue growth. The following table shows the same figures as the previous chart, but adds the incoming cash from Altria to the 4Q18 figure, merely to illustrate the scale of that investment at the time it was announced.

| Adjusted: Cronos' Assets, Revenue and Net Income at Year End | | | | |
|---|---|---|---|---|
| | **FY15** | **FY16** | **FY17** | **FY18\*** |
| **Assets** | US$10,641,000 | US$31,922,000 | US$74,259,000 | US$1,983,471,000 |
| **Revenue** | - | US$419,000 | US$3,147,000 | US$12,121,000 |
| **Net Income** | US$303,000 | US$ (899,000) | US$ (1,483,000) | US$ (21,817,000) |
| **Ratio of Assets to Revenue** | N/A | 76x | 24x | **164x** |
| \* Modified to add the forthcoming US$1.7 billion cash investment from Altria as an asset. | | | | |

44. As the prior charts also show, Cronos was a growth stage company that had routinely posted losses while also posting considerable revenue growth. This is typical of growth stage companies, which are expected to burn through invested cash, while they grow their operations to scale and eventually become profitable. The Altria investment was a huge injection of new investor cash and carried with it the expectation that Cronos would invest the new cash in ways that dramatically grew revenue.

45. Analysts covering Cronos considered a wide variety of information about the Company, but focused heavily on its revenue growth when considering its value, recognizing that it would take longer to reach profitability.

46. For example, on December 7, 2018, the analyst firm Canaccord Genuity stated that the Altria investment would provide "[c]apital to accelerate expansion and global growth"

- 13 -

and Canaccord Genuity increased its estimates regarding its expectations of Cronos' revenue, following the investment by Altria.  Similarly, on March 5, 2019, the analyst firm Cowen issued a report on Cronos, valuing the Company by looking at its stock price as a multiple of its revenue.  Specifically, Cowens stated that it set a price target "reflecting" a particular revenue multiple.  And on March 26, 2019, Canaccord Genuity reduced their overall guidance for Cronos on the basis that its 4Q18 revenue had been lower than they expected, further demonstrating the significance of revenue as a metric that was highly relevant to the Company's public valuation.

**D.     In 2Q19 Cronos Begins Artificially Inflating Its Revenue**

**1.     Cronos Publishes its 1Q19 Results**

47.     On May 9, 2019, Cronos announced revenue of C$6,470,000 (US$4,556,338) for 1Q19, as compared to 1Q18 of C$2,945,000 (US$2,073,943) and compared to 4Q18 of C$5,604,000 (US$3,946,478).

48.     On May 9, 2019, Cronos hosted its 1Q19 earnings call.  During that earnings call, Defendant Barbato stated that: "The company reported net revenue of [C]$6.5 million in the first quarter of 2019, an increase of 15% from the fourth quarter of 2018."  Also during Cronos' 1Q19 earnings call, Defendant Barbato reiterated the significance of revenue as a measure of Cronos' performance, stating: "As we look to 2019, we see that quarter-over-quarter increases will slowly scale in the first half of the year as we ramp up production and with momentum for revenue growth building in the second half of the year."

49.     On May 9, 2019, Cowen issued an analyst report that significantly focused on Cronos' revenue figures.  The report stated that Cronos' 1Q19 revenue had been slightly below analyst consensus and that revenue growth was primarily due to the sale of dry cannabis and explained how the firm's revised revenue estimates support its revised price target for the company.   Similarly, that same day the analyst firm Jeffries issued a report that focused heavily

on Cronos' revenue, stating the Company had come in slightly ahead of their expectations, but that it had still underperformed its peers. This focus on revenue figures further demonstrates the significance of those figures to Cronos' investors, and the pressure Cronos was under to meet the analyst expectations of revenue growth.

50.     As would later be revealed, without the huge contribution of falsely recognized revenue, Cronos would have produced results far below analyst expectations in 1Q19.

### 2.     The MediPharm Agreements

51.     MediPharm specializes in the production of purified, pharmaceutical quality cannabis oil and concentrates and advanced derivative products. MediPharm is a publicly traded company based in Canada that trades on the Toronto Stock Exchange.

52.     May 14, 2019, Cronos announced it had entered into two agreements with MediPharm. The press release stated:

> MediPharm Labs will supply Cronos Group (CRNS) with approximately [C]\$30 million [(US\$21.1 million)] of high-quality private label cannabis concentrate over 18-months, and, subject to certain renewal and purchase options, potentially up to [C]\$60 million [(US\$42.3 million)] over 24-months. In addition, Cronos Group has selected MediPharm Labs' state of the art extraction facility in Barrie, Ontario, as a preferred partner to fulfill certain of its processing needs, under a separate tolling arrangement.

53.     The press release also stated that Cronos had "entered into a multi-year supply agreement with MediPharm," whereby MediPharm agreed to supply Cronos with cannabis concentrate, or bulk resin (the "Supply Agreement"). In the same press release, Cronos announced that it had also entered into a multi-year tolling agreement with MediPharm, whereby Cronos would supply MediPharm with dried cannabis to convert into bulk resin (the "Tolling Agreement"). These two agreements are referred to as the "MediPharm Agreements."

54.     The **Supply Agreement**, sometimes also referred to as the "Bulk Resin Supply Agreement," is an agreement in which Cronos is **purchasing** product from MediPharm.  The agreement calls for Cronos (acting through its wholly-owned subsidiary, Peace Naturals), to "purchase a minimum of approximately [C]\$30 million of cannabis concentrate from MediPharm . . . over the course of 18-months.  Peace Naturals will also have a right of first offer to purchase an additional approximately [C]\$18 million [(US\$12.7 million)] of cannabis concentrate over the same period, subject to the availability of such supply from MediPharm." With the option for mutual extension, "the total potential aggregate value of the Agreement to over [C]\$60 million to the end of April, 2021."  In other words, under the Supply Agreement, Cronos was agreeing to buy between C\$30 million and C\$48 million (US\$21.1-\$33.8 million) of cannabis concentrate – and the parties could extend the agreement in a way that could result in Cronos buying C\$60 million (US\$42.3 million).

55.     The **Tolling Agreement** states that "Peace Naturals will supply bulk quantities of dried cannabis to MediPharm for processing on a fee for service basis into bulk resin or other premium cannabis oil derivative products.  The Tolling Agreement has a two-year term."  In other words, Cronos would supply MediPharm with unrefined cannabis and MediPharm would receive a "fee" as payment for the "service" of processing that product for Cronos.  Generally speaking, the term "tolling agreement" in a context like this, refers to an arrangement where one party to the agreement (here, Cronos), gives raw material to the other party (here, MediPharm) to be processed for a specified fee (*i.e.*, the "**toll**"), and then the processed product is returned to the

party that paid to have the product processed.   The term "tolling" agreement is not a reference to something taking place over a period of time or "tolling" the clock on anything.[2]

56.     The analyst firm Canaccord Genuity summarized the agreements between Cronos and MediPharm (in an analyst report published August 8, 2019), stating that under the Supply Agreement Cronos would "receive ~C$30M of cannabis concentrate over the next 18-months (expandable to ~$60M over 24-months)" and that under the Tolling Agreement it would "send MediPharm dried cannabis to process into oil derivative products on a fee for service basis."

57.     These agreements were of a sufficiently large scale to constitute core aspects of Cronos' business.  Two simple comparisons highlight the significance of the contract to Cronos.

(a)     For the 24 months of 2017 and 2018 Cronos' combined cost of sales, marketing, and R&D budget was about US$8 million.  Under the 18-month Supply Agreement aspect of the MediPharm Agreements – even assuming the extra US$18 million clause and extensions were not utilized – Cronos would be paying US$21.1 million on the one agreement with MediPharm.  Thus, the Supply Agreement required Cronos to spend (in 18 months) more than twice its entire budget for comparable expenses over the prior two years, even taking the widest plausible view of comparable expenses.  The CEO and CFO of a publicly traded company

---

[2] As explained in the following sentences, a former employee of Cronos recounted facts establishing that, even before the announcement of the Tolling Agreement, MediPharm and Cronos had a similar relationship.  The former employee was employed by Cronos from August 2017 through June 2020 as an Integrated Pest Management Technician and reported to Andrea Desilva, Head of Pest Management.  This former employee explained that Cronos was growing its own cannabis that could not be used or sold as flower because it was so high in bacteria and did not pass Health Canada's standards.  This former employee further explained that, bad cannabis was processed into oils because it could be sold in that form after processing. The former employee went on to say that because Cronos had so much bad cannabis, their oil processing department could not keep up with the supply, and by late 2018/early 2019 Cronos had a relationship with MediPharm, where Peace Naturals would send cannabis flower to MediPharm, so that MediPharm could process it into oil for Cronos.  This former employee also recalled that Peace Naturals threatened to break off this relationship with MediPharm in late 2018 because MediPharm was poaching Cronos' more experienced employees, but that the relationship ultimately continued.

would obviously be aware of, and indeed familiar with the details of, a relationship of this magnitude to their business, barring gross recklessness.

