Case 2:20-cv-01310-ENV-JMW    Document 50-1    Filed 01/19/22    Page 1 of 11 PageID #: 983

2022 WL 103563
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

ROBERT F. WOODLEY, individually and on behalf of all others similarly situated, Plaintiff,

v.

DAVID M. WOOD, KERI CROWELL, and QUENTIN R. HICKS, Defendants.

20 Civ. 2357 (ER)
|
Filed 01/11/2022

### OPINION & ORDER

Edgardo Ramos, U.S.D.J.

**\*1** On March 17, 2020, this putative class action was brought under federal securities laws against Gulfport Energy Corporation and its top officers. Doc. 1. A first amended complaint was filed on April 1, 2021 pursuant to a stipulation between the parties. [1] Doc. 47. Plaintiffs filed a second amended complaint as a matter of course on July 8, 2021 in response to a motion to dismiss, Doc. 54, filed on June 16, 2021. Doc. 61. The complaint alleges that Defendants violated federal securities laws by making materially false and misleading statements concerning the manner in which they accounted for their oil and gas properties. Defendants now move to dismiss the second amended complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. Doc. 66.

[1]  The amended complaint did not name Gulfport as a defendant due to the fact that the matter was stayed as to Gulfport because of its Chapter 11 bankruptcy proceedings. Doc. 47 ¶ 10.

For the reasons set forth below, the motion to dismiss is GRANTED.

### I. BACKGROUND

#### A. *Gulfport's Accounting Method*

Gulfport is a Delaware oil and gas corporation with its principal executive office in Oklahoma City, Oklahoma. Doc. 61 ¶ 45.

This case involves Gulfport's accounting for its oil and gas properties in Eastern Ohio and Central Oklahoma. The oil and gas industry faces unique accounting problems due to the non-regenerative nature of the resource, large capital requirements, and abnormally high risks. Doc. 67 at 10. To respond to these challenges, the SEC allows two accounting methodologies: the "successful efforts" approach and the "full cost" approach, which differ in terms of how costs associated with properties are accounted for. *Id.* The SEC specifies how to apply each approach, *id.* (citing *Sec. & Exch. Comm'n Release Notice*, Release No. 113, 2009 WL 375970 (S.E.C. Release No. SAB-113 Oct. 29, 2009), and requires accounting to conform with generally accepted accounting principles ("GAAP"). Doc. 61 ¶¶ 59–61.

Gulfport uses the full-cost accounting approach, as set forth in SEC Rule 4-10(c) of Regulation S-X. Ex. 1, 2018 10-K, F-9; *see* 17 C.F.R. § 210.4-10(c). This approach distinguishes between "proved properties" – oil and gas assets with proved reserves that can be estimated with reasonable certainty – and "unproved properties" – oil and gas assets with no proved reserves. *See* Doc.

2022 WL 103563

67 at 10 (citing 17 C.F.R. §§ 210.4-10(a)(22), (23), (32)). The full-cost approach then capitalizes all costs associated with both proved and unproved properties, but later amortizes and depletes, or recognizes as an expense, the costs associated with proved properties, abandoned properties, and properties that have undergone "complete evaluation" (collectively, the "Amortization Base"). *Id.* at 11 (citing 17 C.F.R. § 210.4-10(c)(3)(ii)).

The full-cost approach also requires a quarterly ceiling test to limit total capitalized costs so that they do not exceed an amount, known as the "cost center ceiling," equal to the sum of (1) projected future revenues, less expenses, from proved reserves, with a discount factor of 10%; (2) the cost of properties not included in the Amortization Base; (3) the lower of cost or estimated fair value of unproved properties included in the Amortization Base; and (4) certain income tax effects associated with certain classes of properties. *Id.* (citing 17 C.F.R. § 210.4-10(c)(4)(i)). If the cost center ceiling is exceeded in a given quarter, the excess is "charged to expense" and "shall not be reinstated for any subsequent increase in the cost center ceiling." *Id.* (citing 17 C.F.R § 210.4-10(c)(4)(ii)).

