# EXHIBIT 1

COURT OF APPEAL FOR ONTARIO

CITATION: CITATION:Badesha v. Cronos Group Inc., 2022 ONCA 663
DATE: 20220926
DOCKET: C69722

Feldman, Roberts and Favreau JJ.A.

BETWEEN

Harpreet Badesha

Plaintiff (Appellant)

and

Cronos Group Inc., Michael Gorenstein, William Hilson, Jerry Barbato, Kevin C. Crostwaite Jr., Bronwen Evans, Murray R. Garnick, Bruce A. Gates. Jason Adler, James Rudyk, Jody Begley, Alan Friedman and Michael Coates

Defendants (Respondents)

Paul Bates, Garth Myers and Paul Guy, for the appellant

James Doris, Michael O'Brien and Alexandria Matic, for the respondents

Heard: March 17, 2022 by video conference

On appeal from the order of Justice Edward M. Morgan of the Superior Court of Justice, dated June 28, 2021, with reasons reported at 2021 ONSC 4346.

**Favreau J.A.:**

Page:  2

[1]     The appellant, Harpreet Badesha, seeks to bring a class action on behalf of the shareholders of the respondent Cronos Group Inc. ("Cronos"). The claim alleges that there were misrepresentations in Cronos's public filings in 2019. In order to proceed with the proposed action, the appellant requires leave of the court pursuant to s. 138.8 of the *Securities Act*, R.S.O. 1990, c. S.5 and certification of the action as a class proceeding pursuant to the Class Proceedings Act, 1992, S.O. 1992, c. 6.

[2]     The motion judge heard the leave motion and the certification motion together. The motion judge characterized the appellant's proposed claim as an action alleging that the defendants made 7,449 separate misrepresentations. He dismissed the motion for leave under the *Securities Act* on the basis that the appellant failed to put forward any evidence that each of the alleged misrepresentations materially contributed to the drop in the price of Cronos's shares at the relevant time. The motion judge also dismissed the motion for certification on the same basis.

[3]     In my view, the motion judge erred in his characterization of the claim, which led to an erroneous application of the test for leave under s. 138.8 of the *Securities Act*. Read generously, the statement of claim does not allege 7,449 discrete misrepresentations. Rather, it alleges that Cronos misrepresented its revenues for two quarters in 2019; these were material misrepresentations that were corrected in March 2020 and that affected share prices at that time. Viewing the claim from

Page:  3

this perspective, in combination with the parties' evidence, the motion judge ought to have found that there is a reasonable possibility that the action will be resolved in favour of the appellant at trial.

[4]    I would allow the appeal and order that the appellant be granted leave to proceed with the action under s. 138.3 of the Securities Act. I would remit the issue of whether the action should be certified as a class proceeding, including as a global class proceeding, back to the Superior Court for determination.

## A.    BACKGROUND

### (1)  Cronos and the events of 2019

[5]    Cronos is a company based in Canada. Its primary business is the cultivation, manufacturing and marketing of cannabis and cannabis-derived products for medical and recreational purposes. Cronos sells its products in Canada and in other parts of the world where use of the products is legal.

[6]    The appellant's claim against Cronos and the other respondents arises from statements made in documents announcing the company's activities and results in 2019, and corrections to those statements in 2020.

[7]    In March 2019, Cronos completed two transactions involving the exchange of cannabis dry flower for cannabis resin with a third party. On May 9, 2019, Cronos released its first quarter results for 2019 in interim unaudited financial statements for the three-month period ending on March 31, 2019 ("2019 Q1 interim financial

Page: 4

statements"). At the same time, Cronos released a Management Discussion and Analysis covering the same time period ("2019 Q1 MD&A"). The documents attributed revenue to Cronos for the first quarter of 2019 from the March 2019 dry flower/resin exchange transactions.

[8]    On August 8, 2019, Cronos released its 2019 Q2 interim financial statements and 2019 Q2 MD&A. These documents included results for the first quarter of 2019 and again reported revenue for the Q1 dry flower/resin exchange transactions.

[9]    In September 2019, Cronos entered another set of transactions exchanging cannabis dry flower for cannabis resin with a third party. On November 12, 2019, Cronos released its 2019 Q3 interim financial statements and 2019 Q3 MD&A. In these documents, Cronos reported revenue for the 2019 Q3 dry flower/resin exchange transactions and again reported revenue for the Q1 dry flower/resin exchange transactions.

[10]   In early 2020, Cronos made a number of public disclosures addressing its reporting on the exchange transactions.

[11]   On February 24, 2020, Cronos issued a press release announcing that it was delaying the completion of its 2019 Q4 interim financial statements and its 2019 audited annual financial statements.

Page:  5

[12]    On March 2, 2020, Cronos issued a press release announcing that it filed a notice with the United States Securities and Exchange Commission, seeking a 15-day extension for its annual report. The press release stated that Cronos was unable to complete the report on time due to "several bulk resin purchases and sales of products through the wholesale channel and the appropriateness of revenue from those transactions."

[13]    On March 17, 2020, Cronos issued a press release and a material change report, advising that its 2019 Q1, Q2 and Q3 unaudited financial statements would be reissued and restated. Cronos disclosed that the revenue reported for 2019 Q1 would be reduced by $2.5 million and for 2019 Q3 by $5.1 million. Cronos also disclosed that it anticipated reporting one or more material weaknesses in its internal controls.

[14]    On March 30, 2020, Cronos released a series of documents, including restated interim financial statements and MD&As for 2019 Q1, Q2 and Q3, 2019 audited annual financial statements and a 2019 MD&A. In addition, the MD&A described the weaknesses in Cronos's internal controls over financial reporting and the measures it intended to adopt to remediate those weaknesses.

