# EXHIBIT B

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

**SECURITIES ACT OF 1933**
**Release No. 11124 / October 24, 2022**

**SECURITIES EXCHANGE ACT OF 1934**
**Release No. 96138 / October 24, 2022**

**ACCOUNTING AND AUDITING ENFORCEMENT**
**Release No. 4358 / October 24, 2022**

**ADMINISTRATIVE PROCEEDING**
**File No. 3-21216**

|  |  |
|---|---|
| **In the Matter of**<br><br>**WILLIAM HILSON, CPA, CA**<br><br>**Respondent.** | **ORDER INSTITUTING PUBLIC ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933, SECTIONS 4C AND 21C OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 102(e) OF THE COMMISSION'S RULES OF PRACTICE, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER** |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate that public administrative and cease-and-desist proceedings be, and hereby are, instituted against William Hilson ("Respondent" or "Hilson") pursuant to Section 8A of the Securities Act of 1933

("Securities Act"), Sections 4C[1] and 21C of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 102(e)(1)(iii) of the Commission's Rules of Practice.[2]

**II.**

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over him and the subject matter of these proceedings, which are admitted, Respondent consents to the entry of this Order Instituting Public Administrative and Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act, Sections 4C and 21C of the Exchange Act, and Rule 102(e) of the Commission's Rules of Practice, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order ("Order"), as set forth below.

**III.**

On the basis of this Order and Respondent's Offer, the Commission finds[3] that:

**SUMMARY**

1.     This matter involves fraudulent conduct by William Hilson, a former senior executive of Cronos Group Inc. ("Cronos"), a Canadian-based issuer in the cannabis industry. In the third quarter of 2019, Hilson, the company's then-Chief Commercial Officer ("CCO"),

---

[1]     Section 4C provides, in relevant part, that:

> The Commission may censure any person, or deny, temporarily or permanently, to any person the privilege of appearing or practicing before the Commission in any way, if that person is found . . . (1) not to possess the requisite qualifications to represent others; (2) to be lacking in character or integrity, or to have engaged in unethical or improper professional conduct; or (3) to have willfully violated, or willfully aided and abetted the violation of, any provision of the securities laws or the rules and regulations issued thereunder.

[2]     Rule 102(e)(1)(iii) provides, in pertinent part, that:

> The Commission may . . . deny, temporarily or permanently, the privilege of appearing or practicing before it . . . to any person who is found…to have willfully violated, or willfully aided and abetted the violation of any provision of the Federal securities laws or the rules and regulations thereunder.

[3]     The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

negotiated the sale of cannabis flower, also known as biomass, to a third-party manufacturer ("Company A"). The sale was part of a broader effort by Cronos to dispose of its existing stock of cannabis flower, which was of lower quality, and therefore, unsaleable in its retail market, to clear out the company's limited vault storage space. Cronos was also motivated to increase its revenue for the pertinent quarter in order to close the gap with internal revenue targets.

2.        To induce Company A into agreeing to purchase the biomass in the third quarter, Hilson orally agreed with Company A to repurchase the cannabis, either as a derivative product or in some other form, in the following quarter. Hilson was not authorized to enter into such a buy back arrangement with Company A. Nor did Hilson disclose to anyone else at Cronos the nature of his oral repurchase agreement with Company A. Under the applicable accounting guidance, the agreement between Hilson and Company A precluded Cronos from recognizing the revenue from this sale of biomass.

3.        Because Hilson did not disclose to others at Cronos the terms of his oral repurchase agreement, Cronos improperly recognized revenue in the amount of $2.3 million USD in connection with the sale of the cannabis flower to Company A, resulting in a material error in its financial statements furnished to the Commission for the third quarter of 2019.

**RESPONDENT**

4.        William Hilson, a Canadian citizen, resides in Toronto. Hilson served as Cronos' Chief Financial Officer ("CFO") from October 2016 to April 2019. He served as Cronos' CCO from April 2019 to December 2019, at which point he left the company. Since 1999, Hilson has held a Chartered Accountant (CA) designation in Canada and has subsequently also been designated as a Chartered Professional Accountant (CPA).[4]

**RELATED PARTY**

5.        Cronos Group Inc. is incorporated in the Province of British Columbia and is principally headquartered in Toronto, Ontario. Cronos engages in the cultivation, manufacturing, and marketing of cannabis and cannabis-derived products. Cronos' securities, which are registered with the Commission pursuant to Section 12(b) of the Exchange Act, are dually-listed on the Toronto Stock Exchange and on the NASDAQ (ticker: CRON). From March 2018 through December 31, 2019, Cronos qualified as a foreign private issuer and had reporting, books and records, and internal controls obligations under Sections 13(a) and 13(b) of the

---

[4]        A "Chartered Accountant" designation was one of three professional designations granted by Canadian accounting bodies to accountants who satisfied requisite educational coursework and training and passed required exams, similar to Certified Public Accountant licenses in the United States. In 2014, the Canadian accounting bodies merged to form a unified Chartered Professional Accountants of Canada (CPA Canada), which would thereafter offer the single CPA designation. Accountants with any of the previously held designations, including chartered accountants, were allowed to waive into CPA Canada membership and until November of this year, must use the designation "CPA, CA" after which they should only use the "CPA" designation.

