# EXHIBIT E



| | | | |
|---|---|---|---|
| Ontario | Commission des | 22nd Floor | 22e étage |
| Securities | valeurs mobilières | 20 Queen Street West | 20, rue queen ouest |
| Commission | de l'Ontario | Toronto ON M5H 3S8 | Toronto ON M5H 3S8 |

**IN THE MATTER OF
WILLIAM HILSON**

**SETTLEMENT AGREEMENT**

## PART I - INTRODUCTION

1.  William Hilson was Cronos' Chief Financial Officer and later its Chief Commercial Officer. In his role as Chief Commercial Officer, Hilson was involved in a 2019 transaction in which Cronos, a public cannabis company, improperly recognized $3 million in revenue. In Hilson's role and as a Chartered Professional Accountant, he understood the need for the transaction to be properly accounted for by Cronos in its interim financial statements. He acknowledges that he failed to take appropriate steps to address the handling of revenue recognition issues for this transaction by Cronos. The interim financial statements in respect of this transaction were not prepared in accordance with generally accepted accounting principles.

2.  When public cannabis companies issue financial statements that do not provide accurate information about their financial performance and condition and fail to have adequate controls, they undermine confidence in the Ontario's capital markets and leadership in the cannabis space.

3.  The parties will jointly file a request that the Capital Markets Tribunal (the **Tribunal**) issue a Notice of Hearing to announce it will hold a hearing to consider whether, pursuant to section 127 of the *Securities Act*, RSO 1990, c S.5 (the **Act**), it is in the public interest for the Tribunal to make certain orders against the Respondent, Hilson.

**PART II - JOINT SETTLEMENT RECOMMENDATION**

4.      The Respondent consents to the making of an order (the **Order**) substantially in the form attached as Schedule "A" to this Settlement Agreement based on the facts set out in this Settlement Agreement.

5.      For the purposes of the Proceeding, and any other regulatory proceeding commenced by a securities regulatory authority, the Respondent agrees with the facts set out in Part III of this Settlement Agreement and the conclusion in Part IV of this Settlement Agreement.

**PART III - AGREED FACTS**

**A.  Hilson's Role at Cronos and the Transaction**

6.      Hilson is a Chartered Professional Accountant with a Master's of Science degree in clinical biochemistry. From about September 2016 until April 15, 2019, Hilson acted as CFO for Cronos Group Inc. (**Cronos** or the **Company**). From April 15, 2019 to December 31, 2019, Hilson was Cronos' Chief Commercial Officer.

7.      Cronos is a licensed cannabis producer in Canada with international production and distribution across five continents. The Company is listed on the TSX (CRON) and NASDAQ (CRON) with a market capitalization of about $1.19 billion as of August 29, 2022. Cronos' portfolio includes Peace Naturals, Spinach and hemp derived CBD brands, Lord Jones, Happy Dance and Peace+.

8.      In July 2019, while Hilson was Cronos' Chief Commercial Officer, Cronos entered into an agreement with a third party titled "Contract Manufacturing Agreement" (**CMO Agreement**) governing the arrangements by which the third party was to provide manufacturing services to Cronos, specifically for the manufacture of vape cartridges. Under the CMO Agreement the biomass could be supplied by Cronos or sourced on its behalf. The CMO Agreement stipulated that Cronos retained title and ownership of the biomass at all times.

9.      Hilson had input into the terms of the CMO Agreement and was aware of its terms. He made the CMO Agreement available to Cronos' accounting department for assessment of revenue recognition.

10.    In the third quarter of 2019, Hilson played a significant role in a transaction in which Cronos improperly recognized $3 million in revenue. In that transaction, Cronos entered into a wholesale transaction to sell dried cannabis to the counterparty to the CMO Agreement (the **Q3 Transaction**).

11.    Hilson negotiated the Q3 Transaction and its payment terms on behalf of Cronos.

12.    Cronos' accounting department prepared its quarterly financial statements, which included the assessment of the Q3 Transaction for revenue recognition purposes.

13.    In his role as Chief Commercial Officer, Hilson was not required to certify or approve Cronos' quarterly financial statements. However, on November 8, 2019, Hilson signed an "Internal Control Certification" in connection with the quarterly financial statements and related reported information as of and for the three months ending September 30, 2019. Hilson confirmed in the signed certification that the interim financial statements were accurate and fairly presented in all material respects Cronos' financial condition, results of operations, and cash flows as they related to his area of responsibility.

14.    The Q3 Transaction did not, in fact, meet the criteria for revenue recognition in accordance with applicable generally accepted accounting principles, in this case International Financial Reporting Standards (**IFRS**). The standard applicable to revenue recognition for the transaction was IFRS 15, *Revenue from Contracts with Customers*.

15.    The Q3 Transaction did not meet the criteria for revenue recognition because it was deemed to be a consignment sale. As a result, Cronos had overstated revenue by approximately $3 million, overstated cost of sales by approximately $1.7 million, and overstated realized fair value adjustment on inventory by approximately $3.3 million in its Consolidated Statements of Operations and Comprehensive Income (Loss), in the interim financial statements for the three and nine months ended September 30, 2019 (the **Q3 2019 Interim Financial Statements**).

