UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------- x
                                            :

IN RE CRONOS GROUP INC. SECURITIES    :
LITIGATION                                   :

                                            :     <u>MEMORANDUM & ORDER</u>
                                            :
                                            :     2:20-cv-1310-ENV-JMW
                                            :
                                            :
---------------------------------------------------------- x

VITALIANO, D.J.

      Lead plaintiff Keith D. Norman, individually and on behalf of all others similarly situated, filed an amended class action complaint against Cronos Group Inc. ("Cronos"), its Chief Executive Officer, Michael Gorenstein, and its Chief Financial Officer, Jerry F. Barbato, alleging two counts:  first, violation of Securities Exchange Act of 1934 (the "Exchange Act") § 10(b), 15 U.S.C. § 78j(b) ("Section 10(b)"), as well as U.S. Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), promulgated thereunder, and second, violation of Securities Exchange Act § 20(a), 15 U.S.C. § 78t(a) ("Section 20(a)").  Am. Compl., ECF No. 37.  Defendants have now moved to dismiss the Amended Complaint.  Mot., ECF No. 45.  For the following reasons, the motion is granted.

<u>Background</u>[1]

      Incorporated in 2012, Cronos is a Canadian company operating in several facets of the global cannabis market, principally serving Canada and the United States.  Am. Compl. ¶ 27–28,

---

[1] Unless otherwise indicated, the background facts are taken from the Amended Complaint and are presumed to be true, as they must be, for the purposes of deciding this motion.  *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008) (quoting *Gorman v. Consol. Edison Corp.,* 488 F.3d 586, 591–92 (2d Cir. 2007)).

32.  From October 2016, to April 2018, Cronos sought to raise capital several times—these totaled more than US$150 million.  *Id.* ¶¶ 34–37.  Amidst that period, in February 2018, Cronos' common stock began trading on the NASDAQ under the symbol "CRON."  *Id.* ¶ 36.  Then, in the fourth quarter of 2018 ("4Q18"), Cronos announced a US$1.8 billion investment by Altria Group ("Altria"), a U.S. tobacco company.  *Id.* ¶ 39.  The investment brought Cronos' total assets from US$200 million to US$20 billion, a near ten-fold increase that dwarfed the rate of its revenue growth and raised expectations for its future performance.  *Id.* ¶¶ 6, 42–46.  The next financial quarter, 1Q19, Cronos announced a 15% increase in revenue, which different financial analysts described as either slightly below or slightly above their expectations.  *Id.* ¶¶ 48–49.

Shortly thereafter, in May of 2019, Cronos entered into two agreements with MediPharm Labs ("MediPharm"), a company specializing in producing marijuana-derived products such as cannabis oil.  *Id.* ¶ 51.  In the first of these agreements—the Supply Agreement—Cronos promised to purchase at least C$30 million (US$21.1 million)[2] of cannabis derivatives from MediPharm.  *Id.* ¶ 54.  This amount was more than 250% greater than Cronos's entire "cost of sales, marketing, and R&D budget" for the preceding two years and greater than the entirety of Cronos's sales for the preceding three years.  *Id.* ¶ 57.  The second contract—the Tolling Agreement—established a "fee for service" arrangement whereby MediPharm would receive Cronos's dried cannabis and process it into bulk resin.  *Id.* ¶ 55.

It is at this point that the dealings of the contracting parties come into plaintiff's crosshairs.[3]  When Cronos sent its cannabis to MediPharm for processing, it did not book the

---

[2] The symbol C$ refers to Canadian dollars, and the symbol US$ refers to United States dollars.  All conversions between the two are drawn from the Amended Complaint, which used a conversion ratio of C$1.42 to US$1.00.  *See* Am. Compl., n. 1.

[3] This is in harmony with the lawsuit's key time-period.  Plaintiff's action is brought "on behalf of all persons and entities who purchased or otherwise acquired the publicly traded securities of

expense as a service fee as contemplated by the Tolling Agreement.  Instead, Cronos recorded

two transactions: a *sale* of raw cannabis to MediPharm, and a *purchase* of bulk resin from

MediPharm.  *Id.* ¶¶ 59–61.  Notwithstanding their appearance on the books, these transactions

arguably lacked commercial substance, as the "purchase" and "sale" at issue were entered into

simultaneously and reciprocally.  *Id.* ¶ 64.  Plaintiff protests that, though permissible to be

recorded as "exchanges" in Cronos's books, these transactions violated applicable accounting

standards in that they should not have been listed as "sales" that generated revenue.  *Id.* ¶¶ 62–

65.  Plaintiff contends that the SEC views such "roundtrip" transactions as suspect due to their

potential for artificially inflating revenue.  *Id.* ¶ 67.  Ultimately, from these bookings, Cronos

showed 1Q19 and 3Q19 quarterly revenue growth of 15% and 24%, respectively.  *Id.* ¶¶ 70–72,

75.