(b)     Under the Supply Agreement, Cronos was buying product with an eye toward reselling it at a profit, perhaps after further processing, packaging and so on.  Regardless of what other expenses were needed to bring the purchased product to market, Cronos was presumably expecting to (at least) offset this US$21.1 million in purchases, with revenue of at least US$21.1 million, when Cronos eventually sold the product it was purchasing to its customers.  It is reasonable to consider how significant US$21.1 million in revenue would have been to Cronos' operations at the time.  For the ***three years*** before entering into the agreements (2016-18), Cronos had total revenue of US$15,687,000.  In other words, this one Supply Contract was expected to generate sales that were far greater than Cronos' revenue over the entire prior three years of operations.  Again, barring gross recklessness, the Individual Defendants would have been intimately aware of the details of such an economically significant arrangement for Cronos.

### 3.     Defendants Begin Fraudulently Double Counting Revenue

58.     Unbeknownst to Cronos investors, the MediPharm Agreements were part of a course of conduct to massively overstate Cronos' revenue during the Class Period.  The allegations in this Section are derived from Cronos' later truthful revelations and the analysis of accounting experts retained by Plaintiff.

59.     The Tolling Agreement called for Cronos to transfer product to MediPharm, so that MediPharm could process that product on a "fee for service basis."  In practice, Cronos instead transferred product to MediPharm and booked those transactions as sales that generated ***revenue***.  This was improper for, at least, the following two reasons.

- 18 -

60.  **First**, the Tolling Agreement was meant to be conducted on a "fee for service" basis.  This language makes it perfectly clear that the agreement was **_not_** a sales agreement. When you pay someone a "fee" for performing a service on an asset you own, you do not book that transaction as a sale.  For example, if someone dropped their car off at a mechanic to pay for the **_service_** of an oil change and then picked up their car—it would be obviously absurd to record that as having "sold a car without oil" and "purchased a car with oil."  Here too, under the Tolling Agreement, Cronos was **_purchasing services_** (*i.e.*, the processing of dried cannabis into bulk resin).  Despite this, Cronos chose to record the transfer of product to MediPharm as sales, which made no sense given the existence of the Tolling Agreement.

61.  **Second**, booking sales as a result of the transfer of product to MediPharm clearly constituted a "round-trip" transaction and under basic accounting rules, booking round-trip transactions as revenue generating sales is blatantly impermissible.

62.  Cronos' originally reported financial statements through September 30, 2019 (*i.e.*, prior to the restatement) applied International Financial Reporting Standards ("IFRS").  IFRS are issued by the International Accounting Standards Board ("IASB").  IFRS also include international accounting standards ("IAS") that were issued by the Board of the International Accounting Standards Committee.[3]

63.  Cronos disclosed that it applied IFRS 15 for purposes of revenue recognition through September 30, 2019.[4]  Most business transactions involve exchanges of cash or other

---

[3] As of December 31, 2019, the Company applied U.S. GAAP in presenting its financial statements. Cronos also presented financial data in Canadian dollars through September 30, 2019. Effective December 31, 2019, Cronos became a domestic issuer pursuant to SEC rules, issued financial statements in accordance with U.S. GAAP, and presented its financial data in U.S. dollars. *See* Financial Statements for the period ended September 30, 2019, p.37.

[4] Thereafter, Cronos applied the comparable U.S. Generally Accepted Accounting Procedures ("GAAP") standard, ASC 606.

monetary assets or liabilities for goods and services. Some transactions, however, involve exchanges with another entity of non-monetary assets and IFRS 15 does not apply to non-monetary transactions, which are governed by IAS 18 (with reference to IAS 16).

64.     When parties engage in both purchases and sales, the transactions are evaluated to assess whether they were linked, or entered into in contemplation of each other. Under the applicable standards, factors that may indicate the agreements are linked include: (1) transactions were entered into simultaneously and (2) relative certainty that reciprocal transactions will occur. In addition, the purpose of the transaction is relevant to consider. Here, Cronos' temporary transfer of inventory to MediPharm was joined with an expectation to reacquire inventory from MediPharm to sell to third-parties. This arrangement resulted in a reciprocal transfer, which lacks commercial substance. Generally, an exchange transaction has commercial substance if the risk, timing, and amount of the cash flows associated with the asset received differ from those of the asset transferred.

65.     Under certain conditions, non-monetary transactions may be reported based on the fair value of the assets involved. Alternatively, the carrying amount of the surrendered asset is used as the basis to report the value of the transaction. Specifically, the carrying amount of the non-monetary asset surrendered must be used to measure *either* (1) an exchange of product held in the ordinary course of business for product that will be sold in the same line of business to customers other than the parties to the exchange *or* (2) transactions that lack commercial substance. The term carrying amount refers to the amount that Cronos had already recorded in its financial statements. In other words, Cronos should have recorded the exchange, but should not have booked the transaction as a sale generating revenue. An exchange for goods or services of a similar nature and value is not regarded as a transaction that generates revenue. The

applicable guidance states that the transfer of raw goods or work in process inventory in exchange for finished goods or inventory within the same line of business, is not a transaction that generates a sale or revenue.  *See* ASC 845-10-25-3A; IAS 18.12; ASC 845-10-30-15.

66.     These rules exist to prevent companies from artificially inflating revenue through transfers of inventory.  For example, if Company A exchanged inventory with Company B, the result is that it simply has different inventory to sell.  If Company A reported revenue on the transaction with Company B and subsequently reported revenue when it sold the inventory acquired from Company B, then Company A would have inappropriately inflated revenues and costs.  It is well accepted that transactions that lack substance should not result in the recognition of revenue.

67.     As Cronos' eventual revelations made clear, during the Class Period, it improperly booked transactions that were lacking in economic substance.  Transferring assets to MediPharm and the receipt of comparable assets back from MediPharm are textbook examples of transactions that lack economic substance.  Ultimately, the transactions culminating in Cronos' restatement were round-trip transactions.  Round-trip transactions are a type of non-monetary transactions that potentially inflate revenue.  These transactions have regularly been scrutinized by the SEC.  For example, a well-known SEC Speech states:[5]

> The staff is concerned when it appears Company A has taken $1 million out of its left pocket only to receive that $1 million back in its right pocket, and wants to record the $1 million received in revenue. For example, assume that Company A pays Company X $1 million to enter into the purchase and supply arrangement under which Company A agrees to supply a product to Company X and Company X agrees to purchase a specified minimum volume of product from Company A. Company A gets the $1 million that it gave Company X back through Company X's guaranteed product

---

[5] Speech by SEC Staff: Revenue Recognition, Lynn Turner, May 31, 2001.

purchases. ***The staff questions how these types of "round-trip" arrangements result in revenue, and whether, in substance, they are sham transactions engineered solely to inflate the revenue line in the income statement.***

68.     In other words, round-trip transactions result in artificial increases to sales when, in fact, such sales are neither legitimate nor representative of sustainable revenue trends.

69.     Regardless of whether the accounting is viewed as impermissibly booking the **_purchase_** of services **as the sale of goods**, or whether the accounting is viewed as counting contracts with **_no economic substance_** as **legitimate sales**, Cronos was impermissibly counting its transfer of product to MediPharm as revenue.

### 4.     Cronos Falsely Posts Rapidly Growing Revenue During the Class Period

70.     As a result of Cronos' fraudulent recognition of revenue from its non-existent sales, including its non-existent sales to MediPharm, Cronos' revenue was artificially inflated during the Class Period.  In addition to posting inflated revenue, Cronos made a variety of assurances (*see* Section V), that it had adequate internal controls and complied with applicable accounting standards.

71.     Specifically, Cronos posted strong results for the first half of 2019 incorporating its false revenue from the false sales in 1Q19.  On August 8, 2019, Cronos hosted its 2Q19 earnings call.  During that earnings call, Defendant Barbato reiterated the importance of revenue, stating that Cronos was "focus[ed] on measures that highlight the operating performance of the business, including . . . net revenue."  Defendant Barbato also stated: "We expect the momentum for quarter-over-quarter revenue growth to build in the second half of the year as we ramp up production in our facilities and increase third-party purchases."