### B. *Gulfport's Accounting Error and Restatement*

**\*2** Gulfport issued a press release with their Q3 2019 financial statements on October 31, 2019, reporting a net loss of $48.8 million for the three months ending September 30, 2019 and net income of $248.4 million for the nine months ending September 30, 2019. Doc. 61 ¶ 131. This financial statement also noted a $35.6 million impairment of Gulfport's oil and gas properties; depreciation, depletion, and amortization of $145.5 million in the three months ending September 30, 2019; depreciation, depletion, and amortization of $388.9 million in the nine months ending September 30, 2019; and a carrying value for its oil and gas properties and equipment of approximately $5.584 billion. *Id.*

Gulfport issued a press release with their Q4 2019 and FY 2019 financial results on February 27, 2020. *Id.* ¶ 26. The press release also included a restatement of the Q3 2019 financial results after management discovered "an error related to the transfer of certain unevaluated leasehold costs to the amortization base." Doc. 68-2 at 5. The same day, Gulfport issued a second press release further explaining the accounting error, stating that

> [m]anagement determined it did not effectively design and maintain controls over the completeness and accuracy of the accounting of transfers of unevaluated capitalized costs into the amortization base for the three and nine month periods ended September 30, 2019 and the twelve month period ended December 31, 2019 ... [and Gulfport] did not have an adequate process for monitoring that its accounting policies for transferring unevaluated oil and gas properties were consistently being performed timely and reconciled with the general ledger.

Doc. 68-3 at 3. This "material weakness in internal controls" thus resulted in an improperly conducted ceiling test and the release of a financial statement that did not correctly report a material impairment, both in violation of GAAP. Doc. 61 ¶¶ 76–77. Gulfport therefore revised its Q3 2019 financial statements to reflect a $571.4 million third-quarter impairment of its oil and gas properties, as opposed to the $35.6 million it originally reported, a $484.8 million third quarter net loss, as opposed to $48.8 million, and a $163.2 million third quarter depreciation, deduction, and amortization expense, as opposed to $145.5 million. *Id.* ¶ 85. Gulfport also revised language concerning their internal controls, procedures, and risk factors, and issued new SOX Certifications (required to comply with the Sarbanes-Oxley Act) to identify the issues that caused the accounting error. *Id.* ¶¶ 91–94.

### C. *Lawsuit Commenced*

On March 17, 2020, Robert Woodley filed suit against Defendants Gulfport, David Wood (former CEO), Keri Crowell (CFO until August 2019), and Quentin Hicks (CFO from August 2019 to May 2021) alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5. Doc. 1. The lawsuit was filed as a putative class action on behalf of all persons who purchased or otherwise acquired Gulfport securities between May 3, 2019 and February 27, 2020. *Id.* On February 8, 2021, the Court appointed Joseph Rotunno as lead plaintiff in this matter and stayed the matter as to Gulfport due to Chapter 11 bankruptcy proceedings. Doc. 42. On February 17, 2021, the parties stipulated to the filing of the first amended complaint, Doc. 45, which was filed on April 1, 2021. Doc. 47. Defendants then filed a motion to dismiss on June 16, 2021. Doc. 54. In response, Plaintiffs filed a second amended complaint as a matter of course on July 8, 2021, mooting Defendants' first motion to dismiss. Doc. 61. The second amended complaint alleges that Defendants issued false and misleading statements and material omissions related to the 2019 filings. *Id.* ¶ 188. Defendants now move to dismiss the second amended complaint. Doc. 66.

D. *Complaint Allegations*

**\*3**  As relevant to the instant motion, the complaint alleges that:

> [d]efendants were motivated to protect themselves from the significant pressure from [shareholders] Firefly and Shah Capital who threatened that if they and Gulfport management failed to deliver immediate improvements to Gulfport's financial results, they could face a proxy contest for control of the Company and lose their positions.... The threat to each of the Defendants was personal and concrete and their careers at Gulfport were on the line. Indeed, there was significant external pressure and threats from Firefly and Shah Capital directed specifically at Gulfport's board of directors and its management, which included Defendants.