**(2)    The statement of claim**

[15]    The appellant, Badesha Harpreet, who owned shares in Cronos during the relevant time period, commenced an action against Cronos and a group of

Page:  6

individual defendants. By the time of the motion before the motion judge, the appellant had amended his statement of claim. (Accordingly, all references to the "statement of claim" or the "claim" hereafter refer to the amended statement of claim.)

[16]   In his claim, the appellant seeks to bring a class action on behalf of all Cronos shareholders who held shares between August 14, 2018 and March 30, 2020. The pleaded causes of action are misrepresentation under s. 138.3 of the *Securities Act*, negligent misrepresentation at common law and oppression under the *Business Corporations Act*, R.S.O. 1990, c. B.16.

[17]   Given the motion judge's decision and the issues on appeal, it is necessary to review the specific manner in which the allegations of misrepresentation are pleaded.

[18]   In the overview section of the claim, the appellant alleges that, during the class period, Cronos and other public cannabis issuers were under pressure to show increasing revenues and sustainable growth. Faced with that pressure, Cronos allegedly "orchestrated a scheme to inflate its reported revenue figures" by entering "into simultaneous transactions with third parties to both sell to them cannabis dry flower and to purchase back cannabis resign and tinctures, transactions that were concluded in contemplation of one another." The claim alleges that Cronos then improperly "booked these sales as revenue" rather than

Page: 7

"properly accounting for these transactions at the carrying value of inventory transferred by Cronos". These improper transactions represented 35% of Cronos's reported revenue for 2019 Q1 and 38% of its revenue for 2019 Q3.

[19] After describing the parties and the exchange transactions in more detail, paragraph 53 of the claim sets out six categories of alleged misrepresentations as follows:

> 53.    During the Class Period, Cronos and the Individual Defendants made the following categories of misrepresentations:
>
> (a)    misrepresentations regarding revenue and consequential misstatements of its financial results ("**Revenue Representations**");
>
> (b)    misrepresentations that Cronos's financial statements were compiled in accordance with IAS and IFRS ("**IAS Representation**");
>
> (c)    misrepresentations in the disclosures of risk encountered by Cronos ("**Risk Representations**");
>
> (d)    misrepresentations regarding Cronos's compliance with its Code of Conduct ("**Code Representations**");
>
> (e)    misrepresentations regarding the effectiveness of Cronos's DC&P and IFCR ("**Controls Representation**"); and
>
> (f)    omissions regarding the nature of Cronos's agreements with third parties ("**Third Party Agreement Representations**").

Page:  8

[20]    The claim is then broken into a series of subsections, each of which deals with the six categories of misrepresentations.[1]

[21]    In the section dealing with the Revenue Representations, the claim describes the Q1 2019 and Q3 2019 transactions, and how these were misreported as revenue in Q1, Q2 and Q3 disclosures. The claim includes a Schedule "A", which sets out what is described as a "comprehensive list of misrepresentations arising from Cronos's improper revenue recognition for Q1, Q2 and Q3 2019". Schedule "A" sets out a long list of line items from the 2019 Q1, Q2 and Q3 interim financial statements, such as accounts receivable, inventory and total assets. The Revenue Representations subsection also refers to other documents and oral statements in which Cronos allegedly repeated its misrepresentations about its revenues for 2019 Q1 and Q3.

[22]    Following the section of the claim that particularizes the six categories of misrepresentations, the claim goes on to describe the various corrections to the misrepresentations. This includes Schedule "B" to the claim, which lists the corrections to line items in Schedule "A" of the claim.

[23]    Paragraph 1 of the claim sets out the relief the appellant seeks in the action, which includes compensation for the misrepresentations and a series of

---

[1] By the time of the motion, the appellant only sought to pursue four categories of misrepresentations, namely the Revenue Misrepresentations, IAS Misrepresentations, Controls Misrepresentations and Risk Misrepresentations.

Page:  9

declarations. One of the declarations sought by the appellant is that the misrepresentations in paragraph 53 of the claim not be treated as a single misrepresentation for the purpose of calculating liability limits.

**(3)   Expert evidence on the motion**

[24]   Each side put forward expert evidence on the motion.

[25]   The appellant's evidence included a report by Dr. Douglas J. Cumming, who is a professor of Finance and Entrepreneurship at the College of Business, Florida Atlantic University, and a Chartered Financial Analyst. Dr. Cumming provided an opinion on whether the alleged misrepresentations in the statement of claim "were material, in the sense that they would reasonably be expected to have a significant effect on the market price of [Cronos's] shares." Dr. Cumming conducted an "event study", and concluded that Cronos's disclosures in 2020 led to the following statistically significant share price reductions:

> (a) after the March 2, 2020 disclosure, there was a statistically significant price reaction of -8.10%;
>
> (b) after the March 19, 2020 disclosure, there was a statistically significant price reaction of -8.40%, and an additional statistically significant share price reaction of -13.46% on March 23; and
>
> (c) after the March 30, 2020 disclosure, there was a statistically significant share price reaction of -10.24%.