3

Exchange Act and related rules thereunder. As a foreign private issuer, Cronos' financial statements were prepared in accordance with International Financial Reporting Standards ("IFRS"). As of January 1, 2020, Cronos began reporting as a U.S. domestic issuer and prepared its financial statements in accordance with U.S. generally accepted accounting principles ("GAAP"). During the relevant period, Cronos offered and sold securities through the Amended and Restated Stock Option Plan, dated May 26, 2015, and the 2018 Stock Option Plan, dated June 28, 2018, which were registered on Forms S-8 filed with the Commission.

## FACTS

### Cronos' Evolving Business in 2019

6.          At the start of 2019, Cronos' business was primarily focused on the cultivation and growth of cannabis flower, which the company in turn expected to sell under various brands in the retail market. However, beginning in early 2019 and continuing throughout that year, an insect infestation of certain biomass in the company's cultivation facilities rendered that biomass unsuitable for cannabis flower retail sales as originally expected. Cronos also lacked the manufacturing ability to convert the biomass to other uses. As a result, Cronos was left with a large supply of lower-quality biomass in its limited vault storage facilities. In response, Cronos was motivated throughout 2019 to sell off its inventory of lower-quality biomass to free up space in its storage facilities.

7.          Around the same time, in anticipation of forthcoming regulatory changes, Cronos made a strategic decision to enter the cannabis vaporizer market. As part of its shift in business strategy, Cronos sought to procure a supply of cannabis resin, a key input of vaporizer cartridges used in the production of vaporizer products. Cronos, however, lacked the in-house manufacturing capability to convert biomass into resin.

8.          To that end, in July 2019, Cronos entered into a contract manufacturing agreement (the "CMO Agreement") with Company A. As described in the CMO Agreement, Cronos and Company A would jointly source biomass as the raw material input—either from Cronos or from third-party cultivators—and Company A would perform all other steps in the production of vaporizer cartridges, including converting the biomass into resin. Cronos preferred that Company A procure the biomass for its vaporizer products from third-parties to avoid using Cronos' lower-quality biomass.

9.          Pursuant to the terms of the CMO Agreement, Cronos retained title and ownership of any biomass and other input materials provided to Company A as well as any vaporizer products produced by Company A. Accordingly, the provision of biomass to Company A by Cronos did not constitute a sales transaction or result in the recognition of revenue. Rather, Cronos could recognize revenue under the CMO Agreement only when a vaporizer cartridge was ultimately sold by Cronos. The CMO Agreement did not include terms permitting Cronos to sell biomass outright to Company A.

4

10.     Company A proceeded to procure biomass for the purpose of converting the biomass into resin for use in vaporizer products and, in accordance with the terms of the CMO Agreement, would then issue an invoice to Cronos for payment.

11.     Hilson served as Cronos' CFO until April 2019, and thereafter became CCO until he separated from Cronos in December 2019.  In his role as CCO, Hilson was familiar with the CMO Agreement with Company A, as well as the terms under which Cronos would provide biomass to Company A for conversion into resin.

**Third Quarter 2019 Sale of Biomass to Company A**

12.     In September 2019, consistent with its goal of increasing space in its limited storage facilities, Cronos approached Company A about the possibility of selling some of its existing lower-quality biomass to Company A.  In addition, Cronos was seeking to increase reported revenue in its third quarter 2019 as the company was facing a shortfall between its projected third quarter revenue and internal revenue targets for the quarter largely due to lower than expected sales in its retail channel.  Revenue from its wholesale channel, which the company had not anticipated would be a core sales channel, became necessary to bridge the gap.

13.     On September 19, 2019, a senior executive at Company A emailed Hilson informing him that, although Company A had no need to purchase Cronos' biomass, the company would enter into such a transaction, in part to help Cronos meet its revenue goals. However, the senior executive made clear that Company A would purchase Cronos' biomass only if Cronos agreed to buy it back as a derivative product or in some other form in the following quarter.  Hilson orally agreed to the condition proposed by the senior executive at Company A although he was not authorized to enter into such a buy back arrangement.  Hilson did not disclose to others at Cronos that he had orally committed to Company A that Cronos would repurchase the cannabis as a derivative product or in some other form in the following quarter.