16.    Hilson failed to take appropriate steps to address the handling of revenue recognition issues for the Q3 Transaction by Cronos, including by not ensuring that an analysis of revenue recognition in respect of the transaction had been prepared and considered by the Company prior to its completion of Q3 2019 Interim Financial Statements.

**B. Cronos Uncovers Errors in Financial Reporting**

17.     On February 24, 2020, Cronos announced that it was delayed in completing its 2019 financial statements and that it would delay its 2019 fourth quarter and full-year earnings release and conference call.

18.     On March 2, 2020, Cronos disclosed that it filed a Form 12b-25 with the SEC for a 15-day extension of the due date to file its Form 10-K for the year ended December 31, 2019. The Company disclosed that it had been unable to complete its financial statements for fiscal 2019 due to a continuing review by the Audit Committee of the Company's Board of Directors, with the assistance of outside counsel and forensic accountants, of several bulk resin purchases and sales of products through the wholesale channel and the appropriateness of the recognition of revenue from the transactions. The Q3 Transaction was one of these transactions.

19.     On March 17, 2020, Cronos announced that, on the recommendation of its Audit Committee and after consultation with its auditors, KPMG LLP, its previously issued unaudited interim financial statements for the first, second and third quarters of 2019 prepared in accordance with IFRS would be restated and reissued and should no longer be relied upon.

20.     The Company disclosed that its Audit Committee had been conducting a review of the transactions, including the Q3 Transaction, and the restatement was being made to eliminate certain of these transactions through the wholesale channel. The Company further disclosed that, in connection with the restatement, it anticipated that it would report one or more material weakness in internal control over financial reporting (**ICFR**) when it filed its Form 10-K.

21.     On March 30, 2020, the Company announced that the Audit Committee had completed its review of the transactions and the Board had determined, on the recommendation of the Audit Committee and advice from KPMG, that the Company would restate its unaudited interim financial statements for the first, second and third quarters of 2019.

22.     The restated interim financial statements, prepared in accordance with IFRS, were filed on March 30, 2020.

23.     The restated interim financial statements disclosed that the Audit Committee review had concluded that there were accounting errors in the previously issued interim financial statements for the first and third quarters of 2019 (Q1 2019 and Q3 2019, respectively).

## PART IV - CONDUCT CONTRARY TO THE PUBLIC INTEREST

24.     Hilson is a Chartered Professional Accountant and was Cronos' former CFO. He had knowledge of Cronos' wholesale business and the CMO Agreement and negotiated the Q3 Transaction. The Q3 2019 Interim Financial Statements prepared by Cronos which recognized revenue for the Q3 Transaction were not in accordance with generally accepted accounting principles.

25.     By engaging in the conduct described in Part III of this agreement, Hilson failed to take appropriate steps to address the handling of revenue recognition issues for the Q3 Transaction by Cronos. This failure constitutes conduct contrary to the public interest.

## PART V - MITIGATING FACTORS

26.     Hilson reached a timely resolution of the matter with the OSC, which has saved resources for both the OSC and the Capital Markets Tribunal.

## PART VI - TERMS OF SETTLEMENT

27.     Hilson agrees to the terms of settlement set forth below.

28.     Hilson consents to the Order substantially in the form attached as Schedule "A", pursuant to which it is ordered that:

   (a)    this Settlement Agreement is approved;

   (b)    Hilson shall make a voluntary payment in the amount of $50,000 to the Commission by wire transfer before the commencement of the Settlement Hearing;

   (c)    Hilson shall pay costs of the Commission's investigation in the amount of $20,000 by wire transfer before the commencement of the Settlement Hearing, pursuant to section 127.1 of the Act; and

6

(d)    pursuant to subsection 127(1) of the Act, Hilson shall be prohibited from acting as a director or officer of any reporting issuer for a period of one year from the date of the Order.

29.    Hilson agrees to attend the Settlement Hearing before the Tribunal by videoconference.

30.    Hilson acknowledges that this Settlement Agreement and the Order may form the basis for orders of parallel effect in other jurisdictions in Canada. The securities laws of some other Canadian jurisdictions allow orders made in this matter to take effect in those other jurisdictions automatically, without further notice to the Respondent. The Respondent should contact the securities regulator of any other jurisdiction in which the Respondent intends to engage in any securities- or derivatives-related activities, prior to undertaking such activities.

**PART VII - FURTHER PROCEEDINGS**

31.    If the Tribunal approves this Settlement Agreement, no enforcement proceeding will be commenced or continued against the Respondent under Ontario securities law based on the misconduct described in Part III of this Settlement Agreement, unless the Respondent fails to comply with any term in this Settlement Agreement.

32.    If the Respondent fails to comply with any term in this Settlement Agreement, enforcement proceedings under Ontario securities law may be brought against the Respondent.