Plaintiff offers a catalog of what they characterize as mis-assertions or misstatements

about the business or finances of Cronos made by defendants throughout the Class Period.  First,

they say defendants reported revenue numbers throughout 2019 that were inflated due to the

improperly characterized roundtrip transactions.  On May 9, 2019, Cronos issued a press release

and filed a Form 6-K, and Barbato hosted an earnings call, each of which, they contend, reported

the improperly inflated revenue figures for 1Q19.  *Id.* ¶¶ 75–78.  These same inflated figures

from 1Q19 were incorporated into Cronos's 2Q19 press release and its Form 6-K on August 8,

2019.  *Id.* ¶¶ 84–86.  And, on November 12, 2019, additional inflated figures for its 3Q19

revenue were similarly shared in its press release, Form 6-K, and Barbato's earnings call.  *Id.*

¶¶ 88–91.

---

Cronos on a U.S. Stock Exchange between May 9, 2019, and March 30, 2020" (the "Class
Period").  Am. Compl. ¶ 1.

Second, each of these three Form 6-Ks included: (1) statements that the reports were "prepared in accordance with International Accounting Standard ('IAS') 34"; (2) statements that Cronos's internal controls over financial reporting ("ICFR") were "designed, under the supervision of the CEO and CFO," to produce reliable financial statements in accordance with the applicable accounting standards; and (3) signed statements by Barbato and Gorenstein ("SOX certifications"). *Id.* ¶¶ 79–83, 87, 92. These SOX certifications attested, "[b]ased on my knowledge" and "reasonable diligence," that the forms contained no misrepresentations, that they fairly represented Cronos's financial performance, and that defendants designed adequate internal controls with no material design weaknesses. *Id.* ¶ 82.

But, as plaintiff points out, there would be a sudden change in defendant's tune. Around the first anniversary of its report of the reciprocal contracts with MediPharm, Cronos announced on February 24, 2020, that it was delaying release of its 4Q19 results. *Id.* ¶ 93. That day, Cronos's share price fell from US$7.15 at the prior day's close to US$6.37, a decline of 10.9%. *Id.* ¶ 94. Next, on March 2, 2020, Cronos filed an incomplete annual report for the 2019 fiscal year, explaining that its board's audit committee was reviewing "the appropriateness of the recognition of revenue" related to wholesales and bulk resin purchases. *Id.* ¶ 96. That incomplete report included MediPharm as one of three Cronos customers accounting for 10% of its 2019 net revenues—this, despite the fact that the only "sales" to MediPharm were the improper roundtrip transactions. *Id.* ¶ 99. In the wake of this news, Cronos's share price fell 11.6%, from a prior close of US$6.02 to US$5.32, raising concerns from some analysts about "aggressive accounting," "overstated revenues," "lack of oversight," and the company's "sustainability." *Id.* ¶¶ 100–03.

Two weeks later, on March 17, 2020, Cronos announced after-hours that it would not be filing a complete annual report but would need to restate its first, second, and third quarter Form 6-Ks.  *Id.* ¶ 102.  It disclosed that, due to certain "transactions through the wholesale channel," it would need to reduce its reported 1Q19 revenue by approximately US$1.8 million, or 39%, and its reported 3Q19 revenue by approximately US$3.6 million, or 40%.  *Id.* ¶¶ 106–07, 109.  Once again, the share price dropped when markets opened, this time 18.5%—from US$5.96 to US$4.86.  *Id.* ¶ 110.