72.     Cronos posted even stronger revenue figures in 3Q19, which included additional false sales.  On November 12, 2019, Cronos announced revenue of C$12,700,000

(US$8,943,661) for 3Q19, as compared to C$3,760,000 (US$2,647,887) for 3Q18.  On

November 12, 2019, Cronos hosted its 3Q19 earnings call.  During that call, Defendant Barbato

stated: "The company reported net revenue of [C]$12.7 million in the third quarter, a 24%

increase from the second quarter."

73.     The following table shows Cronos' annual revenue growth and percent change

quarter-over-quarter for the relevant quarter (in Canadian dollars):



## V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

74.     The statements in ***bold-italics*** text within this Section are alleged to be materially

false, misleading, and/or incomplete.  This section does not purport to identify every statement

made during the Class Period and excludes some statements that merely reiterate the same false

statements identified herein.  Where a statement is attributed to Cronos' management, that

statement is attributable to the Individual Defendants, as they were at the pinnacle of Cronos'

management.  Where a statement was made by an Individual Defendant, or other management-level Cronos employee, that statement is also attributable to Cronos.

### A.    May 9, 2019 – 1Q19 Financial Results

75.    On May 9, 2019, before the markets opened, Cronos issued a press release announcing its financial results for 1Q19.  In that press release Cronos stated:

> *Net revenue was [C]$6.5 million in first quarter 2019*, representing a 120% increase from [C]$2.9 million in first quarter 2018, primarily driven by the launch of the adult-use market in Canada.  *Net revenue increased 15% quarter-over-quarter* from [C]$5.6 million in fourth quarter 2018, primarily driven by increased sales in CBD oil, which carries no excise tax reduction and increased sales of dry flower.

76.    On May 9, 2019, before the markets opened, Cronos filed a Report of Foreign Private Issuer on Form 6-K with the SEC ("1Q19 Financial Report"), to which it appended as an exhibit its 1Q19 financial results. That filing stated that the financial results were approved by Cronos' Board, of which Defendant Gorenstein was Chairman.  Those financial results stated that Cronos had **net revenue of C$6,470,000 in 1Q19**.

77.    On May 9, 2019, Cronos hosted its 1Q19 earnings call.  During that earnings call Defendant Barbato stated that: "***The company reported net revenue of [C]$6.5 million in the first quarter of 2019, an increase of 15% from the fourth quarter of 2018.***"

78.    The statements in the prior three paragraphs—supposedly attesting to the revenue that Cronos was earning—were false and misleading because they wrongfully included improperly recognized revenue that Cronos had not actually earned.  Cronos stated that its net revenue for the quarter was C$6.5 million (or more precisely C$6.47 million), when in fact, this figure was overstated by C$2.5 million due to booking revenue that Cronos had not actually earned.  This information was material to investors because Cronos' revenue was an important

aspect of its public valuation, including because it was a major indicator of Cronos' growth, trajectory, and ability to successfully execute on its business plans.

79.     The 1Q19 Financial Report stated:

> ***These unaudited condensed interim consolidated financial statements for the three months ended March 31, 2019 and March 31, 2018 have been prepared in accordance with International Accounting Standard ("IAS") 34, Interim Financial Reporting***. The accounting policies adopted in the preparation of the unaudited condensed interim consolidated financial statements are consistent with those followed in the preparation of the Company's audited annual consolidated financial statements for the year ended December 31, 2018, except for the adoption of new standards effective as of January 1, 2019. The Company has not early adopted any standard, interpretation or amendment that has been issued but is not yet effective. The Company applied, as of January 1, 2019, International Financial Reporting Standard ('IFRS') 16, Leases and Interpretation of the IFRS Interpretations Committee ('IFRIC') 23, Uncertainty over income tax treatments. As required by IAS 34, the nature and effect of these changes are disclosed in Note 3.

80.     The statement in the prior paragraph is false and misleading because Cronos was not preparing its financials in accordance with the applicable accounting standards, and instead was falsely recognizing revenue that Cronos' had not earned under the applicable accounting standards.[6]  This information was material to investors because it meant that Cronos was overstating revenue, and Cronos' revenue was an important aspect of its public valuation, including, *inter alia*, because it was a major indicator of Cronos' growth, trajectory, and ability to successfully execute on its business plans.  This information was also material because non-conformance with accounting standards indicated problematic operations in general at Cronos and rendered reliance on any of its disclosures riskier.

---

[6] The disclosures stated that the financial results should be read in conjunction with the Company's December 31, 2018, audited financials which contained certain notes regarding discrete variances from applicable accounting standards, but none of those variances are relevant here.

81.    1Q19 Financial Report stated the following, which statements are attributable to

Cronos and the Individual Defendants:

> In accordance with National Instrument 52-109 – Certification of
> Disclosure in Issuers' Annual and Interim Filings, and as required
> by the applicable rules of the U.S. Securities and Exchange
> Commission (the "SEC"), management is responsible for
> establishing and maintaining disclosure controls and procedures
> ("DC&P"), as defined in Rules 13a-15(e) and 15d-15(e) under the
> United States Securities Exchange Act of 1934, as amended (the
> "Exchange Act") and internal control over financial reporting
> ("ICFR"), as defined in Rules 13a-15(f) and 15d-15(f) under the
> Exchange Act. Management has designed DC&P and ICFR based
> on the 2013 Internal Control Integrated Framework issued by the
> Committee of Sponsoring Organizations of the Treadway
> Commission.
>
> The Company's disclosure controls and procedures are designed to
> provide reasonable assurance that material information relating to
> the Company is made known to senior management, including the
> Chief Executive Officer ("CEO") and the Chief Financial Officer
> ("CFO") and information required to be disclosed by the Company
> is recorded, processed, summarized and reported within the time
> periods specified in securities legislation. ***ICFR is designed, under
> the supervision of the CEO and CFO, to provide reasonable
> assurance regarding the reliability of the Company's financial
> reporting and the preparation of its financial statements in
> accordance with IFRS.***
>
> ***As at*** (sic) ***March 31, 2019, management concluded that the
> DC&P and ICFR were adequate and provide such reasonable
> assurances.***

82.    Attached to the 1Q19 Financial Report were two nearly identical signed

certifications from each of the Individual Defendants, which stated:[7]

> 1. Review: I have reviewed the interim financial report and interim
> MD&A (together, the "interim filings") of Cronos Group Inc. (the
> "issuer") for the interim period ended March 31, 2019.

---

[7] Some of this text was in bold in the original. Here, all bold/italic text has been added to identify false and misleading statements.

2. No misrepresentations: ***Based on my knowledge, having exercised reasonable diligence, the interim filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made, with respect to the period covered by the interim filings.***

3. Fair presentation: ***Based on my knowledge, having exercised reasonable diligence, the interim financial report together with the other financial information included in the interim filings fairly present in all material respects the financial condition, financial performance and cash flows of the issuer, as of the date of and for the periods presented in the interim filings.***

4. Responsibility: The issuer's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (DC&P) and internal control over financial reporting (ICFR), as those terms are defined in National Instrument 52-109 *Certification of Disclosure in Issuers' Annual and Interim Filings,* for the issuer.

***5. Design: Subject to the limitations, if any, described in paragraphs 5.2 and 5.3, the issuer's other certifying officer(s) and I have, as at the end of the period covered by the interim filings:***

> ***(a) designed DC&P, or caused it to be designed under our supervision, to provide reasonable assurance that***

>> ***(i) material information relating to the issuer is made known to us by others, particularly during the period in which the interim filings are being prepared; and***

>> ***(ii) information required to be disclosed by the issuer in its annual filings, interim filings or other reports filed or submitted by it under securities legislation is recorded, processed, summarized and reported within the time periods specified in securities legislation; and***

> ***(b) designed ICFR, or caused it to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with the issuer's GAAP.***

*5.1 Control framework: The control framework the issuer's other certifying officer(s) and I used to design the issuer's ICFR is Internal Control – Integrated Framework (2013) ("COSO Framework") published by the Committee of Sponsoring Organizations of the Treadway Commission.*

*5.2 ICFR – material weakness relating to design: N/A.*

*5.3 Limitation on scope of design: N/A.*

6. Reporting changes in ICFR: The issuer has disclosed in its interim MD&A any change in the issuer's ICFR that occurred during the period beginning on January 1, 2019 and ended on March 31, 2019 that has materially affected, or is reasonably likely to materially affect, the issuer's ICFR.