Doc. 61 ¶¶ 100–01. Specifically, the complaint cites two press releases issued by shareholder Firefly: (1) a January 17, 2019 press release in which Firefly stated that they were "discouraged by the Board's lack of urgency in addressing the Company's prolonged stock price underperformance and its unwillingness to commit to actions that we believe would maximize value for stockholders," *id.* ¶ 102, and (2) a March 6, 2019 press release in which they restated their concerns, demanded that the board take three steps of executing a $400 million share buyback plan, changing executive compensation incentives, and abstaining from equity issuances, and threatened that "[i]f the [c]ompany does not accomplish the three goals ..., we believe the Board's composition will need to change," *id.* ¶ 103.

The complaint alleges that Defendants Woods and Hicks acquired a number of Gulfport shares on August 30, 2019 in response to criticism that their interests were not aligned with those of the shareholders. *Id.* ¶ 104. The complaint then alleges that on September 6, 2019, shareholder Shah Capital issued a press release expressing "disappointment" because "management and board have not yet utilized some of the tools available to stop this massive equity underperformance ...." *Id.* ¶ 106. The complaint notes that Gulfport then took several steps to address the concerns, including that two directors resigned from the board, the chairman decided not to seek reelection, the Senior Vice President ("SVP") of Geosciences retired, and the company instituted a 13% reduction in the number of employees. *Id.* ¶¶ 107–08. Despite these changes, Firefly issued another press release on November 21, 2019 expressing continued disappointment and distrust in the incumbent board, especially since the board refused to adopt their action plan, and included a plan to nominate director candidates for election to the board if their concerns were further ignored. *Id.* ¶ 109. Plaintiffs thus allege that this pressure motivated Defendants to conceal the material weakness to protect their "careers and the survival of the [c]ompany." *Id.* ¶ 110–12.

Plaintiffs also allege that Defendants knew or recklessly disregarded that the representations they made were false and misleading. *Id.* ¶ 113. Specifically, they allege:

Because of [Defendants'] positions with Gulfport, and their access to material information available to them but not to the public, Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. As the most senior executives of the Company, Defendants had access to Gulfport's general ledger, which recorded the carrying value of Gulfport's oil and gas properties, and each of them had access to the data inputs used in Defendants' ceiling tests during the Class Period and participated in quarterly ceiling tests. The information concerning the carrying value of Gulfport's oil and gas properties in Gulfport's general ledger to which Defendants had access contradicted both the inputs used in the ceiling test and representations made to investors.

**\*4**  *Id.* ¶ 44.

Plaintiffs also allege that Defendants were on notice of a decline in the natural gas market in 2019 that created a high risk of substantial impairment of their properties. *Id.* ¶ 159. They thus allege that

[t]he reconciliation of supporting records to the general ledger is a process that is taught to students in introductory accounting courses. It is not a sophisticated, complex concept or process. Having failed to perform this most basic accounting process in a declining commodity market in connection with their quarterly ceiling tests, Defendants['] conduct, or failure to act, was an extreme departure from the ordinary standard of care.

*Id.* ¶ 162. Plaintiffs also allege further circumstantial evidence of fraudulent intent throughout the complaint.

## II. LEGAL STANDARD

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Koch v. Christie's Int'l PLC,* 699 F.3d 141, 145 (2d Cir. 2012). However, the Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also id.* at 681 (citing *Twombly*, 550 U.S. at 551). "To survive a motion to dismiss, a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321–23 (2007). A complaint alleging securities fraud must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA") by stating the circumstances constituting fraud with particularity. *See, e.g.*, *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (citing *Tellabs*, 551 U.S. at 320–21). These requirements apply whenever a plaintiff alleges

fraudulent conduct, regardless of whether fraudulent intent is an element of a claim. *Rombach v. Chang*, 355 F.3d 164, 170–71 (2d Cir. 2004) (quoting Fed. R. Civ. P. 9(b)) ("By its terms, Rule 9(b) applies to 'all averments of fraud.' ").