[26]   Dr. Cumming concluded that the misrepresentations regarding Cronos's revenues for 2019 Q1 and Q3 and subsequent corrections in March 2020 caused

Page: 10

the statistically significant drop in prices. He based this conclusion on a review of the trading on the relevant dates and on academic studies regarding the significance of these types of disclosures. He explained his conclusion as follows:

> [Cronos's] large stock price decline and negative excess returns net of market and industry changes after the disclosures on March 2, March 19, and March 30, 2020 are directly attributable to new information correcting [Cronos's] alleged misrepresentations. These misrepresentations were material to investors, as evidenced by the fall in prices, large negative excess returns, and substantial trading volume for [Cronos's] common stock subsequent to their correction. [Cronos's] average daily trading volume was 1.85 million shares (11.05 million shares) on the TSX (NASDAK) during the Class Period prior to the February 24, 2020 disclosure, and averaged 6,77 million shares (28.95 million shares) on March 3, March 20, March 23, and March 31, 2020 in the days following the corrective disclosure on March 2, 19, and 30, 2020, which is a 366% increase in average daily trading volume (Appendix 4). [Cronos's] price decline and trading volume cannot be explained by confounding news on these days.
>
> Finally, in my opinion, the statistical and economic significance of [Cronos's] improper revenue recognition and internal controls on its share price is consistent with academic studies on these topics which show similar negative impacts on share prices from misrepresentations relating to revenue recognition and internal controls. Leading academic studies show that investors consistently take into account improper internal controls in their investment decisions, and revelation of internal control failures and misreporting result in material share price declines. [Footnotes omitted.]

Page:  11

[27]    The respondent's expert evidence included a report by Dr. Douglas Skinner, who responded to Dr. Cumming's report. In his report, Dr. Skinner took issue with Dr. Cumming's conclusions, including the following:

a.    Dr. Skinner stated that Dr. Cumming's event study did not accord with the well-accepted methodology for event studies. For example, he stated that Dr. Cumming's event study did not consider the impact of the COVID-19 pandemic on global market prices.

b.    Dr. Skinner opined that the March 2, 2020 disclosures did not have any statistically significant market impact, when the intraday stock prices were taken into consideration. Specifically, while stock prices dropped overnight after the March 2, 2020 disclosure, the prices had stabilized shortly after the reopening of markets on March 3, 2020.

c.    Dr. Skinner disputed that the March 19, 2020 disclosure led to any statistically significant decline in share prices. Again, Dr. Skinner based this view on an analysis of the intraday impact on share prices. He also stated that, by this point, the corrective information was "stale", as it had previously been disclosed, and therefore any drop in share prices could not be attributed to the disclosure.

d.    With respect to the drop in share prices resulting from the March 30, 2020 disclosure, Dr. Skinner accepted that it was statistically significant. However, in his view, it was caused by factors other than the corrected

Page: 12

results for 2019. For example, it was likely caused by factors such as Cronos's announcement that it was delaying distribution of a new product, referred to as PEACE+, to the United States. In part, Dr. Skinner based this conclusion on a review of contemporaneous commentary on the disclosure of Cronos's results at the relevant time.

[28]  Dr. Cumming replied to Dr. Skinner's opinion evidence. In his reply, Dr. Cumming pointed out that both experts agree that there were drops in the share prices after announcements on March 2, 19 and 30, 2020, and that they both agreed that the drop in shares prices on March 30, 2020 was statistically significant. Dr. Cumming explained the basis on which he disagreed with Dr. Skinner's methodology and his view that contemporaneous public statements supported his conclusion that the disclosures affected Cronos's share prices. Dr. Cumming also explained that his event study took the impact of the COVID-19 pandemic into consideration.

[29]  Besides the expert evidence, the parties also produced documents referred to by the experts that provided contemporaneous commentary on Cronos's March 2020 disclosure and restated financial statements.

Page: 13

## (4)  The motion judge's decision

[30]  In his decision, the motion judge dismissed the motion for leave to proceed with the s. 38.3 claim under the *Securities Act* and denied the motion for certification.

[31]  At the outset, the motion judge characterized the appellant's claim as alleging that the defendants to the action made close to 8,000 separate misrepresentations, which he later specifically calculated as 7,449 misrepresentations. He explained the basis for this characterization as follows:

> [20] At the hearing of the motion, Mr. Myers, for the Plaintiff, set out a litany of what he characterized as separately and independently actionable misrepresentations committed by Cronos and the individual Defendants during 2019. In all, the Plaintiff claims that there were over 570 individual misrepresentations in Cronos' 2019 first, second and third quarter Interim Financial Statements and MD&As. These are alleged to have been reiterated or augmented or supplemented and added to in various statements and certification by individual Defendants. When one tallies it all up, there are allegations of just under 8,000 misrepresentations covered by the Plaintiff's pleading.
>
> [21] The accounting misrepresentations are listed in lengthy schedules to the Amended Statement of Claim. Each alleged misrepresentation relates to purportedly improper revenue recognition for the Q1 and Q3 2019 exchange transactions described above. Thus, any one adjustment made by KPMG is characterized as a multiple error, impacting on, and attributed by the Plaintiff to, anything from accounts receivable, to inventory, to gross and net revenue figures.

Page:  14

[32]    The motion judge then applied the two-part test for leave under s. 138 of the *Securities Act* based on this characterization of the claim. He found that the action was brought in good faith and therefore that the first part of the test was met. However, he found that there was no reasonable possibility that the appellant could succeed at trial and therefore the second part of the test was not met.

[33]    In reaching his conclusion on the second part of the test, the motion judge reviewed the appellant's expert evidence and found that the appellant's expert evidence was "weak" on the issue of whether the misrepresentations affected the share prices, partly because the COVID-19 pandemic likely had an impact on share prices at the relevant time.

[34]    In addition, the motion judge held that, given that the appellant advanced the claim on the basis that the defendants collectively made close to 8,000 misrepresentations, the expert evidence did not support or even address the separate misrepresentations. On that basis, the motion judge found that the test for leave was not met because the appellant had not shown, nor was he capable of showing, that each separate alleged misrepresentation materially contributed to a loss in share price during the relevant time period.

[35]    Having found that the test for leave was not met, the motion judge then turned to the motion for certification. In that context, he focused his analysis on the requirement in s. 5(1)(a) of the *Class Proceedings Act* that the claim disclose a

cause of action. He concluded that the claim does not disclose a cause of action because the claim did not provide any of the misrepresentations made by the individual defendants and because the pleading did not address how the multiple individual misrepresentations caused the plaintiff's losses or the drop in share prices.