14.     As Hilson led the negotiations for the sale of biomass to Company A, he was specifically instructed by a senior company executive that the biomass sale to Company A could not be pursuant to the CMO Agreement, in part because Cronos did not want its lower-quality biomass being used by Company A as part of the vaporizer production.  As a result, the contemplated sale of biomass from Cronos to Company A would be treated as a routine sales transaction, unrelated to the CMO Agreement.

15.     On September 27, 2019, Company A issued a purchase order to Cronos for approximately $3.1 million CAD ($2.4 million USD) of biomass, and a few days later, Cronos issued an invoice to Company A for the sale and shipped the product to Company A.  Neither the purchase order nor the invoice made any reference to the CMO Agreement.  In connection with

5

this biomass sale in September 2019, Cronos recognized $3.0 million CAD ($2.3 million USD) in revenue in its third quarter 2019 financial results.

16.      In November 2019, as part of the quarterly close process, Hilson signed a sub-certification as a financial statement reviewer certifying that Cronos' quarterly financial statements were accurate, within his areas of responsibility, and that he was not aware of any fraud involving the statements.  Hilson did not disclose that he had entered into an oral buy back agreement with Company A related to the September 2019 sale of biomass.

17.      In early December 2019, upon learning of Hilson's upcoming departure from Cronos, the senior executive at Company A contacted Hilson to discuss payment in connection with their prior agreement.

18.      In January 2020, Company A informed Cronos that it had purchased the biomass in September 2019 based on an oral commitment by Hilson to buy back the biomass in a processed form.  To date, Company A has not paid for the biomass sale, and Cronos ceased collection efforts in March 2020 after writing off the receivable.

**Hilson's Conduct Resulted in a Material Error in Cronos' Financial Statements**

19.      In September 2019, at the time Hilson entered into the oral agreement with Company A, Cronos was required to prepare financial statements in accordance with IFRS.  As is relevant here, IFRS requires that contracts have commercial substance in order to be recognized as revenue—that is, that the risk, timing, or amount of the entity's future cash flows is expected to change as a result of the contract.  *See* IFRS 15.9(d).[5]

20.      By virtue of Hilson's verbal agreement with Company A, which conditioned the sale of biomass to Company A on Cronos' commitment to repurchase the derivative product or product in some other form in the subsequent quarter, Cronos did not meet the IFRS standards to recognize revenue in connection with the biomass sale.  Specifically, the risk, timing, or amount of Cronos' cash flows was not expected to change as a result of this proposed round-trip transaction and thus, the transaction lacked commercial substance under IFRS.

21.      Because of the agreement to repurchase cannabis from Company A, Cronos improperly recognized revenue from the sale transaction in the amount of $3.0 million CAD ($2.3 million USD).  The improper revenue recognition represented 22% of Cronos' gross revenue recognized in that quarter.  As a result, Cronos furnished materially inaccurate financial statements on Form 6-K on November 11, 2019.

---

[5]      Although Cronos was required to furnish financial statements prepared in accordance with IFRS in 2019, Cronos subsequently assessed whether a restatement was necessary under GAAP.  The pertinent provisions of IFRS and GAAP, as applied here, are similar and require that a contract have commercial substance.  *See* ASC 606-10-25-1(d).

6

22.        In March 2020, Cronos furnished a Form 6-K/A for the third quarter of 2019 that restated its quarterly financial results by, among other things, excluding revenue associated with the sale of biomass to Company A in September 2019.

## VIOLATIONS

23.        As a result of the conduct described above, Hilson willfully violated Section 17(a) of the Securities Act, which prohibits fraudulent conduct in connection with the offer or sale of securities, and Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c) thereunder, which prohibit fraudulent conduct in connection with the purchase or sale of securities.

24.        As a result of the conduct described above, Hilson willfully violated Section 13(b)(5) of the Exchange Act which prohibits anyone from knowingly circumventing or knowingly failing to implement a system of internal accounting controls, or knowingly falsifying any book, record or account.  Also, Hilson willfully violated Exchange Act Rule 13b2-1, which prohibits any person from, directly or indirectly, falsifying or causing to be falsified, any book, record or account subject to Exchange Act Section 13(b)(2)(A).

25.        As a result of the conduct described above, Hilson willfully violated Exchange Act Rule 13b2-2, which prohibits any director or officer of an issuer from, directly or indirectly: (a) making or causing to be made a materially false or misleading statement; or (b) omitting or causing another person to omit to state a material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with financial statement audits, reviews, or examinations or the preparation or filing of any document or report required to be filed with the Commission.