33.    The Respondent waives any defences to a proceeding referenced in paragraphs 31 or 32 that are based on the limitation period in the Act, provided that no such proceeding shall be commenced later than six years from the date of the occurrence of the last failure to comply with this Settlement Agreement.

**PART VIII - PROCEDURE FOR APPROVAL OF SETTLEMENT**

34.    The parties will seek approval of this Settlement Agreement at the Settlement Hearing before the Tribunal, which shall be held on a date determined by the Tribunal in accordance with this Agreement and the Tribunal's *Rules of Procedure and Forms*.

35.    The Respondent will attend the Settlement Hearing in person or, if the Settlement Hearing is held by video conference, by video conference.

36.    The parties confirm that this Settlement Agreement sets forth all of the agreed facts that will be submitted at the Settlement Hearing, unless the parties agree that additional facts should be submitted at the Settlement Hearing.

37.    If the Tribunal approves this Settlement Agreement:

    (a)    the Respondent irrevocably waives all rights to a full hearing, judicial review, or appeal of this matter under the Act; and

    (b)    neither party will make any public statement that is inconsistent with this Settlement Agreement or with any additional agreed facts submitted at the Settlement Hearing.

38.    Whether or not the Tribunal approves this Settlement Agreement, the Respondent will not use, in any proceeding, this Settlement Agreement or the negotiation or process of approval of this Settlement Agreement as the basis for any attack on the Tribunal's jurisdiction, alleged bias, alleged unfairness or any other remedies or challenges that may be available.

**PART IX - DISCLOSURE OF SETTLEMENT AGREEMENT**

39.    If the Tribunal does not make the Order:

    (a)    this Settlement Agreement and all discussions and negotiations between the parties before the Settlement Hearing will be without prejudice to either party; and

    (b)    the parties will each be entitled to all available proceedings, remedies and challenges, including proceeding to a hearing on the merits of the allegations contained in the Statement of Allegations in respect of the Proceeding. Any such proceedings, remedies

8

and challenges will not be affected by this Settlement Agreement, or by any discussions or negotiations relating to this Settlement Agreement.

40.   The parties will keep the terms of this Settlement Agreement confidential until the Tribunal approves the Settlement Agreement, except as is necessary to make submissions at the Settlement Hearing. If, for whatever reason, the Tribunal does not approve the Settlement Agreement, the terms of the Settlement Agreement shall remain confidential indefinitely, unless the parties otherwise agree in writing or if required by law.

**PART X - EXECUTION OF SETTLEMENT AGREEMENT**

41.   This Settlement Agreement may be signed in one or more counterparts which together constitute a binding agreement.

42.   A facsimile copy or other electronic copy of any signature will be as effective as an original signature.

**DATED** at **Toronto**, **Ontario** this  20th day of October, 2022.

| **"Kate McGrann"** | **"William Hilson** |
|---|---|
| Witness: | **WILLIAM HILSON** |

**DATED** at Toronto, Ontario, this 20th day of October, 2022.

   **ONTARIO SECURITIES COMMISSION**

By:   **"Jeff Kehoe"**
         Name:  Jeff Kehoe
         Title:   Director, Enforcement Branch

## SCHEDULE "A"



| | | | |
|---|---|---|---|
| Capital | Tribunal des | 22nd Floor | 22e étage |
| Markets | des marches | 20 Queen Street West | 20, rue Queen oust |
| Tribunal | financiers | Toronto ON M5H 3S8 | Toronto ON M5H 3S8 |

Ontario

---

**IN THE MATTER OF
WILLIAM HILSON**

File No.
*(Names of panelists comprising the panel)*

*(Day and date order made)*

**ORDER**
(Sections 127 and 127.1 of the
*Securities Act,* RSO 1990, c. S.5)

**WHEREAS** on [**date**] the Capital Market Tribunal held a hearing by videoconference to consider the request for approval of settlement agreement dated **[date]** (the **Settlement Agreement**);

**ON READING** the Joint Application for Settlement Hearing, including the Statement of Allegations dated [**date**] and the Settlement Agreement, the written submissions, and on hearing the submissions of representatives of each of the parties, and on considering William Hilson having made payment of each of $50,000 and $20,000 to the Commission in accordance with the terms of the Settlement Agreement,

**IT IS ORDERED** that:

1.    the Settlement Agreement is approved;

2.    Hilson shall make a voluntary payment in the amount of $50,000 to the Commission by wire transfer before the commencement of the Settlement Hearing;

3.    Hilson shall pay costs of the Commission's investigation in the amount of $20,000 by wire transfer before the commencement of the Settlement Hearing, pursuant to section 127.1 of the Act; and

4.    pursuant to subsection 127(1) of the Act, Hilson shall be prohibited from acting as a director or officer of any reporting issuer for a period of one year from the date of the Order.


_____
[Adjudicator]


_____              _____
[Adjudicator]                                                                         [Adjudicator]