The final stock decline came after Cronos issued its restated annual filings on March 30, 2020.  The restatements reduced its 1Q19 and 3Q19 revenues as anticipated.  *Id.* ¶ 114.  Cronos also issued a press release announcing that it had identified three dry-cannabis-for-bulk-resin exchanges that, in violation of applicable accounting standards, were characterized as creating revenue.  *Id.* ¶ 115.  While it identified the other company involved only as "a third party," its restatements removed MediPharm from the list of "major customers," confirming suspicions that the MediPharm agreements were the source.  *Id.* ¶¶ 118–20.  Lastly, Cronos released two reports by KPMG LLP, its external auditor, identifying several deficiencies in Cronos's internal controls—specifically, poor risk assessment, insufficient segregation of duties, and inadequate review of non-routine transactions.  *Id.* ¶¶ 121–23.  Cronos admitted that its prior internal controls, the creation and review of which management was responsible, were ineffective and led to the improper accounting of the roundtrip transactions.  *Id.* ¶¶ 124–27.  At the next day's opening, Cronos's stock fell from the prior day's close of US$6.34 to US$5.67, yet another 10.5% decline.  *Id.* ¶ 113.

Norman, for himself and the putative class, ticks off a list of acts and omissions by defendants that he says militate in favor of finding the scienter requirement satisfied.

Highlighting allegations set forth in the complaint, he cites the individual defendants' signing of the SOX certifications, *id.* ¶ 130, the magnitude of the revenue restatement, *id.* ¶ 131, the materiality of the MediPharm agreements to Cronos's overall business, *id.* ¶ 132, what he describes as the blatant violation of applicable accounting principles by the improper revenue recognition, *id.* ¶ 133, and the listing of MediPharm as a "major customer" despite it making no actual purchases from Cronos, *id.* ¶ 134. He also stresses the sophistication of Barbato, a former Senior Auditor with "degrees in accounting and business administration," and Gorenstein, a former attorney at Sullivan & Cromwell LLP. *Id.* ¶ 135. Lastly, plaintiff cites an analyst firm's October 17, 2019 report that suspected Aurora Cannabis Inc. ("ACB"), one of Cronos's "main competitors," of perpetrating a nearly identical roundtrip accounting scheme. *Id.* ¶ 136. Because of both Cronos's and ACB's prominence in the industry, Cronos's ownership of some of ACB's stock, and the analyst firm's "routine[]" coverage of Cronos itself, plaintiff claims it is "overwhelmingly likely" the defendants knew of the report. *Id.* ¶ 138.

<u>Controlling Law</u>

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court "must accept as true all [factual statements alleged] in the complaint and draw all reasonable inferences in favor of the non-moving party." *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008) (quoting *Gorman v. Consol. Edison Corp.,* 488 F.3d 586, 591–92 (2d Cir. 2007)). As a consequence, to survive a motion to dismiss, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007)).

Securities fraud claims brought under section 10(b) and Rule 10b-5 must also meet the "heightened pleading requirements" set forth in Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). *See Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012). Rule 9(b) requires that a plaintiff "state with particularity the circumstances" of any fraud claim. Fed. R. Civ. P. 9(b). The PSLRA expands on this standard, "requiring that securities fraud complaints specify each misleading statement; that they set forth the facts on which [a] belief that a statement is misleading was formed; and that they state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." *Anschutz Corp.*, 690 F.3d at 108 (alteration in original) (emphasis added) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005)); 15 U.S.C. § 78u-4(b). Critically, a "strong inference" of scienter requires a showing that is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference." *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 194 (2d Cir. 2008) (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 310, 127 S. Ct. 2499, 2502, 168 L. Ed. 2d 179 (2007)).

<u>Discussion</u>

I.    Exchange Act § 10(b)

Section 10(b) of the Exchange Act of 1934 makes it "unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). In short, this section prohibits manipulation, whether in the form of false statements or otherwise. *United States v. Royer*, 549 F.3d 886, 900 (2d Cir. 2008). Rule 10b-5, promulgated under this section of the Exchange Act, makes it "unlawful for any person, directly or indirectly . . . [t]o make any untrue statement of a material fact or to omit to state a

material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). To state a claim for relief under section 10(b) and Rule 10b-5, a plaintiff must allege that the defendant (1) made material misstatements or omissions, (2) with scienter, (3) related to the sale of securities, (4) upon which plaintiff relied, and (5) which reliance caused plaintiff's injury. *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 167 (2d Cir. 2021) (quoting *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100 (2d Cir. 2015)).