83.     The statements in the prior two paragraphs were false and misleading because

Cronos' public disclosures contained material misstatements and omissions, as described

throughout this Section, rendering Defendants' assurances to the contrary false and misleading

especially given Defendants' scienter.  The statements in the prior two paragraphs were also

false and misleading because they touted the design of Cronos' systems of internal controls

without disclosing that Cronos' internal controls were subject to a material weakness.  In the

alternative, it is alleged that those statements were false and misleading because Defendants did

not exercise reasonable diligence, when concluding that Cronos' disclosures did not contain

misstatements.

**B.     <u>August 8, 2019</u> – 2Q19 Financial Results**

84.     On August 8, 2019, Cronos issued a press release announcing its financial results

for 2Q19.  In that press release Cronos stated that its 1Q19 revenue was *C$6,470,000* and its

revenue for 1Q19-2Q19 was *C$16,707,000*.

85.     On August 8, 2019, before markets opened, Cronos filed a Report of Foreign

Private Issuer on Form 6-K with the SEC (the "2Q19 Financial Report"), to which it appended as

an exhibit its 2Q19 financial results.  The filing stated that the financial results were approved by

Cronos' Board, of which Defendant Gorenstein was Chairman.  The 2Q19 Financial Statements

stated that Cronos had *net revenue of C\$16.707 million for the 6 months ended June 30*,

thereby incorporating the net revenue of C\$6.47 million for 1Q19.

86.     The statements in the prior two paragraphs—supposedly attesting to the revenue

that Cronos was earning—were false and misleading because they wrongfully included

improperly recognized revenue that Cronos had not actually earned.  Cronos stated that its net

revenue for 1Q19 was C\$6.47 million, when in fact, this figure was overstated by C\$2.5 million

due to booking revenue that Cronos had not actually earned.  This information was material to

investors because Cronos' revenue was an important aspect of its public valuation, including,

*inter alia*, because it was a major indicator of Cronos' growth, trajectory, and ability to

successfully execute on its business plans.

87.     The 2Q19 Financial Report also included substantially the same misstatements

regarding Cronos' compliance with accounting standards and internal controls identified and

described in ¶¶79, 81-82.  Those statements were misleading for the reasons identified in ¶80,

83.

**C.    November 12, 2019 – 3Q19 Financial Results**

88.     On November 12, 2019, Cronos issued a press release announcing its financial

results for 3Q19.  In that press release Cronos stated:

> *Net revenue was [C]\$12.7 million in Q3 2019*, representing a
> 238% increase from [C]\$3.8 million in Q3 2018, primarily driven
> by the launch of the adult-use market in Canada and the inclusion
> of Redwood from the date of closing on September 5, 2019 to the
> end of the quarter. *Net revenue increased 24% quarter-over-
> quarter from [C]\$10.2 million in Q2 2019*, primarily driven by
> increased sales in domestic dried cannabis and the inclusion of
> Redwood.

89.     That same day, Cronos filed a Report of Foreign Private Issuer on Form 6-K with the SEC (the "3Q19 Financial Report"), to which it appended as an exhibit its 2Q19 financial results.  The filing stated that the financial results were approved by Cronos' Board, of which Defendant Gorenstein was Chairman.  The 3Q19 Financial Statements stated that Cronos **had net revenue of C\$12.7 million for 3Q19 and net revenue for the first 9-months of 2019 of C\$29.407 million**.

90.     On November 12, 2019, Cronos hosted its 3Q19 earnings call.  During that call Defendant Barbato stated: "***The company reported net revenue of [C]\$12.7 million in the third quarter, a 24% increase from the second quarter***."

91.     The statements in the prior three paragraphs—supposedly attesting to the revenue that Cronos was earning—were false and misleading because they wrongfully included improperly recognized revenue that Cronos had not actually earned.  Cronos stated that its net revenues for 3Q19 and 1Q19 were C\$12.7 million and C\$6.47 million respectively, when in fact, the 3Q19 figure was overstated by C\$5.1 million and the 1Q19 figure was overstated by C\$2.5 million.   Both figures were overstated because they incorporated booking revenue Cronos had not actually earned.  This information was material to investors because Cronos' revenue was an important aspect of its public valuation, including, *inter alia*, because it was a major indicator of Cronos' growth, trajectory, and ability to successfully execute on its business plans.

92.     The 3Q19 Financial Report also included substantially the same misstatements regarding Cronos' compliance with accounting standards and internal controls identified and described in ¶¶79, 81-82.  Those statements were misleading for the reasons identified in ¶80, 83.

## VI.     THE FRAUD BEGINS TO UNRAVEL

### A.     February 24, 2020: Cronos Delays its Earnings Announcement Without Explanation

93.     On February 24, 2020, Cronos was scheduled to release its 4Q19 results and host its earnings conference call on February 27, 2020.  However, on February 24, 2020, before the markets opened, Cronos announced that it would delay the release of its results.  Its short statement explained the delay as follows: "The Company has had a delay in the completion of its financial statements and will make a further announcement in a subsequent press release to schedule the date and time of the earnings conference call."

94.     That same day, February 24, 2020, Cronos' market price fell from a closing price of US$7.15 per share on the prior trading day (February 22, 2020) to US$6.37 per share.  This drop of 10.9% was due to a partial revelation of Defendants' fraud and/or a partial materialization of undisclosed risks arising from Defendants' fraud.

95.     On February 24, 2020, The Motley Fool, a popular investor website, published an article titled "Why Cronos Group Stock Is Tumbling Today," stating that the decline "came in the wake of the Canadian cannabis producer's announcement that it was delaying its fiscal 2019 fourth-quarter and full-year update that was previously scheduled for Feb. 27, 2020."

### B.     March 2, 2020: Cronos Credits its Reporting Delay to Accounting Issues

96.     On March 2, 2020, after the market closed, Cronos filed an incomplete Annual Report on Form 10-K for the fiscal year ended December 31, 2019.  Accordingly, it filed a notification of inability to timely file Form 10-K, under Form 12b-25.  Its justification for the delay was as follows:

> The Company is unable to file the complete Form 10-K at this time without unreasonable effort or expense because of delays in finalizing its audited financial statements. The Company has been unable to complete its financial statements for fiscal 2019 due to a

- 31 -

> continuing review by the Audit Committee of the Company's
> Board of Directors, with the assistance of outside counsel and
> forensic accountants, of several bulk resin purchases and sales of
> products through the wholesale channel and the appropriateness of
> the recognition of revenue from those transactions.

97.     The Company added that it "intends to file a complete version of the Form 10-K

with the SEC as soon as practicable and currently expects to do so within the fifteen-day

extension period afforded by Rule 12b-25 under the Securities Exchange Act of 1934, as

amended. However, no assurance can be given that the Company will meet this deadline."

98.     The incomplete Form 10-K included most of the sections ordinarily found in a

Form 10-K filing – except it did not include audited financial statements.  The indication from

this filing was that Cronos' financial results had not been accepted by its auditor (KPMG LLP) –

in other words, it had been caught.

99.     The incomplete Form 10-K also disclosed that Cronos had three major customers

and that one of these customers was MediPharm.  More specifically, Cronos disclosed that

MediPharm was one of three customers where Cronos' sales to that customer exceeded 10% of

the Company's 2019 net revenues.  It further disclosed that "[t]he Company's arrangement with

MediPharm is described above."[8]  While the details were not yet clear, this was an exceptionally

telling revelation.   It meant that Cronos was booking *at least* 10% of its sales based on the

relationship with MediPharm – a relationship that ultimately should not have resulted in *any*

sales.

100.    By this point, it was clear that Cronos was facing extremely serious accounting

issues.  The issues were severe enough that Cronos had blown its initial filing deadline *and*

---

[8] The disclosure "above" being reference in that quote is a description of the previously publicly disclosed
MediPharm Agreements.

blown past its extension.  Investors did not yet know the exact details of these issues, but they knew enough to understand the likelihood that the Company had been inflating its financial results.  On this news, Cronos' stock fell from a closing price on March 2, 2020 of US$6.02 per share down to a closing price of US$5.32 per share the following day, which amounted to a roughly ***11.6% decline***.  This drop was due to a partial revelation of Defendants' fraud and/or a partial materialization of undisclosed risks arising from Defendants' fraud.