**\*5** Specifically, Rule 9(b) requires that a securities fraud claim based on misstatements must identify: (1) the allegedly fraudulent statements, (2) the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent. *See, e.g., Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012) (citing *Rombach*, 355 F.3d at 170). Conditions of a person's mind—such as malice, intent or knowledge—may be alleged generally, however. *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (citing Fed. R. Civ. P. 9(b)). Like Rule 9(b), the PSLRA requires that securities fraud complaints " 'specify' each misleading statement," set forth the reasons or factual basis for the plaintiff's belief that the statement is misleading, and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. §§ 78u–4(b)(1), (2)); *see also Slayton v. Am. Express, Co.*, 604 F.3d 758, 766 (2d Cir. 2010). Thus, to plead a claim of securities fraud, plaintiffs "must do more than say that the statements ... were false and misleading; they must demonstrate with specificity why and how that is so." *Rombach*, 355 F.3d at 174.

These heightened pleading standards, when viewed together with the more general standards applicable to Rule 12(b)(6) motions to dismiss under *Twombly* and *Iqbal*, make clear that "plaintiffs must provide sufficient particularity in their allegations to support a plausible inference that it is more likely than not that a securities law violation has been committed." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 570 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) (citing *ECA*, 553 F.3d at 196).

### III. DISCUSSION

#### A. Section 10(b) and Rule 10b-5

*1. Legal Standard*

Section 10(b) of the Securities Exchange Act of 1934 prohibits using or employing "in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance," while SEC Rule 10b-5, promulgated thereunder, creates liability for a person who makes "any untrue statement of a material fact or ... omit[s] to state a material fact ... in connection with the purchase or sale of any security." *In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 397 (S.D.N.Y. 2013). A statement may give rise to liability under § 10(b) if it is "(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading." *Police & Fire Ret. Sys. of the City of Detroit v. La Quinta Holdings Inc.*, No. 16 Civ. 3068 (AJN), 2017 WL 4082482, at \*5 (S.D.N.Y. Aug. 24, 2017), *aff'd*, 735 F. App'x 11 (2d Cir. 2018)) (internal quotation marks and citation omitted).

Rule 10b–5, promulgated to implement Section 10(b), "more specifically delineates what constitutes a manipulative or deceptive device or contrivance." *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 534 (2d Cir. 1999). Under Rule 10b–5, it is unlawful for any person, directly or indirectly, by the use of any means specified in Section 10(b):

> (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. To state a claim under Section 10(b) and Rule 10b–5, a plaintiff must plead that: (1) the defendant made a material misrepresentation or omission, (2) with scienter, *i.e.* a wrongful state of mind, (3) in connection with the purchase or sale of a security, and (4) that the plaintiff relied on the misrepresentation or omission, thereby (5) causing economic loss. *In re Express Scripts Holding Co. Sec. Litig.*, No. 16 Civ. 3338 (ER), 2017 WL 3278930, at \*10 (S.D.N.Y. Aug. 1, 2017) (citations omitted); *see also Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014). Moreover, the plaintiff must meet the PSLRA requirements. *ECA*, 553 F.3d at 196. Therefore, while the Court normally draws reasonable inferences in favor of a non-movant on a motion to dismiss, the PSLRA " 'establishes a more stringent rule for inferences involving scienter' because the PSLRA requires particular allegations giving rise to a strong inference of scienter." *Id.* (citing *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 194 (2d Cir. 2008)). "Plaintiffs can establish the requisite 'strong inference of fraudulent intent' either (a) by demonstrating 'that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.' " *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 560 (S.D.N.Y. 2004) (citing *Kalnit*, 264 F.3d at 138–39). To show motive and opportunity to commit fraud, "plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud" that is more than a generalized motive that any public for-profit company might have. *Kalnit*, 264 F.3d at 139–40. To show strong circumstantial evidence of conscious misbehavior or recklessness, a plaintiff must allege "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *ECA*, 554 F.3d at 202–03 (quoting *Kalnit*, 264 F.3d at 142). The standard is higher than enhanced negligence and has been described as "a state of mind *approximating actual intent." S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (internal quotation marks and citation omitted). In general, there are

> **\*6** [a]t least four circumstances [that] may give rise to a strong inference of the requisite scienter: where the complaint sufficiently alleges that the defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.

*ECA*, 553 F.3d at 199 (internal quotation marks and citations omitted).