## B.    POSITIONS OF THE PARTIES

[36]    On appeal, the appellant has narrowed the proposed claim as follows:

> a.    The only cause of action the appellant seeks to pursue is a claim for misrepresentation under s. 138.3 of the *Securities Act*. He no longer asserts a claim for negligent misrepresentation at common law or for oppression under the *Ontario Business Corporations Act*.
>
> b.    Other than Cronos, the plaintiff only seeks to pursue a claim against Mr. Gorenstein and Mr. Barbato, who were respectively Cronos's CEO and CFO at the relevant time. The appellant no longer seeks to pursue a claim against the other individual defendants.
>
> c.    The appellant only relies on misrepresentations in the 2019 Q1, Q2 and Q3 interim financial statements, MD&As and Certificates. He no longer relies on misrepresentations in other documents or on oral misrepresentations.

Page:  16

d.     The appellant has also narrowed the class period from the period of August 14, 2018 to March 30, 2020, to the period of May 9, 2019 to March 30, 2020.

[37]   The appellant submits that the motion judge erred in requiring that he meet the materiality aspect of the test for leave under s. 138.8 of the *Securities Act* by showing that each of the alleged 7,449 misrepresentations caused specific drops in share prices. The appellant also submits that the trial judge erred in holding that the drop in share prices at the relevant time was attributable to COVID-19 rather than to the misrepresentations. In addition, the appellant submits that the motion judge erred in finding that the claim did not disclose a cause of action, and he asks that this court certify the action as a global class proceeding.

[38]   The respondents argue that the motion judge made no errors. They argue that the motion judge properly characterized the claim, and that the evidence on the motion could not support a finding that each alleged misrepresentation had a material impact on the price of shares. They further argue that the motion judge did not improperly attribute the drop in share prices to the COVID-19 pandemic, but rather based his decision on a review of all the available evidence. Finally, they argue that, if this court finds that the motion judge erred in not granting leave pursuant to s. 138.8 of the *Securities Act,* the issue of certification under the *Class Proceedings Act* should be sent back to the Superior Court for determination.

Page:  17

## C.    ANALYSIS

[39]   I agree with the appellant that the motion judge erred in characterizing the claim as being based on 7,449 separate misrepresentations. This approach to the claim tainted his analysis.

[40]   As set out below, viewed properly, the claim alleges one central misrepresentation, namely that Cronos misrepresented its revenues for 2019 Q1 and Q3 by treating transactions involving the exchange of cannabis products with a third party as generating revenue (resulting in misrepresentations in its interim financial statements, MD&As and Certificates for 2019 Q1, Q2 and Q3). Cronos ultimately corrected those documents and line items. The issue of whether this core misrepresentation should be broken down and treated as several misrepresentations for the purpose of calculating damages is to be decided at trial and not at this early stage of the proceedings.

[41]   At this stage of the proceedings, the evidence supports a finding that the appellant has a reasonable possibility of success. There are admitted misrepresentations that were corrected. The price of Cronos's shares dropped around the dates when the corrections were publicly announced. While there is conflicting evidence on the issue of whether the drops in price were caused by the misrepresentations or other factors, such as the COVID-19 pandemic, there is

Page:  18

sufficient evidence to find that the appellant's claim has a reasonable possibility of success.

[42]   I have broken the analysis below down into the following parts: (1) an overview of the relevant provisions of the *Securities Act* and the test for obtaining leave; (2) a discussion of the errors committed by the motion judge in characterizing the claim; (3) once the claim is properly characterized, a discussion of whether the evidence supports a finding that there is a reasonable possibility of success; and (4) a discussion of the appellant's request that this court certify the action as a global class proceeding.

**(1)   Test for obtaining leave under s. 138.8 of the *Securities Act***

[43]   Section 138.3(1) of the *Securities Act* creates a statutory right of action for misrepresentations made by issuers or persons authorized to act on behalf of issuers. The provision gives a right of action to a person or company who acquires or disposes of the issuer's security between the date of release of a document containing a representation and the date the document is publicly corrected, regardless of whether the person or company relied on the misrepresentation.

[44]   When a party brings an action for misrepresentation under s. 138.3(1), s. 138.3(6) gives the court discretion to treat multiple misrepresentations "having common subject matter or content" as a "single misrepresentation".

Page: 19

[45] Section 138.5 of the *Securities Act* prescribes how damages for a misrepresentation are to be calculated, and s. 138.7 places limits on those damages.

[46] While s. 138.3(1) of the *Securities Act* creates a statutory cause of action that eliminates the need to prove reliance on the misrepresentation, to guard against strike suits, s. 138.8(1) of the *Act* requires that a party obtain leave of the court before proceeding with a claim: see *Canadian Imperial Bank of Commerce v. Green*, 2015 SCC 60, [2015] 3 S.C.R. 801, at paras. 67-69; *Rahimi v. SouthGobi Resources Ltd.*, 2017 ONCA 719, 417 D.L.R. (4th) 97, at paras. 36-38. The statutory test for leave provides that the court is only to grant leave if it is satisfied that: (a) the action is being brought in good faith, and (b) there is a reasonable possibility that the action will be resolved in favour of the plaintiff at trial.

[47] In order to meet the "reasonable possibility" of success branch of the test for leave, the plaintiff must show that there was a misrepresentation and that the misrepresentation was material: see *1654776 Ontario Limited v. Stewart*, 2013 ONCA 184, 364 D.L.R. (4th) 302, at para. 64, leave to appeal refused, [2013] S.C.C.A. No. 225. Section 1 of the *Securities Act* defines "misrepresentation" as including "an untrue statement of material fact". In turn, s. 1 of the *Act* defines a "material fact" used in relation to issued securities as "a fact that would reasonably be expected to have a significant effect on the market price of value of the securities".