26.        As a result of the conduct described above, Hilson willfully aided and abetted and caused Cronos' violations of Section 13(a) of the Exchange Act and Rules 13a-16 and 12b-20 promulgated thereunder, which require foreign private issuers with securities registered under Section 12 of the Exchange Act to furnish certain reports on Forms 6-K to the Commission and mandate that such reports contain such further material information necessary to make the required statements not misleading.

27.        As a result of the conduct described above, Hilson willfully aided and abetted and caused Cronos to violate Section 13(b)(2)(A) of the Exchange Act, which requires reporting companies to make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect their transactions and dispositions of their assets.

28.        As a result of the conduct described above, Hilson willfully aided and abetted and caused Cronos to violate Section 13(b)(2)(B) of the Exchange Act, which requires reporting companies to devise and maintain a system of internal accounting controls sufficient, among other things, to permit preparation of financial statements in conformity with GAAP or any other criteria

applicable to such statements.  Hilson also willfully aided and abetted and caused Cronos' violation of Exchange Act Rule 13a-15(a), which requires issuers to maintain internal control over financial reporting.

## FINDINGS

29.     Based on the foregoing, the Commission finds that Hilson willfully violated Section 17(a) of the Securities Act and Sections 10(b) and 13(b)(5) of the Exchange Act and Rules 10b-5(a), 10b-5(c), 13b2-1 and 13b2-2 thereunder and willfully aided and abetted and caused Cronos' violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-15(a) and 13a-16 thereunder.

## RELATED SETTLEMENT

30.     Hilson has entered into a settlement agreement with the Ontario Securities Commission ("OSC") that involves misconduct related to certain of the findings in the Order. Hilson acknowledges that the Commission is not imposing a civil penalty on him based on his anticipated payment of $70,000 CAD (approximately $54,000 USD) as part of his settlement agreement with the OSC.

## IV.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondent Hilson's Offer.

Accordingly, it is hereby ORDERED, effective immediately, that**:**

A.     Respondent shall cease and desist from committing or causing any violations and any future violations of Section 17(a) of the Securities Act and Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B) and 13(b)(5) of the Exchange Act and Rules 10b-5, 12b-20, 13a-15(a), 13a-16, 13b2-1, and 13b2-2 promulgated thereunder.

B.     Respondent is prohibited for three years from the date of this Order from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act.

C.     Respondent is denied the privilege of appearing or practicing before the Commission as an accountant.

D.     After three years from the date of the Order, Respondent may request that the Commission consider Respondent's reinstatement by submitting an application to the attention of the Office of the Chief Accountant.

E.      In support of any application for reinstatement to appear and practice before the Commission as a preparer or reviewer, or a person responsible for the preparation or review, of financial statements of a public company to be filed with the Commission, other than as a member of an audit committee, as that term is defined in Section 3(a)(58) of the Exchange Act, Respondent shall submit a written statement attesting to an undertaking to have Respondent's work reviewed by the independent audit committee of any public company for which Respondent works or in some other manner acceptable to the Commission, as long as Respondent practices before the Commission in this capacity and will comply with any Commission or other requirements related to the appearance and practice before the Commission as an accountant.

F.      In support of any application for reinstatement to appear and practice before the Commission as a member of an audit committee, as that term is defined in Section 3(a)(58) of the Exchange Act, as a preparer or reviewer, or as a person responsible for the preparation or review, of any public company's financial statements that are filed with the Commission, Respondent shall submit a statement prepared by the audit committee(s) with which Respondent will be associated, including the following information:

1.   A summary of the responsibilities and duties of the specific audit committee(s) with which Respondent will be associated;

2.   A description of Respondent's role on the specific audit committee(s) with which Respondent will be associated;

3.   A description of any policies, procedures, or controls designed to mitigate any potential risk to the Commission by such service;

4.   A description relating to the necessity of Respondent's service on the specific audit committee; and

5.   A statement noting whether Respondent will be able to act unilaterally on behalf of the Audit Committee as a whole.

G.      In support of any application for reinstatement to appear and practice before the Commission as an independent accountant (auditor) before the Commission, Respondent must be associated with a public accounting firm registered with the Public Company Accounting Oversight Board (the "PCAOB") and Respondent shall submit the following additional information:

1.   A statement from the public accounting firm (the "Firm") with which Respondent is associated, stating that the firm is registered with the PCAOB in accordance with the Sarbanes-Oxley Act of 2002;

9

2. A statement from the Firm with which the Respondent is associated that the Firm has been inspected by the PCAOB and that the PCAOB did not identify any criticisms of or potential defects in the Firm's quality control system that would indicate that Respondent will not receive appropriate supervision; and

3. A statement from Respondent indicating that the PCAOB has taken no disciplinary actions against Respondent since seven (7) years prior to the date of the Order other than for the conduct that was the basis for the Order.