Defendants do not dispute the material-misstatement, in-connection-with, or reliance prongs of the analysis, focusing instead on the scienter prong.[4] Perforce, scienter becomes the point of departure for testing Norman's claims, positioning the Court's analysis on the two avenues for proving scienter: alleging facts that either (1) show a defendant's motive and opportunity to commit the fraud, or (2) provide strong circumstantial evidence of conscious misbehavior or recklessness. *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 212 (2d Cir. 2020) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 99 (2d Cir. 2007)).

Plaintiff concedes that the amended complaint does not allege motive-and-opportunity scienter. Opp., ECF No. 46, at 30. This alone does not doom plaintiff's claim, but where a plaintiff attempts to plead scienter with evidence of conscious misbehavior or recklessness rather than motive, "the strength of the circumstantial allegations must be correspondingly greater." *Abely v. Aeterna Zentaris Inc.*, No. 12-CV-4711 (PKC), 2013 WL 2399869, at *17 (S.D.N.Y. May 29, 2013) (quoting *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 199 (2d Cir. 2009)). Reckless conduct is "at the least, conduct which is

---

[4] Because the Court grants the motion on the scienter issue, it is unnecessary to reach the issue of loss causation, which defendants' motion also discusses.

highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir.2000) (citation and internal quotation marks omitted). While the inquiry is highly fact-based, securities fraud claims based on recklessness generally suffice to state a claim where "they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Id.*

In assessing whether a plaintiff has sufficiently pleaded a "strong inference" of scienter, a court must assess "all of the facts alleged, taken collectively . . . not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc.*, 551 U.S. at 310. For obvious practical purposes, that assessment begins with the individual factual assertions offered in the complaint:

*"Obviousness" of Accounting Errors*

Plaintiff argues that the "obviousness" of the accounting errors—namely, booking transactions under the Tolling Agreement as revenue-producing sales—weighs in favor of scienter. Opp. at 19–20. The Second Circuit has made clear that an "egregious refusal to see the obvious, or to investigate the doubtful," may give rise to an inference of scienter. *Novak*, 216 F.3d at 308. Nonetheless, such a showing generally requires plaintiff to "specifically allege[]" that "defendants [had] knowledge of facts or access to information contradicting their public statements." *Id.* Moreover, where "plaintiffs contend that defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Id.* at

309 (citing *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 812 (2d Cir. 1996)).  In *Novak*, in reversing a district court's dismissal of a class action securities fraud claim, the court pointed to the fact that various company executives had specifically demanded defendants put an end to the challenged accounting practice—to which defendants had responded that they could not "afford" to do so.  *Id.* at 304.  In the instant action, Norman has presented no comparable evidence of warnings or indicators that would give rise to a strong inference that defendants were "deliberately mak[ing] false statements."  *Id.* at 312.

The cases plaintiff cites further illuminate what the amended complaint lacks.  In *Egan*, the court found sufficient circumstantial evidence of scienter where defendant, an accounting professional, "misled" auditors and failed to correct revenue recognized from a not-yet-complete transaction *after* being confronted with "multiple indicators of fraudulent activity."  *S.E.C. v. Egan*, 994 F. Supp. 2d 558, 565–566 (S.D.N.Y. 2014).  The pleadings in *Egan* did not merely point to defendant's professional experience, or the size of the revenue misstatement at issue, but also to defendant's "active participation" in relevant sale negotiations, requests for a memorandum expressly outlining sales and profits, and receipt of the relevant sale negotiation documents.  *Id.* at 566–567 (explaining that these "'red flags' could not have a non-fraudulent explanation").

Similarly, in finding sufficient evidence of scienter to deny defendant's motion to dismiss, the court in *Veeco Instruments* cites to a litany of "specific facts constituting strong circumstantial evidence."  *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 231 (S.D.N.Y. 2006).  Among other evidence, the court cites to allegations that defendants paid overseas employees to obtain "fictitious customer sign-offs," that defendants failed to write-

10

down nonsaleable inventory after being advised of its accumulation at several meetings, and one defendant explicitly directed a subordinate to "bury" the negative adjustments into the next quarter. *Id.* Finally, the defendants in *Jacobs* were auditors found to have "recklessly conducted their audit" by ignoring "large amounts of unverified receivables" and "millions" in payments that were "questionable on their face." *RFE Inv. Partners VI, L.P. v. Jacobs*, No. 03-CV-3530 (JS)(MLO), 2006 WL 8435481, at *1 (E.D.N.Y. Sept. 15, 2006). The court in *Jacobs* did not merely rely on conclusory allegations, plaintiff made "particularized allegations that [defendants] ignored red flags." *Id.* at *2.