101.    Analyst commentary following this revelation reaffirms the significance of the issues.  For example, on March 3, 2020, the analyst firm Bank of America Securities described the Company's revelation an "unfortunate development" and noted the uncertainty caused by the its apparent use of "aggressive accounting."  Bank of America lowered its price target for the company due to the issues revealed.  The same report stated that issue "remind[ed]" the analyst of scrutiny the prior year when a competitor (Aurora Cannabis Inc.) faced, wherein that competitor was accused of selling "bulk product to its extraction partner (booking revenue), only to buy back extract from said partner and sell said extract."

102.    Also on March 3, 2020, the analyst firm CIBC described the risks posed by "overstated revenues from early- to mid-2019 as a result of the use of excessive transactions to sell products to extractors and then repurchasing those same products (as part of tolling arrangements), with increased market prices inflating revenues.  They stated that the issue was "surprising," especially given the legal expertise of Cronos' executives – Defendant Gorenstein being a former General Counsel and Sullivan and Cromwell corporate attorney and Defendant Barbato previously working as a Senior Auditor for a publicly traded company.  CIBC also stated that the apparent "revelation of the lack of oversight at the management level of an industry flagbearer," may prove more relevant than the direct financial impact.  The same

reported stated "we underscore that the greater concern here is the reputational impact of the revenue recognition error."

103.     Additionally, on March 3, 2020, the analyst firm Jefferies wrote that the disclosure "potentially raises questions over the sales pop last quarter."  More specifically, Jefferies noted that they had previously questioned the long-term "sustainability" of the bulk sales channel as a leading source of revenue from Cronos and noting that the inflated revenue from bulk sales "raises questions over the wholesale revenues."  In other words, the disclosure cast doubt on the long-term viability of one of Cronos' major revenue streams.  Jefferies also identified MediPharm as the likely counter-party to the relevant transactions, noting that the disclosure related to "bulk resin" and that in Cronos' then-recent filings, the agreements with MediPharm were the only mention of bulk resin.

**C.     March 17, 2020: Cronos Announces a Massive Restatement**

104.     The previously filed incomplete Form 10-K and related Form 12b-25 provided Cronos with fifteen days to file a complete Annual Report for 2019.  However, on March 17, 2020, after markets closed, Cronos announced it would **not** be filing a complete Annual Report within the required time, and instead that it would need to restate previously filed financial statements for the "first, second and third quarters of 2019 that were previously filed on Form 6-K on May 9, 2019, August 8, 2019 and November 12, 2019, respectively."  The Company reached this decision based on the "recommendation of the Audit Committee of the Company's Board of Directors and after consultation with KPMG LLP, the Company's independent registered public accounting firm,"  and stated that its "prior financial statements for these periods should therefore no longer be relied upon."

105.     Critically, a restatement is a correction of error in previously issued financial statements resulting from mathematical mistakes, mistakes in the application of GAAP, or

misuse of facts based on information *that existed at the time the financial statements were prepared*. In other words, Cronos' restatement was only appropriate if the information culminating in the restatement was knowable at the time the original financial statements were issued.  Moreover, a restatement is only appropriate if the error in the previously issued financial statements was material. Thus, Cronos' restatement was an admission that its previously issued financial statements were materially false and misleading.

106.    The restatement followed the "review of certain bulk resin purchases and sales of products through the wholesale channel" by the Company's Audit Committee.  Importantly, the Company stated that the "***restatement is being made to eliminate certain of these transactions through the wholesale channel***."  In other words, the delayed results, incomplete 10-K and restatement all were the result of needing to "eliminate" certain transactions.  Those transactions – including the fraudulently booked revenue from non-existent sales to MediPharm – had to be eliminated because it was improper to book revenue from non-existent sales.

107.    More specifically, the Company acknowledged that it would need to reduce revenue for 1Q19 by about C$2.5 million and would need to reduce revenue for 3Q19 by about C$5.1 million.  More specifically, the Company stated:

> The Company will restate its unaudited interim financial results statements for the three months ended March 31, 2019, the six months ended June 30, 2019 and the three and nine months ended September 30, 2019 to eliminate a sale of dried cannabis for C$2.5 million [(US$1.8 million)] in the first quarter, and sales of dried cannabis for C$5.1 million [(US$3.6 million)] in the third quarter which will have the effect of reducing revenue for the three months ended March 31, 2019 by C$2.5 million and the three months ended September 30, 2019 by C$5.1 million.

108.    As previously explained, the Tolling Agreement with MediPharm would result in Cronos delivering dried cannabis to MediPharm (but was not a sales contract).  Here, Cronos

was providing additional information to the market and partially revealing the fraud it previously had hidden from the market – namely that it had been recognizing its transfers of product as "sales," while it was buying product from MediPharm through the Supply Agreement and transferring product to be processed by MediPharm through the "fee for service" Tolling Agreement.

109.    The restatement was *significant* – resulting in reducing revenue by *39%* and *40%* for 1Q19 and 3Q19, respectively.  The following charts show the size of the restatement in comparison to the previously reported results (in Canadian dollars):



110.    Upon announcement of this massive restatement, Cronos' stock price fell sharply. The news was announced after market on March 17, 2020 – and anyone trading in or analyzing Cronos knew to expect Cronos to make a filing that day.  The market closed on March 17, 2020

at the price of US$5.96 and the next morning on March 18, 2020 (after the news that a restatement was forthcoming had been announced), it fell to US$4.86. This was a dramatic **_18.5% decline_**. This drop was due to a partial revelation of Defendants' fraud and/or a partial materialization of undisclosed risks arising from Defendants' fraud.

111.    On March 18, 2020, the analyst firm Jefferies wrote a report commenting on Cronos' restatement. The report concluded that the announcement "paints a gloomy view of Cronos' underlying business" and reiterated that the issue "raises serious questions as to the strength of Cronos' underlying business." On March 20, 2020, an article was published on the investor website Seeking Alpha commenting on the announcements regarding Cronos' restatements. That article commented on the magnitude of the restatement and added "[t]his new development has added to the already growing set of troubles for this Canadian cannabis company."

D.    **March 19, 2020: SEC Inquiry Into Cronos' Dealings with MediPharm**

112.    On March 19, 2020, MarketWatch reported that on March 10, 2020, an email was sent to Cronos employees by a Cronos lawyer, instructing Cronos employees to retain certain records pertaining to a "confidential and non-public inquiry by the Securities and Exchange Commission." The SEC Division of Enforcement had requested that the Company retain and preserve all records about revenue recognition related to bulk resin purchases and wholesale sales of biomass or other products. More specifically, employees were instructed to preserve records related to transactions, negotiations, and other dealings with MediPharm, along with certain other companies including TerrAscend Corp., Heritage Cannabis Holdings Corp., and 48North Cannabis Corp. The only Company disclosed by Cronos as a large Cronos customer in any of Cronos' prior SEC filings was MediPharm.

E.    **March 30, 2020**: Cronos Finally Discloses the Truth, Filing its Restated 10-K and Disclosing the Existence of a Material Weakness

113.    On March 30, 2020, after the close of the market, Cronos issued several restated SEC filings which disclosed its accounting fraud and lack of internal controls.  Those revelations are described in detail below.  In reaction to the news that Cronos had not maintained adequate internal controls and in reaction to the additional information regarding the egregious nature of its overstatement of revenue, the market price for Cronos' stock sharply declined.  On March 30, 2020, Cronos' stock closed at US$6.34 per share, and by the close of trading the following day, Cronos was down to a price of US$5.67, a more than ***10.5% decline***.  This drop was due to a partial revelation of Defendants' fraud and/or a partial materialization of undisclosed risks arising from Defendants' fraud.

1.    **The Restatement of Wrongfully Recognized Revenue**

114.    In a March 30, 2020 press release, Cronos stated that its Audit Committee had "completed its review of certain bulk resin purchases and sales of products through the wholesale channel."  "Following completion of the review, and on the recommendation of the Audit Committee and advice from the Company's independent auditor, KPMG LLP, the Board determined that Cronos Group will restate its unaudited interim financial statements for the first, second and third quarters of 2019.  Accordingly, the Company reduced revenue for the three months ended March 31, 2019 by C$2.5 million and the three months ended September 30, 2019 by C$5.1 million."  This was the same reduction the Company had said that it would need to make, in its March 17, 2020 disclosure.