### 2. Discussion

#### a. Motive and Opportunity to Defraud

Defendants contest only the second element of the claim, arguing that Plaintiffs have not shown the required strong inference of scienter, which on its own is enough to warrant dismissal. Doc. 67 at 15; *see, e.g.*, *In re Bristol-Myers Squibb*, 312 F. Supp. 2d at 555–57. Defendants first argue that the complaint does not plead a motive and opportunity to defraud because it does not plead a concrete and personal benefit. Doc. 67 at 17. Instead, according to Defendants, Plaintiffs plead only that Defendants felt pressure from shareholders to improve Gulfport's stock and therefore had motive to conceal Gulfport's material weakness. *Id.* Such a motive has been routinely rejected by courts in the Second Circuit as sufficient to establish a motive to defraud. *See In re Kandi Techs. Grp., Inc. Sec. Litig.*, No. 17 Civ. 1944 (ER), 2019 WL 4918649, at \*5 (S.D.N.Y. Oct. 4, 2019) (rejecting as a basis for liability the motive to artificially inflate and maintain the market price of securities); *ECA*, 553 F.3d at 198 ("[m]otives that are common to most corporate officers, such as ... the desire to keep stock prices high ... do not constitute "motive") (internal citations omitted); *Tabak v. Canadian Solar Inc.*, 549 F. App'x 24, 29 (2d Cir. 2013) (finding that pressure to increase stock price is not sufficient to establish motive) (summary order).

2022 WL 103563

Plaintiffs, however, argue that they have plead specific and concrete personal threats and pressure against the Defendants, which the Second Circuit has recognized as demonstrating the requisite motive. *See Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64 (2d Cir. 2021). However, in *Credit Suisse*, the complaint alleged a more specific pressure – pressure "to shift [the Defendant's] investment arm away from volatile assets like XIV Notes" – coupled with the awarding of a $10.2 million bonus for complying with that pressure. 996 F.3d at 81. Here, the complaint more broadly alleges that Defendants faced pressure from shareholders to improve Gulfport's financial results and thereby protect their positions in the company from the threat of a proxy contest. Doc. 61 ¶ 110. Most corporate officers face these threats as part of their role, and the Court is not persuaded that the shareholder press releases excerpted in the complaint create a unique motive significant enough to satisfy the high PSLRA threshold for scienter. The complaint thus does not establish motive and opportunity to commit fraud.

### b. Circumstantial Evidence of Conscious Misbehavior or Recklessness

Defendants next argue that the complaint does not plead facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. Because the complaint fails to demonstrate motive, to show scienter through circumstantial evidence, "the strength of the circumstantial allegations must be correspondingly greater." *Kalnit*, 264 F.3d at 142 (internal quotation marks and citation omitted). Defendants argue that the complaint alleges no facts suggesting knowledge of contradictory information, nor any sources by which Defendants could have obtained such knowledge. Doc. 67 at 19. The Second Circuit has stated that "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Teamsters*, 531 F.3d at 196 (rejecting claim of knowledge based on the fact that executives had access to data that suggested their public statements were not accurate); *see also In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 273 (S.D.N.Y. 2009; *In re Iconix Brand Grp., Inc.*, No. 15 Civ. 4860 (PGG), 2017 WL 4898228, at *18 (S.D.N.Y. Oct. 25, 2017) (both cases finding no knowledge or recklessness leading to an inference of scienter due to lack of particularized allegations).

**\*7** Plaintiffs argue that they have sufficiently plead scienter based on eight allegations of circumstantial evidence that holistically raise an inference of scienter. Doc. 69 at 23. The Court will address each allegation in turn.