Page: 20

[48] In *Theratechnologies Inc. v. 121851 Canada Inc.*, 2015 SCC 18, [2015] 2 S.C.R. 106, at para. 39, the Supreme Court explained, in relation to the same provision in the equivalent Quebec statute[2], that the "reasonable possibility" branch of the test for leave is meant to be "more than a speed-bump" but not meant to be a "mini-trial". When seeking leave, a plaintiff must "offer both a plausible analysis of the applicable legislative provisions, and some credible evidence in support of the claim": at para. 39. The court explained the rationale for these requirements as follows:

> A case with a reasonable possibility of success requires the claimant to offer both a plausible analysis of the applicable legislative provisions, and some credible evidence in support of the claim. This approach, in my view, best realizes the legislative intent of the screening mechanism: to ensure that cases with little chance of success – and the time and expense they impose – are avoided. I agree with the Court of Appeal, however, that the authorization stage under s. 225.4 should not be treated as a mini-trial. A full analysis of the evidence is unnecessary. If the goal of the screening mechanism is to prevent costly strike suits and litigation with little chance of success, it follows that the evidentiary requirements should not be so onerous as to essentially replicate the demands of a trial. To impose such a requirement would undermine the objective of the screening mechanism, which is to protect reporting issuers from unsubstantiated strike suits and costly unmeritorious litigation. What *is* required is sufficient evidence to persuade the court that there is a reasonable possibility that the action will be resolved in the claimant's favour. [Emphasis in original.]

---

[2] *Securities Act*, C.Q.L.R. c. V-1.1, s 225.4.

Page:  21

**(2)  The motion judge erred in treating the action as a claim based on 7,449 misrepresentations**

[49]   As reviewed above, the motion judge treated the proposed action as a claim alleging that the defendants collectively made 7,449 individual misrepresentations. He found that there was no reasonable possibility that the appellant could succeed at trial because there was no evidence that each of the alleged misrepresentations affected Cronos's share prices, nor would it be possible to demonstrate that each misrepresentation affected the share prices.

[50]   In my view, the motion judge made a palpable and overriding error in characterizing the claim as alleging that the defendants made 7,449 separate misrepresentations. This approach to the statement of claim is inconsistent with the structure and wording of the claim itself and with statutory intent.

[51]   On its face, the claim does not plead that the defendants collectively made 7,449 misrepresentations. As reviewed above, Cronos's claim focuses on the company's mischaracterization of the cannabis flower/resin exchange transactions as generating revenue. In the overview section of the claim, the core allegations are summarized as follows:

> Through each of its first three quarters of 2019, Cronos posted increasing revenue, signalling to shareholders bright future prospects as it fought with competitors for a share of the nascent cannabis market.

Page:  22

> Unknown to its shareholders, however, Cronos had orchestrated a scheme to inflate its reported revenue figures. To do so, Cronos entered into simultaneous transactions with third parties to both sell to them cannabis dry flower and to purchase back cannabis resin and tincture, transactions that were concluded in contemplation of one another.
>
> Instead of properly accounting for these transactions at the carrying value of inventory transferred by Cronos, Cronos booked these sales as revenue, thereby inflating its balance sheet and its bottom line by signaling to shareholders quarter by quarter that Cronos was a growing company.
>
> These improper transactions represented 35% of Cronos's reported revenue for Q1 2019 and 38% for Q3 2019. [Emphasis added.]

[52] Further in the claim, at paragraph 53, as quoted above, the misrepresentations are broken down into six categories, only four of which the appellant relied on at the motion. The claim then goes on to provide particulars of each category of the misrepresentations, including Schedule "A", which sets out all the line items from the interim financial statements that were later corrected. Admittedly, a handful of the particulars do not relate to the core alleged misrepresentation. However, the vast majority of the particulars are manifestations of the core allegation that Cronos and the other defendants misrepresented their revenues by characterizing the exchange transactions as generating revenue. Now, with the appellant's proposed narrowing of the claim, all alleged misrepresentations relate to this core misrepresentation.

Page:  23

[53]    The motion judge based his approach to the claim in part on the appellant's request for a declaration that the misrepresentations listed at paragraph 53 of the claim not be treated as a single misrepresentation for the purpose of s. 138.3(6) of the *Securities Act*. The motion judge explained his rationale for this approach as follows:

> [67] The *OSA* also addresses the prospect of there being a sequence of numerous misstatements which are alleged to cumulatively add up to a material misrepresentation. Thus, section 138.3(6)(a) provides that "multiple misrepresentations having common subject matter or content may, in the discretion of the court, be treated as a single misrepresentation". This would allow a plaintiff to base a secondary market claim on, for example, a number of interim financial statements, MD&As, press releases, etc. disseminated by a reporting issuer, all of which collectively convey the allegedly misrepresented information on which the claim is based. However, as indicated above, the Plaintiff has specifically pleaded that this collective approach to misrepresentations is not the case here. Paragraph 2(g) of the Amended Statement of Claim seeks:
>
> > a declaration that each misrepresentation stated in paragraph 53 gives rise to separate liability limits for each of the Defendants pursuant to Part XXIII.1 of the *OSA* and the corresponding provisions of the other Securities Legislation, such that there is no basis to grant the Defendants relief under sc. 138.3(6) of the *OSA* and the corresponding provisions of the other Securities Legislation to treat the misrepresentations as a single misrepresentation.
>
> [68] Section 138.7 of the *OSA* sets out liability limits in calculating damages for secondary market claims. Each

actionable misrepresentation is subject to its own separate liability limit. In including in the prayer for relief a declaration that each of the nearly 8,000 alleged misrepresentations is a separate ground of liability, the Amended Statement of Claim seeks to attribute a separate liability limit for each of them. This, of course, could potentially increase the damages limit exponentially, and might go some way to explain why the pleading has been framed so that multiple and repetitive allegations are not grouped together under section 138.3(6)(a) as cumulatively adding up to a single or lesser number of actionable misrepresentations.