H.   In support of any application for reinstatement, Respondent shall provide documentation showing that Respondent is currently licensed as a Chartered Professional Accountant and that Respondent has resolved all other disciplinary issues with any applicable boards of accountancy.  If Respondent is not currently licensed as a Chartered Professional Accountant, Respondent shall provide documentation showing that Respondent's licensure is dependent upon reinstatement by the Commission.

I.   In support of any application for reinstatement, Respondent shall also submit a signed affidavit truthfully stating, under penalty of perjury:

1. That Respondent has complied with the Commission suspension Order, and with any related orders and undertakings, including any orders in this proceeding or any related Commission proceedings, including any orders requiring payment of disgorgement or penalties;

2. That Respondent undertakes to notify the Commission immediately in writing if any information submitted in support of the application for reinstatement becomes materially false or misleading or otherwise changes in any material way while the application is pending;

3. That Respondent, since the entry of the Order, has not been convicted of a felony or a misdemeanor involving moral turpitude that would constitute a basis for a forthwith suspension from appearing or practicing before the Commission pursuant to Rule 102(e)(2);

4. That Respondent, since the entry of the Order:

   (a) has not been charged with a felony or a misdemeanor involving moral turpitude as set forth in Rule 102(e)(2) of the Commission's Rules of Practice, except for any charge concerning the conduct that was the basis for the Order;

   (b) has not been found by the Commission or a court of the United States to have committed a violation of the federal securities

10

laws, and has not been enjoined from violating the federal securities laws, except for any finding or injunction concerning the conduct that was the basis for the Order;

(c) has not been charged by the Commission or the United States with a violation of the federal securities laws, except for any charge concerning the conduct that was the basis for the Order;

(d) has not been found by a court of the United States (or any agency of the United States) or any state, territory, district, commonwealth, or possession, or any bar thereof to have committed an offense (civil or criminal) involving moral turpitude, except for any finding concerning the conduct that was the basis for the Order; and

(e) has not been charged by the United States (or any agency of the United States) or any state, territory, district, commonwealth, or possession, civilly or criminally, with having committed an act of moral turpitude, except for any charge concerning the conduct that was the basis for the Order.

5. That Respondent's conduct is not at issue in any pending investigation of the Commission's Division of Enforcement, the PCAOB's Division of Enforcement and Investigations, any criminal law enforcement investigation, or any pending proceeding of a State Board of Accountancy, except to the extent that such conduct concerns that which was the basis for the Order.

6. That Respondent has complied with any and all orders, undertakings, or other remedial, disciplinary, or punitive sanctions resulting from any action taken by any State Board of Accountancy, or other regulatory body.

J. Respondent shall also provide a detailed description of:

1. Respondent's professional history since the imposition of the Order, including

(a) all job titles, responsibilities and role at any employer;

(b) the identification and description of any work performed for entities regulated by the Commission, and the persons to whom Respondent reported for such work; and

11

2. Respondent's plans for any future appearance or practice before the Commission.

K. The Commission may conduct its own investigation to determine if the foregoing attestations are accurate.

L. If Respondent provides the documentation and attestations required in this Order and the Commission (1) discovers no contrary information therein, and (2) determines that Respondent truthfully and accurately attested to each of the items required in Respondent's affidavit, and the Commission discovers no information, including under Paragraph K, indicating that Respondent has violated a federal securities law, rule or regulation or rule of professional conduct applicable to Respondent since entry of the Order (other than by conduct underlying Respondent's original Rule 102(e) suspension), then, unless the Commission determines that reinstatement would not be in the public interest, the Commission shall reinstate the respondent for cause shown.

M. If Respondent is not able to provide the documentation and truthful and accurate attestations required in this Order or if the Commission has discovered contrary information, including under Paragraph K, the burden shall be on the Respondent to provide an explanation as to the facts and circumstances pertaining to the matter setting forth why Respondent believes cause for reinstatement nonetheless exists and reinstatement would not be contrary to the public interest. The Commission may then, in its discretion, reinstate the Respondent for cause shown.

N. If the Commission declines to reinstate Respondent pursuant to Paragraphs L and M, it may, at Respondent's request, hold a hearing to determine whether cause has been shown to permit Respondent to resume appearing and practicing before the Commission as an accountant.

By the Commission.


Vanessa A. Countryman
Secretary

12