In seeking to analogize the instant case, Norman cleaves to his characterization of Cronos's treatment of the Tolling Agreement, proclaiming that evidence of scienter "does not get much more obvious than making up fake sales." Opp. at 19. He argues that this fraud should have been particularly obvious to Gorenstein, a former General Counsel to a large corporate law firm, and Barboto, a former Senior Auditor. Am. Compl. ¶¶ 24–25, 135. Yet, picking off past titles from their curricula vitae is where the specific pleading begins and ends. Unlike the case precedents he cites—where defendants were confronted with specific evidence of fraud that they ignored or withheld—Norman's complaint is devoid of any particularized allegations that defendants had advanced notice of fraudulent reporting.[5] Moreover, courts in the Second Circuit are clear that "[c]onclusory allegations of a defendant's skill or experience do not suffice unless it

---

[5] Norman's out-of-circuit precedent has similar shortcomings. *See In re Medicis Pharm. Corp. Sec. Litig.*, No. CV-08-1821-PHX-GMS, 2010 WL 3154863, at *5 (D. Ariz. Aug. 9, 2010) ("At the very least, the plaintiff must present facts demonstrating that the defendant was aware of the relevant GAAP principle and that this defendant knew how that principal was being interpreted.") (emphasis added); *In re Ravisent Techs., Inc.*, No. Civ.A. 00-CV-1014, 2004 WL 1563024, at *8 * n.19 (E.D. Pa. July 13, 2004) (plaintiff specifically alleged that the defendants individually approved of the contracts that were the basis of the alleged misstatements).

is specifically shown how or why the [defendant] should have believed the [misrepresentations] to be inaccurate." *Tung v. Bristol-Myers Squibb Company*, 412 F. Supp. 3d 453, 460 (S.D. N.Y. 2019) (internal citations omitted). "Where plaintiffs contend defendants had access to . . . facts [contradicting their public statements], they must specifically identify the [source of] this information"—here, Norman makes no such showing. *Id.* (citing *Novak*, 216 F.3d at 309).

In short, Norman points to the trained eyes of Gorenstein and Barbato and separately points to what he claims are obvious bookkeeping errors that trained eyes should have caught. What is missing is the allegation of connecting facts satisfying the heightened pleading requirement. Put bluntly, Norman fails to identify the specific information that should have made these misstatements obvious generally, or specifically to Gorenstein and Barbato. Unconnected, these allegations cannot support a strong inference of scienter.

*Size of Restatement*

Carrying the same thread, according to plaintiff, the magnitude of the restatement— reducing 1Q19 revenue by 39% and 3Q19 revenue by 40%—supports a strong inference that defendants were aware of the accounting errors at the relevant times. Am. Compl. ¶¶ 106–09; Opp. at 20–22. As with "obviousness," the size of a revenue restatement can support inferring scienter, but such evidence "must be presented in tandem with other circumstantial evidence to suggest scienter." *In re Turquoise Hill Res. Ltd. Sec. Litig.*, No. 13-CV-8846 (LGS), 2014 WL 7176187, at *7 (S.D.N.Y. Dec. 16, 2014) (citing *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir.2000)).

Precedent in this circuit again lays bare what Norman's pleadings lack.  In *comScore, Inc.*, the court explained that the "100% write-off of defendant's nonmonetary revenue of $43.2 million," contributes to the inference of scienter in conjunction with the fact that individual defendants also made affirmative misrepresentations that revenue calculations complied with GAAP.  *Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 553 (S.D.N.Y. 2017).  Similarly, in *Orthofix*, the court found that quarterly revenue restatements of 22%, 17%, and 1600% were significant enough to infer that defendant had notice of fraud, only when viewed in conjunction with "specific factual allegations" that defendants had knowledge that the statements in their certifications were false.  *Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 618 (S.D.N.Y. 2015).