115.    Defendant Gorenstein was quoted in the press release, stating that: "We are pleased that the Audit Committee has completed its review, and that Cronos Group is now current with the filing of our financial reports. As we move forward, we are committed to

improving our internal controls and financial reporting practices, maintaining the highest standards of transparency and accountability, and enhancing our capabilities and resources across functions to support our strategy."

116.    On the same day, Cronos filed its Amended 10-K for the fiscal year ended December 31, 2019, as well as amended and restated financial statements for 1Q19, 2Q19, and 3Q19, which finally disclosed the extent of the accounting fraud, consequential restatement, and provided additional details about the nature of the fraud.

117.    The Company's amended and restated financial statements indicate that Cronos previously issued false revenue for not only 1Q19 and 3Q19, but also meant it had to restate its revenue for the six-month period ended June 30, 2019 and the nine-month period ended September 30, 2019.

118.    Cronos explained the restatement as follows, which explanation is consistent with, but more detailed than, its prior revelations:

> The Company has amended and restated its unaudited condensed interim consolidated financial statements for the three and nine months ended September 30, 2019 ("interim financial statements"). Subsequent to the original issuance of the interim financial statements, the Audit Committee of the Company's Board of Directors, with the assistance of outside counsel and forensic accountants, conducted a review of certain bulk resin purchases and sales of products through the wholesale channel and the appropriateness of the recognition of the revenue associated with those transactions. As a result of this review, it was concluded that there were accounting errors in the previously filed interim financial statements.
>
> In the case of the nine months ended September 30, 2019, these accounting errors were due to three wholesale transactions, one of which occurred during the three-months ended March 31, 2019 and was inappropriately accounted for as revenue. The transaction involved the exchange of cannabis dry flower for cannabis resin, with a third party, in two simultaneous transactions entered into in contemplation of one another. Subsequent to the original issuance of the interim financial statements, this transaction was not deemed

to meet the criteria for revenue recognition in accordance with IFRS 15 and was subsequently accounted for as a non-monetary transaction valued at the carrying value of the inventory exchanged. This resulted in revenue being overstated by approximately [C]$2.5 million and cost of goods sold being overstated by approximately [C]$2.4 million on the Consolidated Statements of Operations and Comprehensive Income (Loss), in the interim financial statements for the nine months ended September 30, 2019.

During the three months ended September 30, 2019, there was a similar wholesale transaction where cannabis dry flower was exchanged for cannabis extracts in three simultaneous transactions which were entered into in contemplation of one another. Subsequent to the original issuance of the interim financial statements, this transaction was not deemed to meet the criteria for revenue recognition in accordance with IFRS 15 due to lack of commercial substance and was subsequently accounted for as a non-monetary transaction valued at the carrying value of the inventory exchanged. This resulted in revenue being overstated by approximately [C]$2.1 million, cost of goods sold being overstated by approximately [C]$3.4 million and realized fair value adjustment on inventory was overstated by approximately [C]$2.3 million on the Consolidated Statements of Operations and Comprehensive Income (Loss), in the interim financial statements for the three and nine months ended September 30, 2019.

During the three months ended September 30, 2019, there was another wholesale transaction for a sale of dried cannabis to a third party. The transaction was deemed to be a consignment sale under the guidance of IFRS 15 Revenue from contracts with customers. As a result, revenue recognized was overstated by approximately [C]$3.0 million, cost of sales was overstated by approximately [C]$1.7 million and realized fair value adjustment on inventory was overstated by approximately [C]$3.3 million on the Consolidated Statements of Operations and Comprehensive Income (Loss), in each case in the interim financial statements for the three and nine months ended September 30, 2019.

119.    Additionally, in the Amended 10-K, Cronos revised its description of its major customers[9] to remove MediPharm from the list – reducing the list from three major customers

---

[9] Cronos defined "major customer' as "customers that each individually accounted for greater than 10% of the Company's annual revenues and greater than 10% of accounts receivable.

down to two major customers.  On that same day, the restated financial information for 1Q19 and 3Q19 was also issued, revising the comments appearing therein regarding Cronos' major customers.  Those results showed that in 1Q19 and 3Q19 one major customer had been removed from the results.[10]  MediPharm was the only major customer removed from the list of three major customers for the year – and the removal of the wrongfully booked transactions eliminated a major customer each time – further establishing that the wrongfully booked revenue in both 1Q19 and 3Q19 both involved MediPharm.[11]

120.    This again, established that at least some of the transactions at issue were the ones in which Cronos had improperly treated the transfer of product to MediPharm (as part of the "fee for service" Tolling Agreement) as sales, and then Cronos was required to "eliminate" those transactions, upon being caught.

## 2.    The Inadequate Internal Controls

121.    Within the Amended 10-K, Cronos published two reports by its auditor, KPMG LLP ("KPMG"), issuing opinions on the effectiveness of the Company's internal controls over financial reporting and the existence of material weaknesses.

122.    In accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB") and based on criteria established in Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the

---

[10] The 1Q19 results had initially disclosed two major customers generating revenues of about C$3.8.  The revised 1Q19 results reduced this to one major customer generating revenues of about C$1.3 million.  This reduction of C$2.5 million is the previously discussed C$2.5 million downward restatement.  The 3Q19 results had initially disclosed three major customers generating revenues of about C$9.5 million.  The revised 3Q19 results reduced this to two major customers generating about C$4.4 million.  This reduction of C$5.1 million is the previously discussed C$5.1 million downward restatement.

[11] Additionally, the Amended 10-K, disclosed the percent of net revenue contributed by the remaining two Major Customers.  One of the remaining major customers contributed 14% of net revenue (about US$3.3 million) and the other contributed 18% (about US$4.3 million).

Treadway Commission ("COSO Framework"), KPMG "expressed an adverse opinion on the effectiveness of the Company's internal control over financial reporting."   In part, this was because KPMG had identified a critical accounting error with respect to the "evaluation of revenue recognition through the wholesale sales channel."[12]

123.   More specifically, KPMG opined that the ineffective internal control over financial reporting was "because of the effect of the material weaknesses . . . on the achievement of the objectives of the control criteria."[13]   KPMG identified the following material weaknesses:

> Risk Assessment: The Company did not appropriately design controls to monitor and respond to changes in its business in relation to our transactions in the wholesale market;
>
> Segregation of Duties: The Company did not maintain adequately designed controls on segregation of purchase and sale responsibilities to ensure accurate recognition of revenue in accordance with GAAP; and
>
> Non-Routine Transactions: The Company's controls were not effective to ensure that non-routine transactions, including deviations from contractually established sales terms were authorized, communicated, identified and evaluated for their potential effect on revenue recognition.

124.   In the Amended 10-K, Defendants disclosed that they conducted an evaluation of Cronos' disclosure controls and procedures as defined in the Exchange Act, and admitted that their prior disclosure controls and procedures were not effective.   In pertinent part, the Individual Defendants stated:

---

[12] KPMG defines a critical audit matter as arising "from the current period audit of the consolidated financial statements that were communicated or required to be communicated to the Audit Committee and that: (1) relate to accounts or disclosures that are material to the consolidated financial statements and (2) involved our especially challenging, subjective, or complex judgments."

[13] KPMG defines material weakness as "a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis."

> Based on this evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that as of December 31, 2019, due to the existence of the material weaknesses in our internal control over financial reporting described below, our disclosure controls and procedures were not effective to provide reasonable assurance that the information required to be disclosed by us in reports we file or submit under the Exchange Act were recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC, and to ensure that the information required to be disclosed by us in reports that we file or submit under the Exchange Act, is accumulated and communicated to our management, including the principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure.

125. The Company conceded that it was the management of Cronos who was responsible for establishing and maintaining adequate internal control over financial reporting, and after management conducted an assessment of the effectiveness of the Company's internal control over financial reporting based on the criteria of the COSO Framework it "concluded that its internal control over financial reporting was not effective as of December 31, 2019 to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with GAAP, due to the material weaknesses."

126. The Company also conceded that:

> Because of these control deficiencies which we have also determined to be material weaknesses, the Company overstated revenue, cost of sales and inventory related to non-routine, wholesale sale transactions which have resulted in the restatement of the interim financial statements for the three months ended March 31, 2019, six months ended June 30, 2019 and three and nine months ended September 30, 2019.

127. As a result of the material weaknesses, "the Company restated one transaction for the three months ended March 31, 2019 and six months ended June 30, 2019, and two transactions for the three months ended September 30, 2019 *to correct misstatements*. These

- 43 -

deficiencies create a reasonable possibility that a material misstatement to the consolidated

financial statements will not be prevented or detected on a timely basis."