### 1. Access to Information Contradicting Financial Statements

First, Plaintiffs point to their allegations in the complaint that Defendants' participation in the ceiling tests and access to Gulfport's general ledger gave them access to information supporting an inference of scienter. Doc. 69 at 23–24. They cite *Sgalambo v. McKenzie*, which says that "[t]o state a claim based on recklessness, plaintiffs may either specifically allege defendants' knowledge of facts or access to information contradicting defendants' public statements, or allege that defendants failed to check information they had a duty to monitor." 739 F. Supp. 2d 453, 473 (S.D.N.Y. 2010) (internal quotation marks and citation omitted). This standard was first stated in *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000), a case in which the Second Circuit surveyed many securities fraud cases to more concretely determine what types of allegations are required to meet the recklessness scienter standard. *Novak* found that plaintiffs have succeeded in stating a claim based on recklessness when they (1) "specifically allege[ ] defendants' knowledge of facts or access to information contradicting their public statements" or (2) allege "facts demonstrating that defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." 216 F.3d at 308. Although *Novak* suggests that mere access to information contradicting public statements can be enough to establish scienter, other cases in this Circuit applying the PSLRA standard have made clearer that it is not enough that defendants held senior positions and had access to inside information. *See, e.g., Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 163 (S.D.N.Y. 2015) ("Plaintiff must do more than allege that the Individual Defendants had or should have had knowledge of certain facts contrary to their public statements simply by virtue of their high-level positions."); *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 406 (S.D.N.Y. 2006) (holding that generalized allegations that the individual defendants "knew, or should have known, that they were misrepresenting material facts, based on their senior positions in the

2022 WL 103563

company" are insufficient to establish scienter);); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 495 (S.D.N.Y. 2004) (finding inference of scienter where confidential sources with pertinent knowledge spoke to the allegations).

"Courts in this Circuit have long held that accusations founded on nothing more than a defendant's corporate position are entitled to no weight." *City of Brockton Ret. Sys. v. Avon Prod., Inc.*, No. 11 Civ. 4665 (PGG) 2014 WL 4832321, at *19 (S.D.N.Y. Sept. 29, 2014); *see also Bd. of Trustees of City of Ft. Lauderdale Gen. Employees' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 873 (S.D.N.Y. 2011), *aff'd sub nom. Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012) (summary order). Therefore, these allegations do not raise a strong inference of scienter.

### 2. Red Flags

 **\*8** Plaintiffs allege that Defendants knew the natural gas market had crashed, which created a high risk for substantial impairment that would affect the ceiling test. Doc. 61 ¶ 159. Because the process of reconciling the ceiling test inputs to the amounts recorded in the general ledger is allegedly a simple process, they argue, Defendants' failure to reconcile the general ledger during such a market crash "was an extreme departure from the ordinary standard of care." *Id.* ¶ 162.

While "scienter may be found where there are specific allegations of various reasonably available facts, or 'red flags,' that should have put the officers on notice that the public statements were false," *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007) (internal quotation marks and citation omitted), Plaintiffs' allegations do not rise to such a level. Plaintiffs have not explained their conclusion that the reconciliation process is not a complex process and have not otherwise shown that the accounting errors were so patently wrong as to be obvious indicators of fraud. *See, e.g.*, *In re Molycorp, Inc. Sec. Litig.*, No. 13 Civ. 5697 (PAC), 2015 WL 1097355, at *15 (S.D.N.Y. Mar. 12, 2015) (finding no inference of scienter even where the error involved reconciliation with the general ledger); *In re Turquoise Hill Res. Ltd. Sec. Litig.*, No. 13 Civ. 8846 (LGS), 2014 WL 7176187, at *6 (S.D.N.Y. Dec. 16, 2014) (rejecting plaintiff's unsupported allegation that the relevant accounting principles were simple and straightforward and thus their misapplication by defendant is evidence of scienter). Furthermore, "[t]he fact that a defendant had a duty to review the Company's internal controls is not a substitute for specific allegations that he was provided with information that demonstrated the inadequacy of those internal controls." *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 307 (S.D.N.Y. 2019). Therefore, these allegations on their own do not support a strong inference of scienter.

### 3. Internal Control Weakness

Plaintiffs argue that the internal control weakness that led to the restatement itself supports an inference of scienter. Doc. 69 at 27. "Courts in this District have repeatedly held that weak internal controls will support an inference of scienter." *In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 246 (S.D.N.Y. 2018) (collecting cases). However, it is also true that bad accounting cannot establish scienter on its own. *See, e.g.*, *In re China Organic Sec. Litig.*, 11 Civ. 8623 (JMF), 2013 WL 5434637, at *10 (S.D.N.Y. Sept. 30, 2013); *Iowa Pub. Emps.' Ret. Sys. v. Deloitte & Touche LLP*, 919 F. Supp. 2d 321, 331–32 (S.D.N.Y. 2013). Additionally, weak internal controls are not evidence of scienter where there is no allegation that the weakness was brought to the defendants' attention prior to making the purportedly false and misleading statements. *See Turquoise Hill*, 2014 WL 7176187, at *8 ("The accounting controls were an after-the-fact explanation for why the error had occurred, not a red flag before it was discovered."). Therefore, the internal control weakness does not support an inference of scienter.