[69] As pleaded, each of the alleged 7,449 individual misrepresentations therefore must be shown to have been separately and distinctly "material" in the *OSA*'s section 1(1) definition of that term. The Defendants' evidence of materiality – i.e. of market impact – does not even attempt to meet that standard.

[54] As reviewed above, s. 138.3(6) of the *Act* gives the court discretion to treat misrepresentations dealing with a common subject matter as a single misrepresentation. By requesting that the misrepresentations listed at paragraph 53 be treated as single misrepresentations, presumably the appellant is seeking to maximize the available damages by avoiding the limits on damages in s. 138.7 of the *Securities Act*. However, the request for declaratory relief did not suggest that the claim was based on 7,449 separate misrepresentations, but rather that the plaintiff sought to have the claim treated as dealing with originally six, and ultimately four, separate misrepresentations. While the paragraphs of the claim following paragraph 53 provide particulars of the alleged categories of misrepresentations, there is nothing in the claim to suggest that the appellant

Page: 25

seeks to have each manifestation of the misreported revenue treated as a separate misrepresentation for the purpose of the claim for damages.

[55]   More significantly, in my view, the declaration sought by the appellant is part of the relief sought and therefore an issue to be dealt with at trial. The requested declaration should not drive the analysis of whether there is a reasonable possibility that the appellant will succeed at trial. Section 138.3(6) gives the court discretion to treat misrepresentations with a common subject matter as a single misrepresentation. In *Kaynes v. BP, P.L.C.*, 2018 ONCA 337, at para. 21, this court explained that the purpose of s. 138.3(6) is to protect defendants from multiple liability:

> [W]e agree with the motion judge's conclusion that the legislative history of s. 138.3(6) demonstrates that it was enacted as a consequence of an Ontario Securities Commission response to a Request for Comments. <u>It is plain from that submission that the section was designed to protect issuers from multiple rights of action or multiple liability for essentially the same misrepresentation repeated on a number of occasions</u>. [Emphasis added.]

[56]   Accordingly, where the issuer made multiple related misrepresentations, the damages attributable to those misrepresentations may be limited to the damages available if the issuer had made only one misrepresentation. However, fundamentally, this is an issue for trial. It would be up to the trial judge to decide whether to exercise their discretion to treat multiple misrepresentations as a single

Page: 26

misrepresentation and the effects of such a determination on the availability of damages.

[57]   For the purposes of the leave motion, on the facts of this case, it was premature for the motion judge to assume that the alleged misrepresentations should be treated as multiple individual misrepresentations rather than a single misrepresentation given their common subject matter. In other words, given the manner in which the claim is pleaded and the core commonality among the alleged misrepresentations, there is a basis for treating the claim as being about a single misrepresentation and the analysis of the reasonable possibility test should proceed on that basis. The reasonable possibility test is about weeding out unmeritorious claims. It is not about dismissing potentially valid claims on technical grounds.

[58]   In fairness to the trial judge, his reasons suggest that counsel for the appellant may have overemphasized the individuality of the alleged misrepresentations during oral argument. In addition, the appellant's factum and reply factum on the motion do state that there were multiple individual misrepresentations.

[59]   Nevertheless, while the reasonable possibility test is meant to be more than a "speed bump", at this early stage in the proceeding the claim is to be read generously. The appellant's claim may be overexpansive in its details, but this

Page: 27

does not detract from the fact that, at its core, this is a claim alleging that Cronos misrepresented its revenues for two quarters based on one accounting error, and that those misrepresentations, once they were corrected, affected the share prices. This is the type of claim s. 138.3 is designed to address. In determining whether the claim meets the test for leave, this is how the claim should be characterized.

**(3)   The evidence supports granting leave**

[60]   The motion judge's decision not to grant leave was primarily based on his characterization of the claim as being based on 7,449 individual misrepresentations, and his view that there was no evidence to support a finding that each of those misrepresentations separately caused share prices to drop. Given that this approach was an error, the question then becomes whether the motion judge's other findings and the evidence on the record support his conclusion that there is no reasonable possibility that the appellant will succeed at trial. In my view, as discussed below, had the motion judge approached the claim properly, he ought to have found that there is a reasonable possibility that the appellant will succeed in the action.

[61]   The respondents argue that, even if the motion judge erred in treating the claim as alleging 7,449 separate misrepresentations, he nevertheless found that, if construed as a claim based on one central misrepresentation, there is no

Page: 28

reasonable possibility that the appellant will succeed. The respondents argue that this finding is entitled to deference and that the appeal should be dismissed.

[62] The appellant disagrees and argues that, to the extent the motion judge found that the misrepresentations did not have a material impact on share prices, he erred in making this finding because he improperly based this conclusion on a finding that any drop in share prices was caused by the COVID-19 pandemic and not by the misrepresentations. The appellant argues that the record does not support such a finding and the motion judge thereby made a palpable and overriding error.

[63] In addressing the merits of these positions, it is helpful to review in some detail the motion judge's reasoning. Specifically, I will focus on whether, regardless of the mischaracterization of the claim as being about a multitude of individual misrepresentations, the motion judge nevertheless found that the misrepresentations treated collectively had no material impact on the price of Cronos's shares and, if so, whether such a finding is consistent with the reasonable possibility test and the evidence.