Financial reporting errors standing alone, or explained by non-fraudulent errors, are generally insufficient to support a finding of scienter.  In *Turquoise Hill*, where defendant had restated revenues that were inflated by 32 and 36 percent over two successive years due to "material weakness in [defendant's] internal controls," the court found an inference of scienter entirely "unsupported by other factors."  2014 WL 7176187, at *7 (internal quotations omitted). Likewise, the court in *Canadian Solar* found that, despite defendant having reported a $15.4 million loss as a $15 million profit, the complaint "fails to establish a strong inference of scienter," as it fails to allege any defendant had information that would have rendered their reporting false.  *Janbay v. Canadian Solar, Inc.*, No. 10-CV-4430 (RWS), 2012 WL 1080306, at *13 (S.D.N.Y. Mar. 30, 2012).

At bottom, court's have found an inference of scienter with comparably sized restatements, but such a finding demands more than a large restatement alone.  Norman's complaint lacks "any allegation that . . . defendants had any contemporaneous basis to believe

that the information they related was incorrect"—it merely points to size.  *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 251 (S.D.N.Y. 2012).  In the absence of such contended information, an inference of scienter cannot be supported.

*Core Operations*

Plaintiff next looks to embrace the two MediPharm agreements as being "core operations of Cronos," contending that any misstatements as to their accounting support an inference of scienter.  Am. Compl. ¶ 132.  Plaintiff points to the fact that the C$30 million in expenses connected to the Medipharm agreements, projected over the course of 18 months, exceeded the combined cost of Cronos' sales, marketing, and R&D for the prior two years.  *Id.*

As a threshold matter, there is considerable question in this circuit as to whether the core operations doctrine survived the enactment of the PSLRA.  *See Zhong Zheng v. Pingtan Marine Enter. Ltd.*, 379 F. Supp. 3d 164, 181 (E.D.N.Y. 2019) (citing *In re Barrick Gold Corp. Sec. Litig.*, 341 F.Supp.3d 358, 374 (S.D.N.Y. 2018)).  In any event, "the majority rule is to consider the core operations allegations to constitute supplementary, but not an independent means to plead scienter."  *Id.*

Under this doctrine, where a defendant made false or misleading statements about core operations of a company, a showing that a defendant knew or should have known about "contradictory facts of critical importance to the company" supports an inference of scienter.  *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) (citing *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989)).  But the bar for qualifying as a core operation is high; "the operation in question [must] constitute nearly all of a company's

14

business before finding scienter." *Frankfurt-Trust Investment Luxemburg AG v. United Tech. Corp.*, 336 F. Supp. 3d 196, 225 (S.D.N.Y. 2018), *aff'd*, 779 Fed. App'x. 69 (2d Cir. 2019) (finding no strong inference of scienter when the misstatements concerned a division that constituted around 25% of the company's business); *see also In re Weight Watchers Int'l Inc. Sec. Litig.*, 2020 WL 7029134, at *20 (S.D.N.Y. 2020) (a core operation must "make up nearly all of a company's business or be essential to its survival").  In line with these precedents, core operations are more than merely "a significant area of business."  *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 738 (S.D.N.Y. 2015).  The amended complaint's assertions regarding the MediPharm agreements, and the projected revenue they represent, do not meet this exacting standard.

In an effort to enhance the centrality of the Medipharm agreements to Cronos' overall business, plaintiff takes certain liberties.  For one, the Amended Complaint juxtaposes Cronos' revenue for the 2016-2018 period with the projected revenue from the Medipharm agreements entered in May 2019 and commencing thereafter.  Am. Compl. ¶ 8, 52, 57(a).  Not only does this sidestep the relative significance of the Medipharm agreements as a percentage of total revenue for the contemporaneous time-period,[6] it skirts the fact that Cronos received a US$1.8 billion investment from Altria in 4Q18.  By the time Cronos entered the Medipharm agreements, Cronos's total assets had increased ten-fold.  Am. Compl. ¶¶ 8(a), 57(a), 132.  Plaintiff seeks to bypass this detail by contending that the US$1.8 billion Altria investment only put more pressure on Cronos to show "corresponding revenue growth," *see* Am. Compl. ¶¶ 43-44; but the argument rings hollow.  Courts are quick to dismiss any motivation for growth as providing evidence of

---

[6] The temporal disconnect is particularly glaring here as Plaintiff concedes that Cronos was a rapidly growing "development stage" company whose revenue jumped exponentially from US$419,000 in 2016 to US$12.1 million in 2018.  Am. Compl. ¶ 5.

scienter, *see S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009)

(explaining that the desire to "sustain the appearance of corporate profitability" is not sufficient

to plead fraudulent intent), and the argument only underscores Plaintiff's failure to demonstrate

that the Medipharm agreements—particularly after the Altria investment—meet the exacting

requirements of the "core operations" doctrine.