128.    Defendants further disclosed a remediation of the material weaknesses

implementing controls and procedures to address the risk assessment, segregation of duties, and

non-routine transactions.

## VII.    ADDITIONAL ALLEGATIONS OF SCIENTER

129.    At all relevant times, Defendants acted with scienter.  Numerous facts support that

Defendants either had actual knowledge of the truthful facts contradicting their false statements

or acted with reckless disregard for the truth or falsity of those statements and omissions.

Cronos has the scienter of its management-level employees, including each of the Individual

Defendants.

130.    Throughout the Class Period, Defendants signed sworn statements attesting to the

fact that they had reviewed Cronos' financial statements and that they were directly involved in

the design of Cronos' internal controls.   Specifically, Defendants assured investors that the

system of internal controls was designed in such a way that it provided reasonable assurance that

"material information related to the issuer [was] made known to" each of the Individual

Defendants.

131.    The size of the restatements – 39% of *total* revenue for 1Q19 and 40% of *total*

revenue for 3Q19 – supports the strong inference that Defendants, as the most senior executives

of the Company, knew or were reckless in not knowing of the improper accounting.  These were

enormously significant violations of basic accounting standards—the sort of violations that only

occur through intentional wrongdoing or gross recklessness.

132.    The materiality of the MediPharm Agreements strongly supports the inference

that Defendants knew the agreements' terms and how the transactions with MediPharm were

being accounted for. The agreements were a core operation of Cronos. The agreements were tied to expenses of at least C$30 million – which was more than twice Cronos' entire aggregate cost of sales, marketing, and R&D budget for the prior *two years*. Or, put in terms of revenue— since Cronos undoubtedly expected to resell the product it was buying from MediPharm at a price equal to or greater than the price that it was paying—the agreements were tied to expected revenue of more than C$30 million, which was far more than Cronos' entire revenue for the *three years* prior to entering into the agreements.

133. The egregiousness of the false accounting strongly supports the inference of scienter. Defendants were booking revenue for "sales" when they were really transferring product to be processed. Defendants were *completely* fabricating sales transactions that ultimately did not merely need to be reduced—they needed to be completely eliminated. The booking of revenue from these non-existent sales were bright red flags indicating wrongful accounting. The violations of applicable International Financial Reporting Standards (IFRS) rules is itself indicative of scienter.

134. The recognition of MediPharm as one of Cronos' three largest *customers* was another bright red flag indicating to those within the Company that they were falsely recognizing revenue. Defendants knew that their relationship with MediPharm—one where they bought product from MediPharm under the Supply Agreement and one where they paid MediPharm to process product on a "fee for service" basis—did not render MediPharm a customer at all, let alone one of Cronos' *three biggest* customers. The CEO and CFO of a publicly traded company are tasked with knowledge of the Company's largest customers and would certainly know that MediPharm was *not a real customer* at all. Again, this was not an incident of merely overstating revenue from a genuine customer—the revenue was entirely fabricated and needed to be entirely

eliminated upon restatement.   It defies belief that the Individual Defendants could have not known the details of supposed "sales" accounting for such massive portions of Cronos' revenue when those sales were with a party that was not even a customer at all.

135.    The sophistication of the Individual Defendants, Cronos' CEO and CFO, strengthens the allegations of scienter, by undermining an exculpating explanation for the fraud. Defendant Barbato previously worked as a Senior Auditor for NACCO Industries and has degrees in accounting and business administration – these blatant accounting violations would have been incredibly obvious to him given this background.  Defendant Gorenstein, a former Sullivan and Cromwell attorney and general counsel, was clearly sophisticated enough to realize the blatantly erroneous accounting being used by the Company.

136.    Additionally, Defendants were on particular notice that round trip transactions of the sort it engaged in were improper.  On October 17, 2019,  Craig Wiggins of The Cannalysts, a reputable analyst firm focused on the cannabis industry, published a report alleging that one of Cronos' main competitors, Aurora Cannabis Inc. ("ACB"), had engaged in round-trip transactions associated with ACB's 2017 "tolling agreement" with Radient Technologies Inc., which were nearly identical to Cronos' improper transactions alleged herein.  The report suggests that ACB booked sales for the transfer of raw cannabis to Radient, and Radient converted these materials to extract that was sold back to ACB.  The report explained that this sort of transaction would be improper.  The report was discussed in articles by several other media outlets.

137.    It is overwhelmingly likely that Defendants were aware of this publicly available analyst report, including because: (1) ACB was one of Cronos' main competitors – and was listed as a member of the "Cronos Peer Group" for purpose of assessing executive compensation at Cronos in its proxy filings – it is overwhelmingly likely that Cronos' management level

employees paid attention to major allegations of wrongdoing at its close competitors; (2) Cronos was a significant shareholder of ACB, and therefore obviously would have tracked major news potentially affecting the company and its investment therein; (3) The Cannalysts and Craig Wiggins routinely covered and commented on Cronos, and executives pay attention to commentary from the analysts that cover their own company, and their peer firms; and (4) Cronos on numerous occasions prior to, and during, the Class Period claimed to be a leader in the industry – indicating that they would be aware of irregularities in competitors' practices.

138.    As alleged herein and taken together, numerous facts point towards Defendants' intent to engage in an impermissible accounting scheme to fraudulently inflate revenue – the size of the restatement, the Defendants' commitment to internal controls, the egregiousness of the accounting errors, the false labeling of MediPharm as a major customer, the sophistication of the Defendants, and the highly public notice of similar allegations of misconduct directed at a major competitor.

## VIII.   CONTROL PERSON ALLEGATIONS

139.    The Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company and were directly involved in the day-to-day operations of the Company at the highest levels.  The Individual Defendants participated in drafting, preparing, and/or approving the public statements and communications complained of herein and were aware of, or recklessly disregarded, the material misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.

140.    The Individual Defendants, as senior executive officers of the Company, were able to and did control the content of the various SEC filings, press releases, earnings calls, and other public statements pertaining to the Company during the Class Period.  The Individual

Defendants were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance and/or had the ability and opportunity to prevent their issuance or cause them to be corrected.  Accordingly, the Individual Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein, and are primarily liable for the misrepresentations and omissions contained therein.

141.    The Individual Defendants, because of their positions of control and authority as senior executive officers and directors, had access to the adverse undisclosed information about Cronos' business through their access to internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at regularly-held meetings, as well as other management and Board of Directors meetings and committees thereof, and reports and other information provided to them in connection therewith.

142.    As senior officers and controlling persons of a publicly held company whose common stock was, during the relevant time, registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations and business, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information. The Individual Defendants' wrongdoing during the Class Period violated these specific requirements and obligations.

## IX.    LOSS CAUSATION

143.    During the Class Period, as detailed herein, Cronos and the Individual Defendants engaged in a course of conduct that artificially inflated and/or artificially maintained the price of Cronos securities and operated as a fraud or deceit on the Class Period purchasers of Cronos

common stock by making the materially false and misleading statements and omissions recited above.   The price of Cronos securities was artificially inflated and/or maintained because Defendants' fraud falsely conveyed higher than true revenue for Cronos and falsely conveyed that the Company had adequate internal controls when it did not.

144.    As the truth was revealed and became known to the market, and as the concealed risks began to materialize, the price of Cronos' common stock declined precipitously as the prior artificial inflation was removed from the price of the shares.   The stock declines were caused by revelations of Defendants' accounting improprieties and materializations of the previously undisclosed risks posed by Defendants' false accounting and inadequate internal controls.   As explained within, those revelations occurred on:

(a)    February 24, 2020, before the markets opened, when Cronos announced it would delay its earnings call, and its stock price fell to US$6.37, from a prior close of US$7.15, which was a ***10.9% decline***.

(b)    March 2, 2020, after the markets closed, Cronos filed the incomplete 10-K.  The following day its stock price fell from a closing price on March 2, 2020 of US$6.02 down to a closing price of US$5.32 on March 3, 2020, which amounted to a roughly ***11.6% decline***.

(c)    March 17, 2020, after the markets closed, Cronos announced it would **not** be filing a complete Annual Report within the required time, and instead announced the expected restatements of its 1Q19 and 3Q19 results.  The market closed on March 17, 2020 at the price of US$5.96 and the next morning (after the news that a restatement was forthcoming had been announced), it fell to US$4.86.   This was a dramatic ***18.5% decline***.