### 4. False SOX Certifications

Similarly, Plaintiffs argue that the false SOX Certifications, which attest to the accuracy of Gulfport's SEC filings in compliance with the Sarbanes-Oxley Act, support an inference of scienter. Doc. 69 at 27. However, the only case they cite from this Circuit found an inference of scienter based on the fact that the defendant personally participated in the design and evaluation of the

2022 WL 103563

internal controls and supervised the evaluations, which Plaintiffs do not allege here. *See Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 246 (S.D.N.Y. 2012). A plaintiff "cannot raise an inference of fraudulent intent based on the signing of a certification without alleging any facts to show a concomitant awareness of or recklessness to the materially misleading nature of the statements." *In re Diebold Nixdorf, Inc., Sec. Litig.*, No. 19 Civ. 6180 (LAP), 2021 WL 1226627, at *14 (S.D.N.Y. Mar. 30, 2021) (internal quotation marks and citation omitted). As discussed above, the other "red flags" plaintiffs allege also do not support an inference of scienter, so the certifications similarly do not.

### 5. GAAP Violations

 **\*9**  Plaintiffs argue that the existence of GAAP violations also support an inference of scienter. Doc. 69 at 28. They argue that Defendants' failure to reconcile the accounts is not a complex process, and therefore Defendants' failure to accurately do so suggests fraudulent intent. *Id.* The only case they cite in support from this Circuit states that while "the existence of GAAP violations are relevant to scienter, they are generally not persuasive absent more concrete evidence of knowledge or recklessness." *In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 627 (S.D.N.Y. 2014) (internal quotation marks and citations omitted); *see also Iconix*, 2017 WL 4898228, at *17; *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996). Therefore, these facts alone do not raise an inference of scienter.

### 6. Magnitude of the Restatement

Plaintiffs also argue that the magnitude of the errors identified in the Restatement, that over $500 million dollars were impaired, constitutes evidence of scienter. Doc. 69 at 31. The magnitude of errors can constitute "some evidence of scienter." *Atlas Air*, 324 F. Supp. 2d at 488–89. However, an inference of scienter is only raised when magnitude is coupled with other circumstantial evidence. *See Iconix*, 2017 WL 4898228, at *17; *see also Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (finding magnitude of write-off errors together with other allegations raised a strong inference of recklessness). So while the magnitude does constitute some evidence of scienter, it is not enough on its own to raise a strong inference.

### 7. SEC Investigation

The complaint includes information about a past instance in which the SEC issued a cease-and-desist order against Defendant Crowell regarding Gulfport's failure to disclose certain transactions concerning Michael Moore, the former CEO, from 2014 to 2018. Doc. 61 ¶¶ 164–68. Specifically, Crowell, the then-CFO, allowed Moore to charge personal expenses on the company credit card and did not require him to pay it back in a timely manner. *Id.* ¶ 167. In the complaint, Plaintiffs allege that the events underlying the SEC's investigation raise a strong inference that Defendant Crowell "engaged in substantially similar conduct during the Class Period ...." *Id.* ¶ 164.

The Court finds that the SEC investigation has no bearing on the fraud at issue in the instant case. A CFO's failure to properly handle a CEO's credit card use has little in common with the allegations raised in the complaint, and no inference of scienter can be drawn here.

### 8. Resignations

Lastly, the Plaintiffs argue that the suspicious timing of the resignations of Crowell and other Gulfport executives raise an inference of scienter. Doc. 69 at 32. They allege that Crowell's resignation on August 9, 2019 is suspicious, as that was the quarter when Gulfport materially understated its impairments, and the resignation meant that Crowell did not have to sign and certify the materially false and misleading financial results published in October 2019. Doc. 61 ¶ 130. However, Plaintiffs do

2022 WL 103563

not allege that the resignations of the other executives are suspicious, so only Crowell's resignation could plausibly support an inference of scienter in the complaint.