[64] As reviewed above, the reasonable possibility test is not meant to be a mini-trial, but it is also not meant to be limited to a *de minimis* assessment of the evidence on the record. As held by this court in *Mask v. Silvercorp Metals Inc.*, 2016 ONCA 641, at para. 43, "a 'reasoned consideration of the evidence' must

Page: 29

include scrutiny of the evidence proffered by both sides, and some weighing of the defence evidence against that adduced by the plaintiff."

[65]  In his reasons, before getting to the issue of the lack of evidence that the 7,449 alleged misrepresentations individually caused drops in the share prices, the motion judge discussed the parties' evidence and addressed the issue of whether the misrepresentations made in relation to the revenues for 2019 Q1 and Q3 could be characterized as material.

[66]  In reviewing this evidence, the motion judge started with the correct premise that a restatement on its own is not sufficient to make a finding that a misrepresentation was material. Rather, relying on authority from this court and the Superior Court, the motion judge held that whether a correction is material is not a matter of semantics, but rather requires an understanding of how a specific correction would be understood in an efficient market and also requires a statistical analysis of the effect of the correction:

> [53] The Court of Appeal made this very point in *Barrick*, at para. 50, quoting approvingly from the motion court's judgment in *Drywall Acoustic Lathing and Insulation, Local 675 Pension Fund (Trustees of) v. SNC-Lavalin Group Inc.*, 2016 ONSC 5784, at para. 45:
>
> > [T]he determination of whether a corrective disclosure is corrective depends not only on a semantic analysis of how the words would be understood in an efficient market and also a statistical analysis of the effect of those words on the market's evaluation of

Page: 30

> the value of the securities that had been misrepresented to the marketplace.
>
> [54] The impact on the market lies at the heart of the statutory definition of "material fact". It is not just an add-on to be examined in case the public corrections are somehow unclear. The possibility exists that there were misrepresentations in the form of inaccuracies in financial statements, but that they had negligible impact and were not material in the *OSA* sense of the term.

[67]   The motion judge then reviewed some of the evidence regarding how the March 2020 corrections were understood.

[68]   He started by expressing his view that the evidence suggested that the corrections to the 2019 Q1and Q3 financial disclosures had little or no impact on share prices in March 2020.

[69]   In doing so, he reviewed Dr. Skinner's evidence and, as part of that review, addressed his view of the impact of the COVID-19 pandemic:

> [57]   Finally, and perhaps most importantly, Professor Skinner observes that, "[t]he alleged corrective disclosure during a period of unusual market volatility, as news came to the market regarding the seriousness of the COVID-19 pandemic in February and March, 2020." This, if anything, is an understatement.
>
> [58]   The Plaintiff himself has included in his Supplemental Motion Record a market analysis by Morningstar Financial Research whose very title makes the point emphatically: "COVID-19 Pandemic Tanks Cannabis Stocks but Has Little Impact on Their Long-Term Potential". The market decline in late 2020 that is pointed to by the Plaintiff and his economics expert is, according to this evidence, more reflective of the materiality of the pandemic than of anything that Cronos

Page:  31

did or did not announce to the public. As Morningstar puts it, "The COVID-19 outbreak has rattled the economy and broader equity markets. Likewise, shares in cannabis companies have dropped significantly."

[70]   The motion judge also reviewed some of the other contemporaneous documents released at the time discussing the impact of the disclosures. He stated that those documents suggested that the "accounting matters that were restated by Cronos in March 2020 were already relatively obscure, with market analysts generally perceiving them as insignificant in both the long term and the short term." He referred to a report that stated that the transactions that led to the restated financial reports were a relatively small portion of Cronos's business and that Cronos was nevertheless viewed as a healthy company. He also referred to a report that opined that the March 2020 restatement was a sign of Cronos's health as a company, and that it was doing better than other companies in the same industry.

[71]   Despite this evidence, the motion judge acknowledged that there were some contemporaneous documents to support a finding that the March 2020 disclosure had a negative impact on Cronos's share prices. He described this evidence as follows:

> [63]   To be fair, there are some negative contemporaneous market reports about Cronos in the Plaintiff's motion record. Eight Capital's March 27, 2020 report entitled "Top line misses on lower volumes" indicated that Cronos had "disappointing Q4 results" and that the analysis had revised their performance analysis

Page:  32

"to reflect adjusted expectations on the timing and ramp-up of the company's cultivation assets". That said, the market report portion of the analysis was headed "Results disappoint but shares hang in", indicating that the analysts' concern was with Cronos' actual business performance and not with any reporting issues which impact on share prices.

[72]    Immediately following his review of the evidence on the impact of the March 2020 disclosure on share prices, the motion judge's reasons focus on his view, discussed above, that the claim is based on allegations that there were 7,449 separate misrepresentations and his conclusion that there is no evidence that would support a finding that any of those misrepresentations was individually material.

[73]    The motion judge ultimately concludes as follows:

> [77] In sum, the evidence of materiality contained in the record is all but non-existent. What evidence that does exist is weak and tends to confuse market-wide movements in share prices, especially those coinciding with the March 2020 onset of the COVID-19 pandemic, with company-specific movements.
>
> [78] Even more importantly, nothing in the record demonstrates that the thousands of alleged misrepresentations pleaded in the Amended Statement of Claim would each, to use the words of section 1(1) of the *OSA*, "reasonably be expected to have a significant effect on the market price or value" of Cronos' securities. In particular, the Plaintiff's materiality evidence fails to demonstrate the materiality of any individual misrepresentations asserted in the Amended Statement of Claim on an individual or even a category basis.