Plaintiff's second conflation is the comparison of projected future revenue to aggregate

cost of sales, marketing, and R&D budget for the prior two years. Again, Plaintiff fails to

demonstrate how the comparison of past expenses ought to weigh in the assessment of projected

revenue for purposes of determining Cronos' "core operations." Much more relevant is the

comparison of the projected revenue from the MediPharm agreements with Cronos's

contemporaneous growth: Cronos's restated 10-K discloses that, amending for the overstated

revenue, net revenue still grew from US$3.1 million in 2017 to US$12.1 million in 2018 and

US$23.8 million in 2019. ECF No. 45-7 at 49. In the context of the enormous capital injection

it received that year, and Cronos' continued revenue growth, the MediPharm agreements are not

core operations within the ambit of applicable case law.

*Violations of Accounting Standards & Weak Internal Controls*

Next, plaintiff claims that Cronos's violation of applicable accounting standards, and its

weak internal controls, support a finding of scienter. Again, the complaint is plagued by a

temporal disconnect and lacks the specific allegations that prior courts have relied on in finding

scienter. In *Varghese*, cited by plaintiff, the court draws a strong inference of scienter not merely

from the fact that defendant holding company had week internal controls, but because the

plaintiff provided strong evidence that "[d]efendants were aware of the problems" at the time they misreported their financial data. *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 606–607 (S.D.N.Y. 2009). Specifically, the *Varghese* court highlighted the abrupt removal of the CEO, and the resignation of company board and audit committee member, whose resignation email stated that the company was "very much lacking in Good Corporate Governance" and held "sham" oversight calls. *Id.* at 603.

Plaintiff also cites to *Fairway*, where plaintiff relied on a series of confidential informants to demonstrate that defendant's statements about potential growth and expansion belied a very different "contemporaneous reality." *In re Fairway Grp. Holding Corp. Sec. Litig.*, No. 14-CV-0950 (LAK), 2015 WL 249508, at *8 (S.D.N.Y. Jan. 20, 2015). While the court there found that accounting violations supported an inference of scienter, this conclusion is reached in conjunction with evidence of a high-profile resignation and alleged "access to [contradictory] facts" supported by plaintiffs' confidential witnesses within the company. *Id.* at *1516. If any such telltale signs were present during the class period, Norman's complaint fails to allege them. Norman points to the reports Cronos published by its auditor at the time Cronos amended its 10-K, which highlight a "critical accounting error" and "ineffective internal control over financial reporting." Am. Compl. ¶¶ 122123. However, glaringly absent is any assertion giving rise to a strong inference that defendant had actual knowledge, or reasonably should have based off surrounding events, at the time that any false or misleading statement was made.

Norman's remaining case law is equally unavailing. Unlike the instant case, courts finding scienter based on weak internal controls have drawn from specific allegations that the defendants were aware of the deficiencies when misstatements were made. *See, e.g.*, *In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 246 (S.D.N.Y. 2018) ("[T]he outgoing

[auditing] firm informed Mona and the Company of deficiencies in its internal controls . . . ."); *In re Grupo Televisa Sec. Litig.*, 368 F. Supp. 3d 711, 716–18 (S.D.N.Y. 2019) (defendants were alleged to have engaged "in deliberately illegal behavior" enabled by intentionally weak internal controls); *Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008) (complaint contained numerous specific allegations supporting scienter, including "repeated and knowing violations of the Company's internal controls"). The mere fact that a defendant-accountant or -lawyer was included in the corporate defendant's leadership team does not mean that such an individual was presented with the contested data at issue and provided with opportunity to make use of their specialized skills in the context of such data. As such, without any particularized allegation to the contrary the Court finds little basis here for supporting a strong inference of scienter.