(d)      March 30, 2020, after the markets closed, Cronos officially restated its revenue, disclosed its material weakness in internal controls, and disclosed additional information about its accounting fraud.   On March 30, 2020, Cronos' closed at a price of US$6.34, and by the close of trading the following day, Cronos was down to a price of US$5.67, a ***10.5% decline***.

145.    As a result of their purchases of Cronos common stock at artificially inflated prices during the Class Period, Plaintiff and other members of the Class suffered a substantial economic loss (*i.e.*, damages under the federal securities laws). The price decline in Cronos common stock was a direct result of the nature and extent of the materially false and misleading statements and omissions revealed to investors and the market.  Thus, Defendants' wrongful conduct, as alleged herein, directly, and proximately caused the damages suffered by Plaintiff and the Class.

## X.    APPLICABILITY OF PRESUMPTION OF RELIANCE: *AFFILIATED UTE* AND FRAUD-ON-THE MARKET PRESUMPTIONS

146.    Plaintiff alleges that throughout the Class Period, Defendants omitted material information of which Defendants were aware or reckless in not knowing.  Such statements artificially inflated or artificially maintained the price of Cronos publicly traded common stock and operated as a fraud or deceit on all persons and entities who purchased or otherwise acquired that common stock during the Class Period.  Because Defendants chose to speak on the issues described in Section V, it was important that Defendants not mislead investors or withhold material information. To the extent that the Defendants concealed or improperly failed to disclose material facts with respect to Cronos and its business, Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

147.    Plaintiff is entitled to a presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's common stock traded in an efficient market;

(d)    the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's shares; and

(e)    Plaintiff and other members of the Class purchased Cronos' common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

148.    At all relevant times, the market for Cronos common stock was an efficient market for the following reasons, among others:

(a)    Cronos shares met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    The Company traded at high volumes throughout the Class Period;

(c)    The Company had a high market capitalization throughout the Class Period;

(d)    Cronos filed periodic public reports with the SEC;

(e)    Cronos regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services, the Internet and other wide-ranging public disclosures;

(f)     Cronos was followed by several securities analysts employed by major brokerage firm(s), who wrote reports that were distributed to customers of their respective brokerage firm(s), were publicly available, and entered the public marketplace; and

(g)     Unexpected material news about Cronos was rapidly reflected in and incorporated into the Company's share price during the Class Period.

149.    As a result of the foregoing, the market for Cronos' common stock promptly digested current information regarding Cronos from publicly available sources and reflected such information in Cronos' common stock' price. Under these circumstances, all persons and entities who purchased or otherwise acquired Cronos' common stock during the Class Period suffered similar injury through their purchase of Cronos at artificially inflated prices, and the presumption of reliance applies.

## XI.    NO SAFE HARBOR

150.    The statutory safe harbor provided by the Private Securities Litigation Reform Act ("PSLRA") for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements and omissions alleged herein.

151.    The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. To the extent certain statements alleged to be false or misleading are determined to be mixed statements of historical or present information and future information, such statements are not entitled to the safe harbor with respect to the part of the statement that refers to historical or present conditions.

152.    To the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking statements, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying

important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

153.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of Cronos who knew that the statement was false when made.

## XII.    CLASS ACTION ALLEGATIONS

154.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities who purchased or otherwise acquired the publicly traded securities of Cronos on a U.S. Stock Exchange between May 9, 2019, and March 30, 2020, inclusive, and were damaged thereby (the "Class").  Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Cronos during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Cronos' employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person. Purchases and acquisitions on the Toronto Stock Exchange ("TSX") are not part of the definition of the Class.

155.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Cronos' common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and

can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds

or thousands of members in the proposed Class. Record owners and other members of the Class

may be identified from records maintained by Cronos or its transfer agent and may be notified of

the pendency of this action by mail, using the form of notice similar to that customarily used in

securities class actions.

156.    There is a well-defined community of interest in the questions of law and fact

involved in this case. Questions of law and fact common to the members of the Class which

predominate over questions which may affect individual Class members include:

        (a)    whether the Exchange Act was violated by Defendants;

        (b)    whether Defendants' statements omitted material facts necessary in order

to make the statements made, in light of the circumstances under which they were made, not

misleading;

        (c)    whether Defendants knew or recklessly disregarded that their statements

were false and misleading;

        (d)    whether the price of the Company's common stock was artificially

inflated; and

        (e)    the extent of damage sustained by Class members and the appropriate

measure of damages.

157.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class

sustained damages from Defendants' wrongful conduct alleged herein.

158.    Plaintiff will adequately protect the interests of the Class and has retained counsel

experienced in class action securities litigation. Plaintiff has no interests that conflict with those

of the Class.

159.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIII.   COUNTS

### COUNT I
### Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

160.     Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

161.     This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC, on behalf of Plaintiff and the Class, against Cronos and the Individual Defendants.

162.     During the Class Period, Defendants deceived the investing public, including Plaintiff and the Class, and artificially inflated or maintained the price of Cronos common stock.

163.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of conduct that operated as a fraud and deceit upon purchasers of Cronos common stock in violation of §10(b) of the Exchange Act and Rule 10b-5.  Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  Defendants' false and misleading statements and omissions are described in Section V.

164.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the adverse material information as specified herein.

165.    Defendants had actual knowledge of the misrepresentations, omissions, and deceptive conduct alleged herein, or acted with reckless disregard for the truth. Defendants' acts were done for the purpose and effect of concealing the scheme alleged herein from the investing public, and to artificially manipulate the market price of Cronos common stock.

166.    By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

167.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and members of the Class suffered damages in connection with their respective purchases and sales of Cronos common stock during the Class Period.

## COUNT II
### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

168.    Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

169.    This Count is asserted pursuant to Section 20(a) of the Exchange Act, on behalf of Plaintiff and the Class, against the Individual Defendants.

170.    As alleged above, Cronos violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making materially false and misleading statements and omitting material information in connection with the purchase of Cronos' shares.

171.    This fraudulent conduct was undertaken with scienter, and the Company is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with reckless disregard of the falsity of their statements and the fraudulent nature of its

scheme during the Class Period.  Thus, Cronos is primarily liable under Section 10(b) of the Exchange Act.

172.    As set forth above, the Individual Defendants had control over Cronos and made the materially false and misleading statements and omissions on behalf of Cronos within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their executive positions and their culpable participation, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends were false and misleading. The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

173.    In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein. Cronos, in turn, controlled the Individual Defendants and all of its employees.

174.    By reason of such wrongful conduct, Individual Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## XIV.   PRAYER FOR RELIEF

175.   WHEREFORE, Plaintiff respectfully prays for judgment against the Defendants as follows:

(a)   Determining that this action is a proper class action maintainable under Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiff as a class representative, and appointing Labaton Sucharow LLP as lead class counsel pursuant to Rule 23(g);

(b)   Determining and declaring that Defendants violated the Exchange Act, as charged in Counts I-II, by reason of the acts, omissions and, status of control alleged herein;

(c)   Awarding Plaintiff and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with interest thereon;

(d)   Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including but not limited to attorneys' fees and costs incurred by Plaintiff's consulting and testifying expert witnesses; and

(e)   Granting such other and further relief as the Court deems just and proper.

## XV.   JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury of all issues so triable.

DATED:  November 23, 2020

                             **LABATON SUCHAROW LLP**

                             */s/ Carol C. Villegas*
                             Carol Villegas
                             Christine M. Fox
                             Jake Bissell-Linsk
                             Charles Farrell
                             140 Broadway
                             New York, New York 10005
                             Tel: 212-907-0700
                             Fax: 212-818-0477
                             Email:     cvillegas@labaton.com
                                         cfox@labaton.com
                                         jbissell-linsk@labaton.com
                                         cfarrell@labaton.com

                             ***Counsel for Lead Plaintiff Keith D.***
                             ***Norman and Lead Counsel for the Class***

                             **THE SCHALL LAW FIRM**
                             Brian Schall
                             Rina Restaino
                             1880 Century Park East, Suite 404
                             Los Angeles, California 90067
                             Telephone: (310) 301-3335
                             Facsimile: (310) 388-0192
                             brian@schallfirm.com
                             rina@schallfirm.com

                             *Additional Counsel for Keith D. Norman*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 23, 2020, a copy of the foregoing was filed

electronically via the Court's CM/ECF system. Notice of this filing will be sent by e-mail to all

parties whose counsel has appeared in this action, by operation of the Court's electronic filing

system. Parties may access this filing through the Court's CM/ECF System.

<i><u>/s/ Carol C. Villegas</u></i><br>Carol C. Villegas