A "resignation by itself is insufficient to support an allegation of scienter because there are any number of reasons that an executive might resign." *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 575 (S.D.N.Y. 2012) (internal quotation marks and citations omitted) (finding that a suspiciously timed resignation added to the inference of scienter). However, a suspiciously timed resignation can add to "the overall pleading of circumstantial evidence of fraud." *In re Scot. Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 n.176 (S.D.N.Y. 2007). Here, Crowell resigned in August 2019 before the false financial statements were released in October 2019. Doc. 61 ¶¶ 130–31. While the timing could in theory support Plaintiffs' allegations, the resignation alone does not support a strong inference of scienter.

**\*10** In conclusion, several of Plaintiffs' arguments are essentially arguments that the occurrence of the accounting errors that led to the restatement is itself evidence of fraudulent intent. Such arguments are weak absent more concrete circumstantial evidence of actual scienter, as mistakes can be made without fraudulent intent. Plaintiffs' other arguments are not alleged with sufficient specificity or do not individually raise a strong inference of scienter. Even collectively, Plaintiffs' allegations do not come close to showing the required level of "highly unreasonable" conduct that is "an extreme departure from the standards of ordinary care." *ECA*, 554 F.3d at 202–03. Defendants' suggested inference that they discovered, disclosed, and corrected the accounting errors within a relatively short period of time with no fraudulent intent is simply more compelling. *See Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 297–98 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015) (summary order). Plaintiffs' claim of scienter therefore cannot stand. Defendants' motion to dismiss the claims under Section 10(b) and Rule 10b-5 is GRANTED.

### B. Section 20(a)

Section 20(a) of the Exchange Act imposes liability on individuals who control any person or entity that violates section 10. *See* 15 U.S.C. § 78t(a). "To assert *a prima facie* case under Section 20(a), a plaintiff 'must show a primary violation by the controlled person and control of the primary violator by the targeted defendant, and show that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person.' " *Ft. Lauderdale Gen. Emps.' Ret. Sys.*, 811 F. Supp. 2d at 882 (quoting *S.E.C. v. First Jersey Sec, Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996).

Liability for a Section 20(a) violation is derivative of liability for a Section 10(b) violation. *See, e.g.*, *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 297–98 (S.D.N.Y. 2006). Because Plaintiffs have inadequately pled a § 10(b) violation, they cannot make a successful Section 20(a) claim. Consequently, Defendants' motion to dismiss Plaintiffs' Section 20(a) claim is GRANTED.

### C. Leave to Amend

Plaintiff requests leave to amend the complaint in the event the Court grants Defendants' motion. Doc. 69 at 34 n.35. Federal Rule of Civil Procedure 15 instructs courts to "freely give leave [to amend a pleading] when justice so requires." Fed. R. Civ. P. 15(a)(2). The Second Circuit has instructed courts not to dismiss a complaint "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Shabazz v. Bezio*, 511 F. App'x 28, 31 (2d Cir. 2013) (quoting *Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009)). In *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*, the Second Circuit reaffirmed the "liberal spirit" of Rule 15 and counseled strongly against the dismissal of claims with prejudice prior to "the benefit of a ruling" that highlights "the precise defects" of those claims. 797 F.3d 160, at 190–91 (quoting *Williams v. Citigroup Inc.*, 659 F.3d 208, 214 (2d Cir. 2011) (per curiam)).

Here, although Plaintiffs have already had the opportunity to amend their original complaint, because this is the Court's first opportunity to highlight the precise defects of Plaintiffs' pleading and it is not yet apparent that another opportunity to amend would be futile, the Court will permit Plaintiffs to replead their dismissed claims.

2022 WL 103563

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED. Plaintiffs may file a third amended complaint, if at all, by February 11, 2022. The Clerk of Court is respectfully directed to terminate the motion, Doc. 66.

It is SO ORDERED.

**All Citations**

Slip Copy, 2022 WL 103563

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

---