Page:  33

> [79] Rather than pleading factual causation for each alleged misrepresentation, the analysis is done on a global basis. All of the alleged misrepresentations are treated as a single misrepresentation, and this is despite their being specifically pleaded as separate and distinct from each other.
>
> [80] The record before me does not support leave to proceed. The Plaintiff has not established that there is a reasonable possibility of establishing at trial that the alleged misrepresentations were material. In fact, his own expert witness has conceded that cannot be shown. The claim is therefore lacking a crucial ingredient for liability under Part XXIII.1 of the *OSA*.

[74]   As indicated above, the appellant argues that the motion judge erred because he improperly found that the COVID-19 pandemic caused any drop in share prices at the relevant time. The appellant argues that this finding was inconsistent with the record and went beyond the scope of the motion judge's role on the motion; the issue of what impact the COVID-19 pandemic had on share prices, and whether such an impact can explain the relevant drop in share prices, is more properly decided at trial than on the motion for leave. In my view, the appellant overstates the motion judge's characterization of the impact of COVID-19 on Cronos's share prices. As reviewed above, the motion judge's consideration of whether the misrepresentations had an impact on the price of Cronos's shares focused primarily on the respondents' expert evidence and comments in contemporaneous documents dealing with the significance of the corrections. While he referred to the impact of the pandemic, this was only one of several factors he considered in assessing the materiality of the March 2020 disclosures.

Page: 34

[75]    But this does not end the inquiry. There is no doubt that deference is owed to the motion judge's assessment of the evidence on the motion.  However, in my view, the motion judge's assessment of the evidence was tainted by his characterization of the claim. As outlined above, the motion judge's conclusion on the strength of the evidence is followed immediately by his discussion about his view that the pleading was fundamentally flawed and that the evidence did not support, and could not support, a finding that each individual misrepresentation was material.

[76]    In this sense, he arguably never completed the exercise of deciding whether, if the claim was treated as alleging a single misrepresentation, the threshold for granting leave was met. Notably, while the motion judge reviewed and relied on the evidence of Dr. Skinner, the respondents' expert, he did not review and assess Dr. Cumming's evidence, other than to comment that this expert did not assess whether each of the alleged 7,449 misrepresentations was material. While the motion judge found that the claim was weak, he did not address whether the evidence was sufficient for granting leave. Rather, his conclusion on whether leave should be granted focused primarily on what he viewed as the fundamental flaws in the pleading and evidence.

[77]    Even if one were to treat the motion judge's analysis as complete, in my view, it tips into the realm of a mini-trial. In this case, there is evidence of misrepresentations regarding Cronos's revenues in 2019 Q1 and Q3. There is also

Page:  35

evidence that those misrepresentations were corrected in March 2020 through disclosures between February 24 and March 30, 2020. There were accompanying share price drops soon after the disclosures on March 2, 19 and 30, 2020. There is conflicting evidence on the significance of those drops in share prices. There is also conflicting evidence on the cause of those share price drops. This conflict is found in both contemporaneous documents that address the marketplace's reaction to the disclosure and expert evidence that analyzes the statistical significance of the disclosure. There is no doubt that the market forces at the time included the onset of the COVID-19 pandemic, but there is conflicting evidence regarding the pandemic's impact on Cronos's share prices.

[78]   These circumstances are sufficient to meet the reasonable possibility test. The evidence in support of the claim is well beyond *de minimis*. On a motion for leave, it is no doubt appropriate for the court to engage in some weighing of the evidence. On a case such as this one, where there was a drop in share prices, and there is credible, complex and competing evidence on whether misrepresentations have a material effect on share prices, the reasonable possibility threshold is met and the issue should be left for trial. Accordingly, I would grant leave under s. 138.3(1) of the *Securities Act*.

Page: 36

**(4) The issue of certification should be decided by the Superior Court**

[79] In my view, it would not be appropriate for this court to decide whether the action should be certified as a class proceeding, and this issue should be sent back to the Superior Court for determination.

[80] The appellant's position is that, if this court grants the appeal on the leave issue, the court should also grant an order certifying the action as a global class proceeding. In making this argument, the appellant suggested that the respondents have conceded that the action meets most aspects of the test for certification pursuant to s. 5(1)(a) of the *Class Proceedings Act*.

[81] The respondents dispute that they have made these concessions and that the case is appropriate for certification as a global class proceeding.

[82] In his decision, the motion judge dismissed the motion for certification only on the basis of his finding that the claim does not disclose a cause of action. In doing so, he found that the claim did not plead sufficient particulars of the misrepresentations made by each defendant and that the claim does not address the materiality of each individual alleged misrepresentation. Given my conclusion above that this was a mischaracterization of the claim, in my view, the motion judge erred in finding that the claim fails to disclose a cause of action.

[83] However, it would not be appropriate for this court to decide that the action meets all requirements for certification, including as a global class proceeding. The

Page: 37

motion judge did not address the other requirements in s. 5(1) of the *Class Proceedings Act* for certification of the action nor did he address whether the action should be certified on a global basis. The Superior Court is in a better position to address these issues at first instance.[3]

## D.    DISPOSITION

[84]   I would allow the appeal and grant leave to proceed with the misrepresentation action under s. 138.3 of the *Securities Act*. I would remit the issue of whether the action should be certified as a class proceeding back to the Superior Court for determination.

[85]   As agreed between the parties, the appellant is entitled to costs of $35,000 inclusive of disbursements and HST.     *K.F.*

Released: September 26, 2022

C. Favreau J.A.

I agree K. Feldman J.A.

I agree. J.B. Roberto J.A.

---

[3] Given that the plaintiff has narrowed his proposed claim as reflected in para. 36 above, presumably the certification motion will proceed on the basis of a further amendment to the statement of claim that reflects these changes.