*Sophistication*

Norman further argues that the individual defendants' sophistication, as a former Sullivan & Cromwell attorney and a former Senior Auditor for a large company, supports a finding of scienter. He is correct that their sophistication supports scienter. Sophistication alone, however, is insufficient to establish scienter, and the complaint lacks the type of allegations that might yield an inference of scienter. *See Abely*, 2013 WL 2399869, at *18 (finding sophistication and access to raw data insufficient to allege scienter); *In re Scot. Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 (S.D.N.Y. 2007) (finding scienter where plaintiff alleged that defendants knew of specific red flags and "actively engaged in the planning of" the transactions that formed the basis of the material misstatements). Plaintiff here alleges that Gorenstein, the former General Counsel at Sullivan and Cromwell LLP, and Barbato, a former Senior Auditor and Finance

18

Director, were "clearly sophisticated enough" to identify the accounting misstatements at issue. Am. Compl. ¶¶ 24-25, 135.  Plaintiff's complaint is rife with statements made by Gorenstein and Barbato—material misstatements which defendants do not contest—but none suggests that Gorenstein and Barbato were involved in the erroneous revenue calculation and had contemporaneous reason to know of their misstatements. While this factor leans slightly towards finding scienter, defendant's sophistication alone cannot establish scienter without additional specific allegations of knowledge.

*SOX Certifications*

More easily dispensed with is plaintiff's claim that the defendants' act of signing the SOX certifications supports scienter.  Courts, generally, have found that "these certifications typically 'add nothing substantial to the scienter calculus' because 'allowing Sarbanes-Oxley certifications to create an inference in every case . . . would eviscerate the pleading requirements for scienter set forth in the PSLRA.'"  *Zhong Zheng*, 379 F. Supp. 3d at 181 (quoting *Reilly v. U.S. Physical Therapy, Inc.*, No. 17 Civ. 2347 (NRB), 2018 WL 3559089, at *19 (S.D.N.Y. July 23, 2018)).  Rather, "a Sarbanes-Oxley certification is probative of scienter only if the complaint alleges specific contrary information, such as 'glaring accounting irregularities or other "red flags,"' of which the certifying defendant had 'reason to know.'"  *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 304–05 (S.D.N.Y. 2008) (quoting *Garfield v. NDC Health Corporation*, 466 F.3d 1255, 1266 (11th Cir. 2006)).  As discussed at length, the instant complaint does not contain such allegations.

*Allegations Against ACB*

Plaintiff's final stab towards weaving a tapestry of scienter ties to a public report making allegations of similar roundtrip transactions by Cronos's competitor, ACB.  Am. Compl. ¶ 136. Plaintiff contends that the allegations in this report—and their presumed notoriety within the industry—are sufficient to charge defendants with knowledge of their own accounting malfeasance.  But plaintiff fails to allege, under the heightened pleading standard, that the claims made in the article were sufficiently well known to infer defendant's awareness of them.

Significantly, the cases upon which Norman relies make clear that a public account of a competitor's malfeasance is insufficient to tag a defendant with scienter involving similar misconduct.  *Bankrate*, for example, involved an industry-wide problem that "was well-publicized by other companies" and that the defendant's senior management was "personally involved in directing hands-on efforts to improve" at their own company.  *Arkansas Tchr. Ret. Sys. v. Bankrate, Inc.*, 18 F. Supp. 3d 482, 486 (S.D.N.Y. 2014).  To the same effect, *Silver Wheaten* involved a competitor whose parallel malfeasance was not only "highly publicized" but against whom regulatory and penal action had already been taken.  *In re Silver Wheaton Corp. Sec. Litig.*, No. CV15-5146-CAS(JEMX), 2016 WL 3226004, at *10 (C.D. Cal. June 6, 2016). Instructively, the complaint there revealed aggravating factors, namely that defendants would have known prior to its misstatements that regulators intended to audit it.  *Id.*  The instant complaint pales in comparison.  Instead of an industry-wide problem, it identifies allegations against only one competitor, Am. Compl. ¶ 136, and it fails to allege widespread publication of the article or its underlying allegations.  Like the bulk of allegations in this complaint, this factor also fails to support an inference of scienter.

II.    Exchange Act § 20(a)

The disposition against plaintiff on his § 10(b) claim forecloses his claim under § 20(a) claim. *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014).  This claim, as a result, is dismissed.

<u>Conclusion</u>

For the reasons set forth above, the facts pleaded in the amended complaint, viewed in their totality, are found to fall short of the standard to plead scienter under the PLSR and case law.  Defendant's motion is granted in full, and the complaint is dismissed with prejudice.

The Clerk of Court is directed to enter judgment accordingly and to close this case.

    So Ordered.
 Dated: Brooklyn, New York
        November 11, 2023

                                        */s/ Eric N. Vitaliano*
                                        _____
                                        ERIC N. VITALIANO
                                        United States District Judge